**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| SABRE, INC., et al., | ) |
| | ) |
| | ) |
| VS. | ) |
| | ) |
| NORTHWEST AIRLINES, INC., | ) |
| | ) |
| | ) |
| | ) |

Misc. No. _____

Case Pending in the Northern District of Texas,
Fort Worth Division
Civil Action No. 4:04-CV-612-Y
Consolidated with 4:04-CV-907-Y (ECF)

**MEMORANDUM IN SUPPORT OF MOTION OF NORTHWEST AIRLINES, INC.**
**TO COMPEL COMPLIANCE WITH ITS**
**SUBPOENA *DUCES TECUM* TO GALILEO INTERNATIONAL, LLC**

Of Counsel:

James P. Denvir
Amy J. Mauser
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Telephone: (202) 237-2727

Parker C. Folse, III
1201 Third Avenue, Suite 3100
SUSMAN GODFREY LLP
Seattle, WA 98101
Telephone: (206) 516-3860

Thomas Tinkham
Theresa M. Bevilacqua
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600

Lewis H. Lazarus #2374
Mary B. Matterer #2696
MORRIS, JAMES, HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899
Telephone: (302) 888-6800
mmatterer@morrisjames.com

**Attorneys for**
**Northwest Airlines, Inc.**

DATED:   August 23, 2005

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  STATEMENT OF FACTS .....................................................................................3

    A.   Northwest's Claims in the Northern District of Texas ...............................3

    B.   Northwest's Subpoena to Galileo ...............................................................5

        1.   Information Requested......................................................................5

        2.   Galileo's Response to the Subpoena.................................................6

III. ARGUMENT ..........................................................................................................8

    A.   The Protective Order Addresses Galileo's Concerns That The Requested
         Information Is Commercially Sensitive, Competitive, or Proprietary.....................8

    B.   The Protective Order Will Address Any Concerns Regarding the Disclosure
         and/or Use of Information Relating to Galileo's Agreements with Other Airlines
         and Travel Agents. ......................................................................................10

    C.   Galileo's Request to Stay Its Production Pending the Resolution of Sabre's
         Motion to Dismiss Is Incompatible with the Discovery Schedule in the
         Underlying Litigation.................................................................................11

    D.   Galileo Has Failed To Demonstrate That The Subpoena Is Unduly Burdensome.12

    E.   The Information Northwest Has Requested Is Relevant.........................13

        1.   Requests Relating to Northwest's Antitrust Claim .....................14

            a.   Galileo's Contractual Relationships With Other Airlines and Its
              Pricing To Airlines...............................................................14

            b.   Northwest's Shared GDS Fee Initiative and Shared GDS Fees In
              General ................................................................................15

            c.   Galileo's Contractual Relationships With Travel Agents.................16

            d.   Competition in the Provision of Airline Flight and Fare Information
              and Booking Capability To Travel Agents and GDS Alternatives....17

        2.   Requests Relating to False Advertising and Misrepresentation Claims....18

IV.  CONCLUSION.....................................................................................................19

i

# TABLE OF AUTHORITIES

## CASES

*Austin v. Blue Cross and Blue Shield,*
  903 F.2d 1385 (11th Cir. 1990) .......................................................................................14

*Bennett v. LaPere,*
  112 F.R.D. 136 (D. R.I. 1986) ........................................................................................10

*Builders Ass'n of Greater Chicago v. City of Chicago,*
  170 F.R.D. 435 (N.D. Ill. 1996) .....................................................................................11

*Covia Partnership v. River Parish Travel Center, Inc.,*
  1991 WL 264549 (E.D. La. Dec. 4, 1991) ......................................................................10

*Flatow v. Islamic Republic of Iran,*
  201 F.R.D. 5 (D.D.C. 2001) ............................................................................................12

*Gray v. First Winthrop Corp.,*
  133 F.R.D. 39 (N.D. Cal. 1990) ......................................................................................11

*Grumman Aerospace Corp. v. Titanium Metals Corp. of Am.,*
  91 F.R.D. 84 (E.D.N.Y. 1981) ........................................................................................10

*Hickman v. Taylor,*
  329 U.S. 495 (1947)........................................................................................................13

*Horizons Titanium Corp. v. Norton Co.,*
  290 F.2d 421 (1st Cir. 1961) ...........................................................................................14

*Irons v. Karceski,*
  74 F.3d 1262 (D.C. Cir. 1996) ........................................................................................12

*Kaiser Aluminum & Chemical Corp. v. Phosphate Engineering and Construction Co.,*
  153 F.R.D. 686 (M.D. Fla. 1994) ............................................................................. 10-11

*Kreuzfeld A.G. v. Carnehammar,*
  138 F.R.D. 594 (S.D. Fla. 1991) .....................................................................................13

*Oppenheimer Fund, Inc. v. Sanders,*
  437 U.S. 340 (1978)....................................................................................................2, 13

*Seattle Times Co. v. Rhinehart,*
  467 U.S. 20 (1984)............................................................................................................8

*Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.,*
  813 F.2d 1207 (Fed. Cir. 1987)....................................................................................9, 13

*Turner Broadcasting Sys., Inc. v. Tracinda Corp.*,
    175 F.R.D. 554 (D. Nev. 1997)...................................................................................11

*United States v. Grinnell Corp.*,
    384 U.S. 563, 570-71 ..................................................................................................14

*Voyeur Dorm, L.C. v. City of Tampa*,
    2000 WL 34235978 (M.D. Fla. Apr. 19, 2000) ...................................................8, 11

## OTHER AUTHORITIES

C. Wright, A. Miller, and R. Marcus, <u>Federal Practice and Procedure</u>
    § 2043 (2005 Pocket Part).......................................................................................8, 9, 12

## I.    **INTRODUCTION**

Northwest Airlines, Inc. ("Northwest") has filed antitrust, false advertising, misrepresentation, and other claims against Sabre, Inc., Sabre Holdings Corporation, and Sabre Travel Ltd., d/b/a Sabre Travel Network ("Sabre"), and those claims are being litigated in the United States District Court for the Northern District of Texas. In connection with that litigation, Northwest served a subpoena on Galileo International, LLC ("Galileo"). Galileo has objected to the subpoena and refused to produce responsive documents. Galileo's objections fall into five categories.

*First*, Galileo objects to producing documents because it contends that the subpoena seeks competitively sensitive business information. Northwest has offered Galileo a protective order that would preclude any business person or in-house lawyer at Northwest or Sabre from reviewing or having access to such sensitive information; however, Galileo declined even to comment on drafts of the protective order or to propose an alternate protective order. In contrast, almost all of the third-parties subpoenaed by Northwest and Sabre in the litigation are producing documents pursuant to the protective order proposed by Northwest and approved and entered by the Court.

*Second*, Galileo asserts that its agreements with other airlines, and with travel agents, contain confidentiality provisions preventing the disclosure of such agreements. These agreements are relevant to the litigation between Northwest and Sabre, and any concerns relating to the confidentiality of the agreements are addressed by the protective order that has been entered in the litigation. Galileo cannot escape its discovery obligations by contracting privately for the confidentiality of documents.

*Third*, Galileo contends that it should have no obligation to produce documents in response to the subpoena as long as Sabre's motion to dismiss Northwest's antitrust claims is

pending.   The Federal Rules of Civil Procedure do not provide for a stay of discovery while a motion to dismiss is pending, and Galileo did not file such a motion.[1]  Moreover, the motion to dismiss was fully briefed on March 24, 2005, and there has been no decision on the motion.  In the meantime, there has been no stay of discovery in the litigation, and Northwest and Sabre have been conducting discovery on all issues in the case for a matter of months, pursuant to a court-ordered deadline for the completion of discovery in December.   While Northwest agreed as a courtesy to defer Galileo's production for almost five months, despite the absence of any discovery stay, it can no longer do so consistent with the December discovery deadline.

*Fourth,* Galileo contends that certain requests are burdensome.   Northwest has expressed its willingness to discuss with Galileo its concerns that any requests may be unduly burdensome, and to explore ways to narrow such requests, but Galileo has inexplicably declined Northwest's invitation to engage in such discussions, given its other objections.  Instead, it has simply stonewalled.  Galileo's blanket objection that requests are burdensome does not excuse it from responding to the subpoena, and having refused Northwest's repeated invitations to confer about its objections, it is in no position to argue those objections now.

*Fifth,* Galileo objects to the subpoena on the ground that the information sought is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.   In order for information to be discoverable, it need only "encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978).  Northwest's requests clearly meet this standard.  All of the information sought is directly relevant to the antitrust, false advertising, and misrepresentation claims that Northwest has asserted.

---

[1]      As is discussed in more detail *infra,* although Sabre filed a motion to stay early in the case, it later withdrew it and agreed to commence discovery on April 12, 2005.

## II.    STATEMENT OF FACTS

### A.    Northwest's Claims in the Northern District of Texas

Northwest has filed antitrust, false advertising, misrepresentation, and other claims against Sabre, which are pending in the U.S. District Court for the Northern District of Texas. Sabre is one of four major Global Distribution Systems ("GDS") providers. (First Amended Complaint "FAC" ¶ 16).[2]  Galileo is another. (*Id.*)  GDSs provide travel agents with computerized listings of the flights and fares of participating airlines.  GDSs also enable travel agents to book flights and issue tickets to their customers. (*Id.* ¶ 9).

Travel agents are the dominant channel for distributing air transportation services to customers. (*Id.* ¶¶ 11-13, 21.)  Because almost all travel agents subscribe to only one GDS, major airlines must participate in all four to have their flight and fare information displayed to all travel agents. (*Id.* ¶¶ 14, 22.)  This gives each GDS monopoly power over airlines. (*Id.* ¶ 23.) Travel agents do not pay GDSs for the use of their services; GDSs typically pay travel agents to use their systems. (*Id.* ¶¶ 9, 28.)  Instead of charging travel agents, each GDS charges the airline a "booking fee" for each transaction processed through its system. (*Id.*)  In 2003, Northwest paid GDS fees totaling $180 million. (*Id.*)

Because most travel agents typically pay no fees to use a GDS, and receive incentive payments from GDSs for booking through their systems, there is a perverse incentive structure that encourages the travel agents – who decide how to book tickets – to increase their GDS usage, despite the cost to the airlines and the availability of other technologies. (*Id.* ¶¶ 28-30.)

---

[2]    A copy of Northwest's First Amended Complaint against Sabre is attached hereto as Exhibit 1. Northwest's claims were originally filed in federal district court in Minnesota; they were then transferred to federal district court in Texas, and Northwest's case was consolidated with a breach of contract case filed by Sabre, which was pending in that court.

On August 24, 2004, Northwest announced a new policy intended to cut costs by changing the incentive structure. (*Id.* ¶ 36.) Starting September 1, Northwest would charge travel agents who use a GDS to issue its tickets a "Shared GDS Fee" of $7.50 per round-trip ticket and $3.75 per one-way ticket. (*Id.*) Under the new policy, travel agents who bypassed GDSs – by booking through alternate booking technologies – would pay no fee. (*Id.*)

Sabre saw Northwest's initiative as a serious threat to its monopoly over airlines, particularly if other airlines followed suit. (*Id.* ¶ 37.) In response, Sabre announced it would (a) begin biasing its GDS display by giving other airlines' flights more prominence than Northwest's, even when Northwest's flights better served a traveler's needs (*id.*), and (b) add the Shared GDS Fee into the Northwest fares displayed to travel agents, thus making its fares appear higher than they really were. (*Id.* ¶ 45.)   When Northwest did not immediately withdraw its Shared GDS Fee, Sabre carried out these threats and also falsely told travel agents who searched for first or business class seats on Northwest's international flights that none were available, although plenty were. (*Id.*)

By misrepresenting information about Northwest's service and prices to a substantial segment of the travel agents responsible for selling Northwest's tickets, Sabre sought to force Northwest to abandon its Shared GDS Fee. (*Id.* ¶ 49.) Sabre not only punished Northwest to coerce it to abandon the initiative, it also announced its actions publicly to ensure that other airlines got the message and did not match the Northwest initiative. (*Id.* ¶ 40.) Sabre's threats succeeded; no airline dared match the initiative, and on September 2, 2004, Northwest rescinded it. (*Id.* ¶¶ 50, 52.)

In response to Sabre's retaliatory conduct, Northwest filed a lawsuit against Sabre alleging, *inter alia*, claims for wrongful maintenance and abuse of its monopoly power in

violation of the Sherman Act and false advertising and misrepresentation in violation of the
Lanham Act and various state statutory and common law provisions.

**B.      Northwest's Subpoena to Galileo**

**1.      Information Requested**

On February 23, 2005, Northwest served a subpoena on Galileo requesting the production
of documents relating to the following topics:

(a)     Galileo's contracts with airlines for the time period August 24, 2004 to the present
and the booking fees that Galileo charges airlines (Request Nos. 1, 2, 3, 11, 12);

(b)     Northwest's Shared GDS Fee and shared GDS fees in general (Request Nos. 4, 5,
16);

(c)     Galileo's payments to travel agents and its agreements with them (Request Nos. 6,
7);

(d)     Any liabilities or penalties imposed on travel agents for terminating an agreement
prior to its expiration and the number of travel agents who have terminated their
agreements before they expired (Request Nos. 8, 9);

(e)     The extent to which travel agents rely on GDSs for booking flights and the extent
to which airlines rely on travel agents for the sale and distribution of tickets
(Request Nos. 17 and 18);

(f)     The effect of the position of flights on GDS screens or of screen bias on airline
bookings (Request Nos. 14, 15); and

(g)     Distribution channels other than travel agents through which airlines sell
passenger travel and the extent to which such other distribution channels are used
(Request Nos. 10, 13, 19).

A copy of the subpoena is attached hereto as Exhibit 2.

**2.    Galileo's Response to the Subpoena**

Upon receipt of the subpoena, Galileo requested additional time to serve objections to the subpoena and to produce documents. Northwest consented to Galileo's request, giving Galileo until March 16 to serve objections and until March 22 to produce documents. (Exhibit 3 (March 9, 2005 letter from Mark Altschul to Daniel Low).)

Galileo served its objections on Northwest on March 16.[3] Galileo's general objections to the subpoena included the objection that "Sabre has a pending motion to dismiss the antitrust claims for failure to state a claim." (Exhibit 4 (March 16, 2005 letter from David Wentzel to Daniel Low).). In addition, Galileo objected on the grounds that each request (a) "seeks the production of documents which would reveal trade secrets and other confidential research, development, or commercial information the disclosure of which would severely compromise Galileo"; (b) "seeks information that is neither relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of admissible evidence"; (c) is "overly broad and unduly burdensome"; and (d) "seeks information or documents that Galileo is not permitted to disclose pursuant to confidentiality obligations or agreements with third parties." (*Id.*)

On April 12, Sabre advised Galileo and all third parties served with subpoenas that it had withdrawn its motion to stay discovery, and that the parties were proceeding with discovery on all claims asserted in the litigation. (Exhibit 5 (April 12, 2005 e-mail from Racheal Turner to Galileo and other third-parties).) Thereafter, Northwest sent Galileo a letter requesting that Galileo provide a time that would be convenient "to discuss Galileo's remaining objections to Northwest's subpoena, as well as a schedule for the production of responsive documents." (Exhibit 6 (April 14, 2005 letter from Amy Mauser to Mark Altschul).) Galileo responded that it

---

[3]    On March 30, Galileo sent Northwest "amended objections" raising new objections for the first time; because these new objections are untimely, they are not addressed here.

was "in the process of assessing the latest events" and would contact Northwest once it had

evaluated how to proceed (Exhibit 7 (April 19, 2005 letter from Mark Altschul to Amy Mauser).)

On May 19, Galileo and Northwest participated in a telephone conference during which

the parties reviewed each of Galileo's objections.  During that call, Galileo reiterated its

objections to each request, and agreed to produce only standard form contracts—that is, the

blank forms that provide a starting point for negotiations with airlines—and some information on

the termination of contracts by travel agents.[4]  During that call, Northwest advised Galileo that it

was working on a protective order that would address the concerns expressed by Galileo, and

other third-parties, concerning the production of commercially sensitive, competitive, and

proprietary information.  Galileo agreed to review any draft protective order received from

Northwest.

On May 25, Northwest sent Galileo for its review and comments a draft protective order.

(Exhibit 8 (May 25, 2005 e-mail from Amy Mauser to Mark Altschul).)  In particular, the

protective order created a special class of information – "Restricted Access" – applicable only to

third-parties.   Pursuant to the proposed order, "Restricted Access" Information cannot be

reviewed by any businessperson or in-house lawyer at Northwest or Sabre.   Galileo did not

provide any comments in response to the draft protective order.

On June 13, Northwest sent Galileo another draft of the protective order for its review

and comments, which incorporated the comments that it had received from other third-parties.

(Exhibit 9 (June 13, 2005 e-mail from Amy Mauser to Mark Altschul).)   Northwest also asked

Galileo to provide a time when it would be convenient to discuss Galileo's production in

response to Northwest's subpoena.  Galileo never responded to Northwest's request.

---

[4]     That information has not yet been produced.

On July 19, 2005, Judge Terry Means, who is presiding over the litigation between Sabre

and Northwest in the Northern District of Texas entered a protective order that allows third-

parties to designate commercially sensitive, competitive, or proprietary information "Restricted

Access," and when such designation is made, provides that no businessperson or in-house lawyer

at Sabre or Northwest can review such information. (Exhibit 10.) Thereafter, Northwest advised

Galileo that the protective order had been entered, and inquired whether Galileo was still

objecting to the production of documents responsive to the subpoena. (Exhibit 11.) Galileo did

not respond.

### III.    ARGUMENT

#### A.    The Protective Order Addresses Galileo's Concerns That The Requested Information Is Commercially Sensitive, Competitive, or Proprietary.

"Under the Rules, the only express limitations are that the information sought is not

privileged, and is relevant to the subject matter of the pending action. Thus, the Rules often

allow extensive intrusion into the affairs of both litigants and third parties." *Seattle Times Co. v.*

*Rhinehart*, 467 U.S. 20, 30 (1984). Thus, "[i]t is well settled that there is no absolute privilege

for trade secrets and similar information; the protection afforded is that if the information sought

is shown to be relevant and necessary, proper safeguards will attend disclosure." C. Wright, A.

Miller, and R. Marcus, Federal Practice and Procedure § 2043 (2005 Pocket Part); *see also*

*Voyeur Dorm, L.C. v. City of Tampa*, 2000 WL 34235978, *1 (M.D. Fla. Apr. 19, 2000) (For

trade secrets and other sensitive information, "the Federal Rules of discovery contemplate their

production in a manner designed to prevent improper disclosure where the information is

relevant to matter at issue in litigation.").

The appropriate response to an objection that a discovery request, either pursuant to Rule

34 or 45, seeks sensitive commercial, competitive, or proprietary information is not to deny the

requested discovery, but rather to ensure that the information is disclosed pursuant to appropriate safeguards. In other words, "[t]he normal and expected reluctance of business firms to disclose [ ] information . . . is in itself an insufficient basis on which to deny discovery of that information under appropriate protection from divulgement to competitors. . . . [I]t is precisely the purpose and function of a protective order to protect confidential information, i.e., if the information were *not* confidential there would be less or no need for a protective order." *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1211 (Fed. Cir. 1987) (emphasis in original); *see generally* Federal Practice and Procedure § 2043 (2005 Pocket Part) ("In most cases the key issue is not whether the information will be disclosed but under what conditions, as the Supreme Court has recognized. The need for the information is ordinarily held paramount but reasonable protective measures are supplied to minimize the effect on the party making the disclosure.").

Northwest has proposed – and the Court in the Northern District of Texas has entered – a restrictive protective order that permits non-parties such as Galileo to designate their sensitive information "Restricted Access." Information bearing this designation may not be shown to any businessperson or in-house lawyer at Northwest or Sabre. Access to such information is confined to outside counsel, independent experts, and consultants (all of whom agree to be bound by court order), and the Court, and the information is to be used for no purpose other than the litigation. The vast majority of the non-parties that have been subpoenaed by Northwest and Sabre, including other airlines, have agreed to produce competitively sensitive information pursuant to this protective order.

Galileo has provided no explanation as to why it believes this protective order is inadequate, nor has it proposed an alternate protective order; accordingly, its objection to the

9

subpoena on the ground that the information requested is competitively sensitive should be overruled.

**B.    The Protective Order Will Address Any Concerns Regarding the Disclosure and/or Use of Information Relating to Galileo's Agreements with Other Airlines and Travel Agents.**

The confidentiality provisions in Galileo's contracts with other airlines and travel agents do not relieve Galileo of its obligations to produce those contracts in response to Northwest's subpoena. "Parties may not foreclose discovery by contracting privately for the confidentiality of documents." *Covia Partnership v. River Parish Travel Center, Inc.*, 1991 WL 264549, *1 (E.D. La. Dec. 4, 1991) ("The confidentiality clause in the Worldspan contract does not shield it from discovery."); *see also Grumman Aerospace Corp. v. Titanium Metals Corp. of Am.*, 91 F.R.D. 84, 87 (E.D.N.Y. 1981) ("In short, [case law] cannot fairly be extended beyond their litigation contexts to permit parties to contract privately for the confidentiality of documents, and foreclose others from obtaining, in the course of litigation, materials that are relevant to their efforts to vindicate a legal position. To hold otherwise would clearly not serve the truth-seeking function.").[5]

A protective order can address any confidentiality concerns relating to Galileo's agreements with other airlines and travel agents. As the court explained in *Kaiser Aluminum & Chemical Corp. v. Phosphate Engineering and Construction Co.*, 153 F.R.D. 686 (M.D. Fla. 1994) in requiring the production of a party's contracts with third-parties:

> Defendant does not wish to disclose any information
> relating to its contracts with third parties. Defendant
> claims that these documents are irrelevant to this litigation
> and revealing them would put it at a competitive

---

[5]    *See also Bennett v. LaPere*, 112 F.R.D. 136, 140 (D. R.I. 1986) ("[T]he settlement documents contain a boilerplate paragraph, routine in medical malpractice cases, which calls for the confidentiality of the accord and the related agreements – yet litigants cannot so easily collogue to screen themselves from the rigors of pretrial discovery.").

> disadvantage, since the documents contain trade secrets. . .
> The parties have entered into a confidentiality agreement
> that permits use of these and other discovered information
> only in the litigation and to disclose the information only to
> court approved individuals. The Magistrate found that this
> was sufficient to protect this information and that the
> documents were necessary to the preparation of Plaintiff's
> case. The Court is inclined to agree with him.

*Id.* at 688; *see also Voyeur Dorm, L.C. v. City of Tampa*, 2000 WL 34235978, *1 (M.D. Fla. Apr. 19, 2000) (For trade secrets and other sensitive information, "the Federal Rules of discovery contemplate their production in a manner designed to prevent improper disclosure where the information is relevant to matter at issue in litigation.").

### C.  Galileo's Request to Stay Its Production Pending the Resolution of Sabre's Motion to Dismiss Is Incompatible with the Discovery Schedule in the Underlying Litigation.

"Had the Federal Rules of Civil Procedure contemplated that a motion to dismiss under Fed. R. Civ. Pro. 12(b)(6) would stay discovery, the Rules would contain a provision to that effect. In fact, such a motion is directly at odds with the need for expeditious resolution of litigation." *Gray v. First Winthrop Corp.*, 133 F.R.D. 39, 40 (N.D. Cal. 1990); *see also Turner Broadcasting Sys., Inc. v. Tracinda Corp.*, 175 F.R.D. 554, 556 (D. Nev. 1997) ("[A] pending Motion to Dismiss is not ordinarily a situation that in and of itself would warrant a stay of discovery."); *Builders Ass'n of Greater Chicago v. City of Chicago*, 170 F.R.D. 435, 437 (N.D. Ill. 1996) ("But a motion to stay discovery will not be granted every time a potentially dispositive issue is placed before the court. Although Rules 26(c) and (d) do give the court authority to stay discovery, this authority must be exercised so as to 'secure the just, speedy and inexpensive determination of every action.'").

Sabre's motion to dismiss has been fully briefed since March 24, 2005. There has been no indication from the judge presiding over the litigation between Northwest and Sabre in the

Northern District of Texas as to when he intends to rule on the pending motion. Northwest agreed to defer Galileo's production in response to the subpoena for almost five months as a courtesy; however, it cannot continue to do so consistent with the December discovery deadline in the underlying litigation. The parties are proceeding with discovery on all claims in the litigation, and expect to complete discovery by December; in addition, other third parties are beginning to produce documents now that the protective order relating to document productions by non-parties has been entered.

Galileo's request to stay its production obligations pending resolution of Sabre's motion to dismiss should therefore be denied.

### D.     Galileo Has Failed To Demonstrate That The Subpoena Is Unduly Burdensome.

"[T]he burden to establish that a subpoena duces tecum is unreasonable or oppressive is on the person who seeks to have it quashed. That person cannot rely on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting upon compliance." Federal Practice and Procedure § 2459 (2005 Pocket Part); *see also Irons v. Karceski*, 74 F.3d 1262, 1264 (D.C. Cir. 1996) ("the party seeking to quash a subpoena bears a heavy burden of proof"); *Flatow v. Islamic Republic of Iran*, 201 F.R.D. 5, 8 (D.D.C. 2001) ("When the burdensomeness of a subpoena is at issue, the onus is on the party alleging the burden to prove that the subpoena violates Rule 45.").

Here, Galileo relies on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and injurious consequences. That is insufficient. If particular requests are unduly burdensome, Northwest has offered to discuss ways to narrow such requests. For example, with other non-parties, Northwest has limited the

time period covered by particular requests, or the places where non-parties must search for

responsive documents. Because Amadeus has merely asserted that the subpoena is burdensome

without explaining the extent of the burden, and has been unwilling to discuss with Northwest

ways to narrow the scope of the subpoena, its burdensomeness objection should be overruled.

Having forced Northwest to file this motion without engaging in any effort to resolve its disputes

voluntarily, Galileo should not now be permitted to explain or rely further on this objection.

### E.    The Information Northwest Has Requested Is Relevant.

The documents that Northwest has requested all seek relevant information, and the

requests are all well within the bounds of permissible discovery. "Parties may obtain discovery

regarding any matter, not privileged, that is relevant to the claim or defense of any party. . . .

Relevant information need not be admissible at trial if discovery appears reasonably calculated to

lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

> The key phrase in this definition – "relevant to the subject matter
> in the pending action" – has been construed broadly to encompass
> any matter that bears on, or that reasonably could lead to other
> matter that could bear on, any issue that is or may be in the case.
> [citation omitted]  Consistently with the notice pleading system
> established by the Rules, discovery is not limited to issues raised
> by the pleadings, for discovery itself is designed to help define and
> clarify the issues. [citation omitted]  Nor is discovery limited to
> the merits of a case, for a variety of fact-oriented issues may arise
> during litigation that are not related to the merits.

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

Thus, "[w]ith respect to the issue of 'relevancy' of discovery, discovery rules 'are to be

accorded a broad and liberal treatment.'" *Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594, 607

(S.D. Fla. 1991) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507-08 (1947)); *Truswal*, 813 F.2d

at 1211-12 ("Relevance under Rule 26(b)(1) is construed more broadly for discovery than for

trial. . . .  A district court whose only connection with a case is supervision of discovery ancillary

to an action in another district should be 'especially hesitant to pass judgment on what constitutes relevant evidence thereunder.'") (quoting *Horizons Titanium Corp. v. Norton Co.*, 290 F.2d 421, 425 (1st Cir. 1961)).

### 1.    Requests Relating to Northwest's Antitrust Claim

Identification of a relevant market and market power are essential elements of Northwest's antitrust claim. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements:  (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development of superior product, business acumen, or historic accident."). In addition, "both causation and antitrust injury are essential elements of antitrust standing." *Austin v. Blue Cross and Blue Shield*, 903 F.2d 1385, 1389 (11th Cir. 1990). Northwest's requests relate to market definition, market power, causation, and/or damages.

### a.    Galileo's Contractual Relationships With Other Airlines and Its Pricing to Airlines

GDSs, such as Galileo and defendant Sabre, provide travel agents with computerized listings of the flights and fares of participating airlines and enable them to book flights and issue tickets to customers. The vast majority of travel agents subscribe to only one GDS, rather than multiple GDSs. Instead of charging travel agents, each GDS charges the airline a "booking fee" for each transaction processed through its system. Northwest has alleged that each of the four major GDSs, including Sabre, has market power over airlines such as Northwest, who have no alternative but to pay to participate in each GDS in order to have their flights and fares displayed to those travel agents who subscribe to the GDS. In other words, computerized reservation services provided to each GDS's travel agency subscribers constitute a separate market.

Northwest's requests relating to Galileo's contracts with other airlines (Request Nos. 1, 2, and 3), and its pricing to airlines (Request Nos. 11 and 23) seek information relevant to Northwest's antitrust claims for at least three reasons:

*First,* Sabre argues that the relevant market is broader than computerized reservation services provided to each GDS's travel agency subscribers, and that GDSs compete with each other for participation by airlines such as Northwest. Northwest anticipates that the evidence of each GDS's contracts with airlines, and their pricing to airlines, will show that GDSs do not constrain each other's market power over the prices each charges to airlines and that GDSs do not compete with one another.

*Second,* the extent to which the contracts that Galileo has with other airlines contain provisions restricting the ability of airlines to take actions that would introduce competitive pressure on booking fees is directly relevant to whether Sabre's ability to exercise its market power has been enhanced by such restrictions. Evidence of such restrictions would also be relevant to issues of causation and damages in Northwest's case against Sabre.

*Third,* Northwest also anticipates that evidence of each airline's negotiations with GDSs such as Galileo will demonstrate that from an airline's perspective (a) there are no effective substitutes for each GDS's provision of fare and flight information and booking capability to the GDS's travel agent subscribers, and (b) no other product is reasonably interchangeable for access to those subscribers.

### b.    Northwest's Shared GDS Fee Initiative and Shared GDS Fees in General

Northwest's requests concerning its Shared GDS Fee and shared fees in general (Request Nos. 4, 5, and 16) relate to the conduct underlying Northwest's antitrust claim, namely, Northwest's announcement and implementation of its Shared GDS Fee and Sabre's retaliation in

response.  To the extent Galileo communicated with other airlines and/or other GDSs in response to Northwest's Shared GDS Fee, or otherwise discouraged or prevented any other airline from implementing a similar shared fee, that is further evidence of GDS market power and the efforts of GDSs to prevent the development of competitive alternatives to GDSs.  In addition, to the extent Galileo considered the possibility that an airline might initiate an effort to pass GDS fees (in whole or in part) on to travel agents or to engage in any other means of reducing the fees paid by airlines to GDSs, and the reasons for an airline doing so, this information may be relevant to, or reasonably calculated to lead to the discovery of admissible evidence relating to, the market power of GDSs and causation and damages.

### c.    Galileo's Contractual Relationships With Travel Agents

Northwest has alleged that GDSs like Galileo have used contract provisions to prevent airlines from bypassing GDSs and establishing less costly competitive alternatives for locating fare and flight information and, as a result, have caused Northwest and other airlines to pay booking fees in excess of the levels that a competitive market would produce.  For example, through their agreements with travel agents, GDSs have tied travel agents to a particular GDS for multi-year periods and have imposed substantial economic deterrents to switching among GDSs or to using less costly booking alternatives.  As a consequence, each GDS has preserved its market power over airlines such as Northwest that must continue to participate in each GDS in order to reach that GDS's travel agents' subscribers.  Sabre, on the other hand, argues that competition among GDSs for travel agency subscribers is intense and therefore undermines any claim that it possesses or can exercise market power over airlines.  Determining the nature of each GDS's contractual relationships with, and its payments to, its travel agency subscribers is directly relevant to that argument.  *See* Request Nos. 6, 7, 8, and 9.

**d.    Competition In The Provision of Airline Flight And Fare Information and Booking Capability to Travel Agents and GDS Alternatives**

As explained *supra,* Northwest has alleged that the Sabre GDS, and each of the other major GDSs, constitutes a relevant market.   Northwest's requests relating to competition in the provision of airline flight and fare information and booking capability to travel agents, and alternate technologies to the GDSs for locating fare and flight information and booking reservations, seek information directly relevant to market definition and market power. *See* Request Nos. 10, 13, 17-19.   For example, evidence concerning the extent to which airlines such as Northwest remain substantially dependent on the travel agency channel for distribution of their tickets – and the extent to which GDSs recognize that fact – is relevant to the absence of reasonable substitutes for each GDS' provision of flight and fare information and booking capability to its travel agency subscribers, and the absence of another product that is reasonably interchangeable for computerized access to those subscribers.   In addition, Northwest and other airlines offer only limited booking alternatives to GDSs for travel agency users of GDSs.   Sabre, however, contends that those alternatives and other recent new entrants demonstrate the existence of a competitive market.   The extent to which GDSs, including Galileo, view such alternatives as genuine, effective competitive substitutes for travel agency subscribers is directly relevant to issues of market definition and market power.

## 2.    False Advertising and Misrepresentation Claims

Northwest has alleged that Sabre, in retaliation for Northwest's implementation of its Shared GDS Fee, biased the display of Northwest flights so that they appeared in positions inferior to those of competing flights in Sabre's GDS display of information to travel agencies. For example, Sabre gave the flights of other airlines more prominence than Northwest's, even when Northwest's flights better served travelers' needs.  In addition to pleading antitrust claims based on such conduct, Northwest has alleged false advertising and misrepresentation claims against Sabre under the Lanham Act and state statutory provisions and common law.  Request No. 14 relating to the effects of the position of flights on GDS screens or of screen bias on airline bookings is relevant to show that the practice of display bias is effective in damaging sales of the target airline's flights.    Until recently, Department of Transportation rules prohibited the practice of display bias by GDSs, but those rules expired prior to Sabre's use of display bias against Northwest.  Evidence that other GDSs have made plans for the use of display bias would be relevant to Northwest's claim that each GDS possesses market power and does not constrain each other's use of that power. *See* Request No. 15.

IV.    **CONCLUSION**

For the foregoing reasons, Northwest's Motion to Compel Compliance With Its

Subpoena *Duces Tecum* served on Galileo should be granted.


Of Counsel:

James P. Denvir
Amy J. Mauser
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Telephone: (202) 237-2727

Parker C. Folse, III
1201 Third Avenue, Suite 3100
SUSMAN GODFREY LLP
Seattle, WA 98101
Telephone: (206) 516-3860

Thomas Tinkham
Theresa M. Bevilacqua
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600

DATED:   August 23, 2005

Lewis H. Lazarus #2374
Mary B. Matterer #2696
MORRIS, JAMES, HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19899
Telephone:  (302) 888-6800
mmatterer@morrisjames.com

**Attorneys for
Northwest Airlines, Inc.**

## CERTIFICATE OF SERVICE

It is hereby certified this 23rd day of August, 2005 that copies of the foregoing document,

**Memorandum in Support of Motion of Northwest Airlines, Inc. to Compel Compliance**

**with its Subpoena *Duces Tecum* to Galileo International, LLC,** were hereby served as

indicated:

**VIA HAND DELIVERY**

Galileo International, Inc.
c/o Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE  19808

**VIA FEDERAL EXPRESS**

Mark J. Altschull, Esq.
David F. Wentzel, Esq.
McDermott Will & Emery
227 West Monroe Street
Chicago, IL  60606
312.372.2000

Neil A. Goteiner, Esq.
Farella, Braun & Martel LLP
Russ Building
235 Montgomery Street
San Francisco, CA  94104
415.954.4400

R.H. Wallace, Esq.
Shannon Gracey Ratliff & Miller LLP
777 Main Street, Suite 3800
Fort Worth, TX  76102
817.336.9333

Fred H. Bartlit, Esq.
Bartlit, Beck, Herman, Palenchar & Scott LLP
1899 Wynkoop Street, 8th Floor
Denver, CO  80202
303.592.3100

Chris Lind, Esq.
Bartlit, Beck, Herman, Palenchar & Scott LLP
Courthouse Place, 54 West Hubbard Street
Chicago, IL  60610
312.494.4400

Mary B. Matterer #2696
mmatterer@morrisjames.com