# EXHIBIT   1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Northwest Airlines Incorporated, a
Minnesota Corporation,

    Plaintiff,

v.

Sabre, Inc.; Sabre Holdings
Corporation; and Sabre Travel
International Ltd., d/b/a Sabre Travel
Network,

    Defendants.

Civil File No. 04-CV-03889 (PAM/RLE)

**FIRST AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

 1. For its Complaint against Sabre, Inc., Sabre Holdings Corporation, and

Sabre Travel International Ltd., d/b/a Sabre Travel Network (collectively, "Sabre"),

Northwest Airlines, Inc. ("Northwest") states and alleges as follows:

## INTRODUCTION

 2. Northwest brings this suit under the federal antitrust laws to obtain relief

from Sabre's abuse of its monopoly power in the provision of computerized reservation

services to the many travel agents who subscribe to Sabre's system. Like most major

airlines, Northwest has no choice but to pay Sabre so that information about its flights

and fares will be accessible to those travel agents, enabling them to issue tickets on

Northwest flights. Because of its monopoly power, Sabre has charged Northwest and

other airline participants in the Sabre system exorbitant fees every time a travel agent

uses its system to book a flight, and those fees have increased the cost of airline travel, to

the detriment of consumers. Recently, Northwest announced policies designed to reduce Sabre's stranglehold on the industry and bring a measure of relief from the financial burden Sabre has imposed on airlines and consumers. In response, Sabre used its monopoly power to bludgeon Northwest, manipulating the information it provides to travel agents in ways plainly calculated to reduce sales of Northwest tickets in order to force Northwest to withdraw the new policies. In doing so, Sabre also sent a very strong public message to the rest of the airline industry designed to deter other carriers from matching Northwest's policies or pursuing similar initiatives. Sabre's strategy succeeded, and Northwest was forced to retreat. Unless the Court acts to enforce the antitrust laws, Sabre will not hesitate to react similarly to future initiatives designed to introduce competition into the distribution of travel services, and both Northwest and consumers will continue to pay the price. Northwest also brings this action to redress Sabre's breach of the parties' contractual agreements and for its violation of the Lanham Act and of Minnesota law through deceptive trade practices and defamation.

## PARTIES

3.      Northwest is the world's fifth largest airline, offering domestic and international travel by providing approximately 1,500 daily departures. Northwest is a corporation organized and existing under the laws of the State of Minnesota, with its principal place of business located at 2700 Lone Oak Parkway, Eagan, Minnesota.

4.      Defendant Sabre, Inc., is a Delaware Corporation with its principal place of business located at 3150 Sabre Drive, Southlake, Texas. Sabre, Inc. owns and operates the Sabre GDS used by travel agencies and others for the sale and distribution of air

2

transportation services and information.

5.     Defendant Sabre Holdings Corporation ("Sabre Holdings") is a Delaware Corporation with its principal place of business located at 3150 Sabre Drive, Southlake, Texas. Defendants Sabre, Inc., and Sabre Travel International Ltd. are subsidiaries of Sabre Holdings Corporation. Sabre Holdings directed and/or participated in the actions of these subsidiaries described in this complaint and is jointly and severally liable for their conduct.

6.     Defendant Sabre Travel International Ltd. ("Sabre Travel") is an Irish corporation, with its principal place of business located at 3150 Sabre Drive, Southlake, Texas. Sabre, Inc. and Sabre Holdings have used Sabre Travel simply as a corporate vehicle for holding contracts with airline participants in the Sabre GDS, including Northwest. Sabre Travel neither owns nor operates the Sabre GDS, and Sabre, Inc. in reality performs the services that Sabre Travel is obligated to perform under those contracts.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over all claims asserted against defendants pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between Northwest and the defendants and the amount in controversy exceeds $75,000.00. In addition, the Court has jurisdiction over Northwest's antitrust and Lanham Act claims pursuant to 28 U.S.C. § 1331.

8.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b) and (c). For venue purposes, defendants

reside and transact business in this District and a substantial portion of the events giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

9.     For decades, major airlines in the United States, including Northwest, have relied heavily on travel agents to provide consumers with information about airline services and to sell their tickets. In turn, individual travel agents have overwhelmingly relied on one of four major computerized reservation systems provided by third-party vendors, now called global distribution systems ("GDSs"), to obtain flight and fare information, make bookings, and issue tickets to their customers.[1] However, travel agents do not pay GDSs for the use of those services. Instead, every time a travel agent books a flight using a GDS, the GDS charges participating airlines a booking fee – which airlines must pay if they want their flights and fares displayed over the GDS to the travel agent – and then uses a portion of that booking fee revenue to pay travel agents for using the system. With each passing year, GDS booking fees have become an increasingly large part of airline operating expense. In 2003 alone, Northwest paid approximately $180,000,000 in booking fees to GDSs.

10.     As of 1985, bookings by travel agents accounted for approximately 60% of all airline revenues, and about 90% of those sales were made by travel agents using a GDS. By 1989, travel agents accounted for about 75% of airline ticket revenues, and over 95% of agents relied on a GDS.

---

[1]     Until recently, GDSs were known as Computer Reservation Systems ("CRSs"). In this complaint, Northwest follows the current nomenclature.

11.     In the years since 1989, airlines have begun to change the ways in which they distribute their services, particularly by using the Internet as a means by which customers may book their flights directly with carriers, bypassing GDSs (travel agents also have access to airline web-sites which allow direct booking with airlines) and allowing airlines to avoid GDS booking fees.  Nevertheless, major airlines have continued, by necessity, to rely substantially on travel agency sales booked through GDSs for a substantial portion of their ticket sales.  Sabre has estimated that as of 2003, 70% of all airline revenue continued to be generated through sales by "brick and mortar" travel agencies.  Moreover, online travel agencies (which also use GDSs, and in some cases are owned by them) account for an additional 13% of airline revenues.  In recent years, approximately 65% of Northwest's revenue has been generated by "brick and mortar" travel agencies, and another 10-15% has been generated by online agencies that use GDSs.

12.     An even larger percentage of business passengers continues to use travel agencies despite the availability of Internet sales channels.  The National Business Travel Association recently reported that less than 10% of corporate travel is booked through the Internet and that many corporations forbid their employees to book travel on the Internet, even if the employees find a lower fare through that channel.  Among travel agencies that manage high-yielding corporate travel accounts, Sabre is the dominant GDS.  As is true for most network carriers, Northwest's business travelers account for a disproportionately high share of Northwest's total passenger revenue.

13.     In short, travel agents continue to be a critical distribution outlet for major

airline sales of air passenger service. Travel agents, in turn, continue to rely almost exclusively on GDSs, resulting in steadily increasing booking fee expenses for major airlines, despite the fact that almost all travel agencies now have Internet access.

14.    Significantly, most travel agents rely primarily on only one GDS, rather than subscribing to multiple systems. In 2003, the American Society of Travel Agents reported, based on a survey of its membership, that 94% of travel agents use only one GDS system.

15.    The vast majority of travel agencies use only one GDS because it is costly and inefficient for travel agent locations to use multiple GDSs. Multiple GDS usage currently requires agencies to incur additional time, effort, and expense in searching more than a single GDS, as well as additional training costs, and requires them to implement duplicative accounting, billing, and recordkeeping systems necessary for tracking multiple GDS transactions.

16.    Travel agents cannot readily switch from one GDS to another. There are currently four major GDSs that, in theory, are available to travel agents: Sabre, Galileo, Worldspan, and Amadeus. The reality is that switching among them is rare. Standard GDS contracts require multi-year commitments from travel agents. Even if travel agents could readily switch GDS systems at the end of their multi-year contract terms, however, there are significant practical, economic, and contractual impediments to a travel agent's ability to readily and rapidly switch systems during the contract term. Those impediments help maintain each GDS system's monopoly power over airlines. As a practical matter, each GDS, including Sabre, controls access by major airlines to a

discrete, but critical, group of travel agents whose distribution services remain essential to every major airline's competitive and financial viability.

17.    A variety of factors account for the monopoly power that GDSs exert over major airlines.

18.    First, nearly half of travel agencies have contracts with GDS systems with durations of five years. Most of the remainder have contracts of at least three years duration. As a deterrent to switching prior to the expiration of the contract term, GDS contracts with travel agents typically include liquidated damage clauses that attach an onerous financial penalty to termination of the agent's contract before the expiration of its term. Even without these contractual penalties, travel agents would incur significant operational costs in switching GDS systems midstream. Moreover, GDSs have perpetuated substantial inefficiencies and cost-based impediments to any travel agency location subscribing to more than a single GDS. As a result, nearly every travel agent is irrevocably tied to a single GDS for a multi-year period.

19.    Further, although most travel agents now have the ability to access airline web sites tailored for their use to book flights, the GDSs, including Sabre, have imposed substantial penalties and disincentives on travel agents' use of alternative, and less costly, airline booking alternatives. Most GDSs— including Sabre – pay travel agents to use their services, rather than the other way around. Those payments are tied to productivity commitments by travel agencies, *i.e.*, commitments to use the GDS service for a specified volume of bookings, coupled with financial penalties or disincentives if those commitments are not reached. Thus, any booking a travel agent makes through a GDS

alternative is one less booking through a GDS that counts toward the travel agent's eligibility for productivity payments. Therefore, while travel agents have the technical ability to by-pass GDS systems when making airline bookings, there are significant financial disincentives to doing so. Travel agents have behaved consistently with the financial disincentives imposed by the GDS systems.

20.    In theory, an airline could exert countervailing leverage against GDSs, like defendants, by withholding its participation in a particular GDS since, over time, the GDS's service would become less valuable to consumers and thus to travel agents. However, any such action would impose an immediate, and unacceptably harsh, penalty on the airline in reduced bookings by travel agent subscribers to the GDS, while imposing only a future, and uncertain, cost to the GDS, which is protected from immediate harm by long term contracts with travel agents. As the Department of Transportation recently found:

> "An airline's greatest leverage for obtaining lower fees or better terms for participation will be a threat to withdraw from the system. If an airline withdraws, however, it will immediately begin losing bookings from that system .... It is true that an airline's withdrawal from a system will make that system less attractive to travel agencies, and over time the system will lose subscribers. Because the average travel agency contract has a term of three years, however, only a relatively small portion of the system's subscribers will have the ability to switch to another system in the short term. Thus the airline's revenue losses from withdrawal will be substantial and begin occurring immediately, while the system's losses in subscribers will be gradual and occur over a period of some months. In these circumstances, the system [GDS] should have the upper hand in bargaining."

21.    Despite the growth of the Internet as a means by which passengers (and travel agents) can book their travel directly with airlines, each GDS – including Sabre -

continues to enjoy monopoly power over major airlines such as Northwest. Travel agents continue to be the dominant channel for distribution of air transportation services, and travel agents continue to rely almost entirely on a single GDS. Therefore, from the standpoint of airlines, different GDSs are not substitutes for each other.

22.    In sum, in order to reach essential groups of travel agents, major airlines are compelled to deal with the GDS that serves those agents. They must have their flights and fares displayed in all four of the major GDSs; to ignore any one of them would be to sacrifice sales by the group of travel agents who exclusively use that GDS. And because of the importance of marginal revenues in the airline business, that is a sacrifice that neither Northwest, nor any other major airline, can afford to make.

23.    As a consequence, each GDS – including Sabre – constitutes a separate market for air carriers, and each is a monopolist with market power over carriers that want to sell airline tickets through its travel agency subscribers. As the United States Department of Justice has concluded:

> "Each CRS provides access to a large, discrete group of travel agents, and unless a carrier is willing to forego access to those travel agents, it must participate in every CRS. Thus, from an airline's perspective, each CRS constitutes a separate market and each system possesses market power over any carrier that wants travel agents subscribing to that CRS to sell its airline tickets."

24.    Sabre has taken a variety of steps to enhance and protect its monopoly position, including insisting on long-term contracts with travel agents and building contractual incentives and disincentives to make it difficult for travel agents to leave, or to use multiple GDSs.

25.     The major GDSs have exercised their monopoly power in a variety of ways. The practical and legal impediments to travel agents' ability to switch from one GDS to another or to use more than one system give GDSs, including Sabre, the ability to charge booking fees greatly in excess of levels that a competitive market would produce, with little or no need to compete for airline participants.

26.     In Northwest's case, GDS booking fees have increased steadily over the last decade, even though the Internet has offered a low-cost alternative to GDS systems. Northwest now pays an average booking fee of approximately $12.50 per domestic ticket issued through a GDS. GDS booking fees constitute a significant component of Northwest's costs, totaling approximately $180,000,000 in 2003. Sabre's own charges to Northwest per net flight segment booked increased from 1994 through 2003 by almost 62%. Significantly, the dramatic increase in booking fees over the last decade has occurred at a time when other analogous electronic and data input expenses have declined or remained flat, as one would expect. This is consistent with recent Department of Transportation findings that "the systems' [GDS] fees exceed competitive levels for the reasons set forth in the notice of proposed rulemaking.... We have not seen evidence that the systems' fees generally respond to market forces ...."

27.     The excessive booking fees charged by GDSs have clearly harmed consumers of airline transportation. Each year, major airlines incur hundreds of millions of dollars in monopolistically inflated booking fees, and to varying degrees, those costs have been passed on to consumers in the form of higher ticket prices.

28.     The current market structure reinforces the ability of GDSs to impose

excessive costs on the traveling public through supracompetitive booking fees. GDS purchasing decisions are made by travel agencies, but the responsibility for payment for GDS service falls on the major airlines, which have no choice but to participate in every GDS. Indeed, the airlines must pay fees to GDSs even when a passenger does not use the ticket and a refund is issued. On the other hand, travel agencies typically pay nothing to use a GDS. To the contrary, they are paid by GDSs to use their systems. As the Department of Transportation has found, "[t]ravel agencies often obtain CRS services at no cost or receive bonus payments in exchange for agreeing to use a system…. [I]n 2002 fewer than half of all travel agencies paid monthly fees for system services and … 60 percent of them received a signing bonus of some kind from the system they were using."

29.    GDSs similarly feel no pressure to reduce booking fees since they do not compete for the patronage of those who pay them – the airlines – given that major airlines have no practical choice but to list their flights and fares in all of the four principal GDSs. Rather, GDSs have the opposite incentive, since they use booking fees to cement their relationships with travel agents by paying them for use of the GDS service.

30.    This disconnection between the purchase decision and payment responsibility creates perversely misaligned incentives. Travel agents have no incentive to shop for the GDS with the lowest booking fees since they do not pay them. Indeed, because incentive payments that GDSs make to travel agencies are funded by booking fees, travel agencies actually have an incentive to choose a GDS with the highest booking fees. This harms consumers because supracompetitive booking fees increase the cost of air transportation. Consumers will therefore benefit from actions designed to increase

competition and reduce GDS fees.

31.    For these reasons, the Antitrust Division of the Department of Justice has in the past stated its view that GDS systems should be prevented from charging booking fees to airlines, causing GDSs to charge travel agents for providing flight information and booking services, thus realigning incentives so that the parties paying for GDS services, unlike the airlines, are those in a position to choose among GDS suppliers ("zero booking fee concept"). Such a structure would introduce competition among GDSs on booking fee levels and ultimately drive booking fees down to competitive levels, to the benefit of airlines and their customers.

32.    The market power of GDSs over airlines has been threatened by advances in Internet distribution of air passenger service. All of the major airlines, and most of the others, offer fares and booking services over their own web sites. And several airlines offer travel agents access to such fares to book travel for their customers through a dedicated web site. Northwest, for example, provides a dedicated web site, called WorldAgent Direct, that travel agents may use to obtain flight and fare information and to book travel on Northwest and its code share partners. Other major airlines have developed similar Internet sites. In addition, Orbitz offers a service by which travel agents may make bookings for their customers using non-GDS technology.

33.    As the Department of Transportation has found, however, despite the "development of sources of airline information and booking capabilities on the Internet [that] has created additional resources that travel agents can use .... [travel agents] continue to make most of their bookings through a [GDS] system ... [because] using

alternative booking channels is less efficient for travel agents."

34.    Moreover, even though customers have the ability to search for and book travel through "online" agencies, all of the major online travel agencies use a GDS for all or most of their bookings. For example, Travelocity (itself a subsidiary of defendant Sabre Holdings) uses the Sabre GDS, while Orbitz, Expedia, and Priceline all use the Worldspan GDS. Like Travelocity, other major online travel agencies, such as OneTravel.com and CheapTickets.com, are owned by or under common ownership with GDSs. Thus, even when a passenger uses one of these online agencies to book travel on Northwest, Northwest must still pay the GDS a booking fee, just as it would if the booking had been made through a "brick and mortar" travel agency.

35.    Each GDS's market power over airlines such as Northwest will persist as long as travel agents continue to be locked into use of a GDS for airline bookings. Each of the alternatives to GDS distribution of information and booking capability to travel agents is in its infancy, and none has succeeded, or likely will succeed in the foreseeable future, in materially undermining GDS market power.

36.    Consistent with, though more modest than, the Justice Department's "zero booking fee" concept discussed above, Northwest publicly announced a new policy on August 24, 2004, intended to reduce the burden of GDS monopoly fees on itself and its passengers by providing incentives for travel agents to use non-GDS alternatives in booking Northwest flights. Under that policy, which became effective on September 1, 2004, Northwest announced that it would bill back travel agents who booked Northwest flights through a GDS a "Shared GDS Fee" of $3.75 per one-way tickets and $7.50 per

roundtrip tickets.  Northwest made clear that no such charge would be assessed for travel

agent bookings made through booking services such as Northwest's WorldAgent Direct

site or other third-party technologies that by-pass GDSs.  Even under the new policy,

Northwest would continue to absorb approximately $5.00 of the average GDS fee per

round trip ticket.

37.    Sabre saw Northwest's initiative as a serious threat to its monopoly power

over airlines, particularly if other airlines followed suit with similar strategies of their

own.  It reacted swiftly and brutally.  First, on the day of Northwest's announcement,

Sabre publicly announced that it would bias the display of flight information in the Sabre

GDS by giving the flights of other airlines more prominent visibility than Northwest's

flights, even when Northwest's flights would better meet a customer's needs.

38.    Second, Sabre announced that it would cut off Northwest's access to certain

system data and tools enjoyed by other airline participants in the Sabre GDS.

39.    Third, Sabre announced that it would withhold from Northwest a portion of

certain discounts otherwise payable under Sabre's full content discount program.

40.    Sabre made clear in its announcement that it would follow the same

coercive course of action against any other airline participant in the Sabre direct-connect

program that charged a fee for tickets issued through Sabre.

41.    As it had threatened, Sabre immediately began biasing the display of flight

information over the Sabre GDS in ways that disadvantaged Northwest and immediately

cut off Northwest's access to system data and tools.  For example, Northwest is the only

airline to offer non-stop service between Minneapolis and Rapid City, South Dakota.  On

14

the flight display, Sabre placed the non-stop Northwest flight at the end of the third display screen, behind fourteen connecting flights on other carriers. Between Minneapolis and Winnipeg, where Northwest again is the only airline to offer non-stop service, Sabre placed the non-stop Northwest flight at the end of the third display screen, behind sixteen connecting flights on other carriers. Sabre also introduced bias on all Northwest available international flights in markets where Northwest was not the only non-stop provider between two given markets. For example, between Los Angeles and Tokyo, Sabre placed Northwest's flight on the third display screen, behind fifteen flights on other carriers.

42.    Display bias is a powerful tool that GDSs can use to disadvantage disfavored airlines. For example, a 1981 study by Sabre found that more than half of all Sabre sales came from the first line on the computer screen display, and almost 92% came from the first screen of displayed information. By placing Northwest flights at the end of the display list (well beyond the first screen of information), Sabre was attempting to ensure that few, if any, of its travel agent subscribers would book flights on Northwest.

43.    Display bias has been condemned in harsh terms by the federal courts. In *In re Air Passenger Computer Reservations Systems Antitrust Litigation*, 694 F. Supp. 1443 (C.D. Cal. 1988), the court declared:

> "Display biasing is unreasonably restrictive of competition in that it restricts competition on the merits in the air transportation business. When consumers attempt to purchase a ticket on the best available flight their final decision is not solely based upon the merits of the particular flight (flight time, price, service, etc.). Rather, biasing artificially inflates the value of the host airline's flights by listing their flights above better flights. The consumer bears the brunt of this practice by getting a less than optimal flight, and the airline with the better flight

15

has lost a sale it should have otherwise made. This type of competitive advantage depends upon the perpetration of a fraud upon the consumer. It is unreasonable and therefore an unwarranted competitive advantage because it inhibits competition on the merits."

44.    Display bias is not only a practice that works a fraud on consumers, it is a practice that Sabre Travel International Ltd. itself agreed not to use. On July 1, 2003, Northwest and Sabre Travel International Ltd. entered into an amendment to an agreement entitled Sabre Participating Carrier Distribution and Services Agreement ("Agreement"). As amended, the Agreement provided that Sabre would not introduce any "bias" based on carrier identity into its flight display – a promise that Sabre broke on August 24.

45.    When Northwest did not withdraw its Shared GDS Fee initiative in the face of Sabre's GDS screen display bias, Sabre escalated its assault, announcing on August 26 that, effective September 1, 2004, it would begin adding the Northwest "Shared GDS Fees" into the displayed price of Northwest's fares in the shopping and pricing displays of the Sabre GDS. In other words, although those fees were charges that Northwest intended to assess against *travel agents* who booked through a GDS, Sabre decided to treat them as an across-the-board *fare* increase to Northwest's *passengers*. The consequence of this plan, which Sabre put into effect on September 1, was to bias Northwest's fares in comparison to the fares of its competitors, so that when travel agents searched for the lowest fares, Northwest's appeared to be either $3.75 or $7.50 higher than they really were.

46.    Put simply, Sabre lied about Northwest's fares, in a manner calculated to

place Northwest at an even more serious competitive disadvantage. To Sabre, the fact that its travel agent subscribers might not have to pay the Shared GDS Fee at all (if they used a non-GDS technology for booking) or might not attempt to pass all of the fees on to their customers, was immaterial. It chose to treat the fee as an actual fare increase, precisely for the purpose of creating bias against Northwest's service throughout the Sabre GDS. Sabre falsely and fraudulently represented Northwest's fares to travel agents and to the public.

47.    Sabre knew that Northwest's Shared GDS Fee was not a fare increase, and knew that it would not necessarily be incurred by its subscribers or passed on to consumers even if incurred. Indeed, Sabre manipulated its system so that if a travel agent actually succeeded in booking a Northwest ticket despite the roadblocks Sabre set up, the actual issued ticket would <u>not</u> include the fictitious fare increase.

48.    Sabre did not stop with biasing its systems against Northwest flights and fares. On August 31, Sabre notified Northwest that if it did not withdraw the Shared GDS Fee initiative by midnight, Sabre would begin closing out Northwest's inventory of high-value seats on Northwest's international flights, as displayed in the Sabre GDS. When Northwest did not comply, Sabre followed through on its threat beginning on September 1, 2004. It began manipulating the data in its GDS in order to close out the availability of high-yielding business and first class travel on all of Northwest's international flights displayed in the Sabre GDS. When travel agents searched Sabre for flight information on international routes served by Northwest, the Sabre GDS showed that Northwest's business and first class cabins were full – despite the fact that ample

17

seats were available.  Once again, Sabre simply lied to its travel agent subscribers and, through them, to the public, all in a blatant effort to pressure Northwest into abandoning its "Shared GDS Fee policy."  In fact, the Shared GDS Fee policy did not even apply to international bookings.  Sabre's actions were simply a bald-faced attempt to economically coerce Northwest into dropping that policy.

49.     Sabre has engaged in other retaliatory and punitive actions against Northwest beyond those described in detail above, including turning off journey logic controls and refusing to pay Northwest discounts to which it was entitled under Sabre's full-content discount program.

50.     In implementing its retaliatory campaign against Northwest, Sabre intended to do more than merely punish and coerce Northwest.  It also sent a message to other airlines that Sabre will not tolerate actions designed to erode its monopoly power, and that any efforts by airlines to introduce more competition into the relevant market, and to wean travel agents from their single GDS dependency, will be met with a swift and harsh response.  It intended to stop other carriers from matching Northwest's announcement, and thereby kill off Northwest's new policy in its infancy.  Through these and other actions, Sabre succeeded, as no other airline matched Northwest's Shared GDS Fee initiative.

51.     There is no doubt that the true purpose behind Sabre's actions beginning August 24 was to protect its ability to charge and recover supracompetitive booking fees and to restrain competition among GDSs and with alternative forms of distribution.  It also painted a very clear picture to the entire industry about what the consequences would

be of any future efforts by carriers to liberate themselves from the burden of monopolistic booking.

52. On September 2, 2004, at 5:00 p.m., Northwest announced that it was rescinding its "Shared GDS Fee." Having accomplished its objective of bringing about Northwest's withdrawal of its initiative and deterring other airlines from matching it, Sabre advised Northwest that it was going to restore its display of Northwest's flight and fare information to the status they enjoyed prior to announcement of the Shared GDS Fee policy, *i.e.*, an unbiased display. However, Sabre continues to withhold discount payments to which Northwest was entitled for the time period during which the Shared GDS Fee policy was in effect.

53. As a result of defendants' anticompetitive conduct, absent relief from this Court, Northwest and other airlines will be forced to continue paying monopoly prices for access to GDSs, and GDSs will continue to block price competition among themselves as well as competition from on-line alternatives to GDS services provided to travel agents. And consumers will continue to foot much of the bill in the form of higher air fares.

54. Northwest has been damaged by Sabre's conduct in numerous ways, including the following: Sabre's conduct effectively prevented Northwest from successfully implementing the Shared GDS Fee policy. That policy would have enabled Northwest to reduce its booking fee charges, not only from Sabre but also from other GDSs, as travel agents moved toward non-GDS alternatives for booking Northwest flights. In addition, with respect to travel agents who continued to use GDSs, the policy would have enabled Northwest to defray at least some part of the resulting booking fees

through collection of the Shared GDS Fee from those agents. With each passing day, these elements of damages grow larger. In addition, Sabre's conduct has enabled it and the other GDSs to maintain their per segment booking fees at monopolistic levels, and Northwest is entitled to recover the resulting overcharges. Further, Sabre's manipulation of information displayed over the Sabre GDS has cost Northwest sales that it otherwise would have made through Sabre-automated travel agents. Northwest is entitled to recover these damages from Sabre, and all other losses caused by Sabre's conduct.

## MARKET DEFINITION

55. The conduct described above constitutes a violation of the federal antitrust laws, specifically, Section 2 of the Sherman Act, 15 U.S.C. §2.

56. For purposes of antitrust analysis in this case, the relevant product market consists of the provision of computerized air passenger transportation flight and fare information and booking capability (hereafter referred to as "GDS services") to travel agent subscribers of the Sabre GDS. In that market, Sabre is a seller of the relevant service and Northwest is a buyer. Northwest pays for that service primarily in the booking fees that it pays to Sabre. In this market, the services provided by other GDSs are not substitutes. Sabre provides the only practical access to Sabre-automated travel agents, since the vast majority of such travel agents only use the Sabre GDS. Because they are not effective substitutes, other GDSs do not constrain the pricing power of Sabre in setting the booking fees that airlines such as Northwest must pay. The geographic scope of this market is national.

57. In the product market described above, Northwest is a competitor of Sabre,

as well as a customer. That is because Sabre provides services not only to airlines such as Northwest (providing them a vehicle for displaying their information to travel agents and permitting flight bookings), but also to its travel agency subscribers (who use the system to access that information and to make bookings). From the standpoint of travel agents, Northwest provides an alternative to the Sabre GDS. Through Northwest's own dedicated web site for travel agents, Sabre subscribers can access Northwest flight and fare information and book travel for their customers on Northwest flights. In that sense, Northwest is a competitor of Sabre.

## BARRIERS TO ENTRY

58.    The relevant market defined above is characterized by durable barriers to entry that protect Sabre's monopoly power. No new GDS has appeared on the scene in more than a decade; to the contrary, fewer GDSs are now available to travel agents than were available 10 years ago. More importantly, several economic barriers prevent travel agents from using more than a single GDS and prevent them from rapidly and efficiently switching GDS providers prior to the termination of multi-year contract terms. The GDSs have also erected powerful economic barriers to competition from on-line alternatives to the services GDSs provide to travel agents. In short, to obtain access to Sabre-automated agents, Northwest must, and for the foreseeable future will need to, participate in the Sabre GDS system, and pay Sabre's monopolistic booking fees.

59.    Although some travel agents have indeed switched among GDSs over the years, the rate of switching has not been significant. Moreover, switching GDSs at the end of a contract term does nothing to alleviate the monopoly power of any GDS. As

long as a GDS retains a significant base of travel agent subscribers, airlines such as Northwest have no practical choice but to continue participating in that GDS's system and to continue paying the GDS's monopolistic booking fee charges. Any travel agents who switch simply become the clients of some other GDS, merely transferring some of the monopoly power of one GDS to another.

60. For reasons discussed above, at all times relevant to this complaint, and for the foreseeable future, non-GDS alternatives are not likely to induce travel agents to switch from a GDS to a non-GDS vehicle for accessing information and booking travel. Only the practical ability to switch immediately from one GDS to another, to use more than a single GDS, or to efficiently substitute on-line alternative services – none of which is possible in the current industry structure – might ultimately undermine the monopoly power of the defendant GDSs.

## MONOPOLY POWER

61. For the reasons previously explained, Sabre possesses monopoly power in the market for provision of GDS services to Sabre travel agency subscribers. Sabre's share of that market approaches 100%.

## ANTICOMPETITIVE CONDUCT

62. Sabre has engaged in a scheme to maintain its monopoly power through anticompetitive and exclusionary conduct. Northwest's August 24 initiative was a procompetitive policy, consistent with the Antitrust Division of the Justice Department's recommendations, designed to provide travel agents with incentives to create price competition among GDSs and to make use of non-GDS alternatives for booking travel –

whether on Northwest's own dedicated web site or through some other non-GDS mechanism. By retaliating against Northwest in the manner described in this complaint, and by publicly sending the message to all other participating carriers that they could expect to be punished in the same way, Sabre has engaged in anticompetitive and exclusionary conduct without any lawful business justification.

63.    The success of Sabre's actions in fact depended on their tendency to discipline and undermine Northwest. By biasing the display of Northwest information, Sabre in fact de-valued the service it provides to its travel agent subscribers. Those subscribers could no longer rely on the accuracy of flight and fare displays in the Sabre GDS and had to engage in extra time-consuming effort to search out the best flights for their customers. Similarly, when Sabre artificially closed out the availability of high-value seats on Northwest's international flights – an action that had no conceivable connection to Northwest's Shared GDS Fee, which did not even apply to international bookings – Sabre deprived its travel agent subscribers of the opportunity to sell tickets that they might otherwise have sold, thus depriving them of commission revenues (and itself of booking fees). Absent an anticompetitive motive, a company in Sabre's position would have no legitimate reason to sacrifice short term profits and to undermine the value of its own service in these ways. The fact that it did so is itself a clear indicator of the degree of Sabre's monopoly power, and a sign of the hold it maintains over its subscriber base.

## FIRST CAUSE OF ACTION

64.    Northwest incorporates paragraphs 1 through 63 of this complaint by

reference.

65.    Sabre has engaged in monopoly maintenance in violation of Section 2 of the Sherman Act.  Sabre has willfully and wrongfully maintained and abused its monopoly power in the relevant market through the anticompetitive and exclusionary conducted described herein.  Sabre's conduct has harmed competition and consumers, and it has directly and proximately caused injury to Northwest's business and property. Northwest's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

## SECOND CAUSE OF ACTION

66.    Northwest incorporates paragraphs 1 through 63 of this complaint by reference.

67.    Sabre's conduct described above breached the Sabre Participating Carrier Distribution and Services Agreement between Northwest and Sabre Travel International, Ltd., as amended (the "Agreement").

68.    Northwest has fully performed its obligations under the Agreement and has satisfied all conditions precedents to enforcement of the Agreement.

69.    Sabre's breach of contract has caused damage to Northwest in an amount in excess of $75,000.

## THIRD CAUSE OF ACTION

70.    Northwest incorporates paragraphs 1 through 63 of this complaint by reference.

71.     Northwest possessed prospective contractual relations with air travel customers who, but for Sabre's conduct, would have purchased tickets for air travel on Northwest flights.

72.     Sabre's conduct described above interfered with the air travel customers' prospective contractual relations with Northwest, by inducing or otherwise causing air travel customers not to enter into contractual relations with Northwest for air travel, and/or by preventing Northwest from acquiring or continuing the prospective contractual relations.

73.     Sabre's conduct described above was intentional and improper, and employed wrongful means in order to cause the interference.

74.     Sabre's conduct described above creates and continues an unlawful restraint of trade, and/or has as its purpose eliminating competition.

75.     Sabre's interference with Northwest's prospective contractual relations has caused damage to Northwest in an amount in excess of $75,000.

## FOURTH CAUSE OF ACTION

76.     Northwest incorporates paragraphs 1 through 63 of this complaint by reference.

77.     Sabre's conduct described above was undertaken in the course of Sabre's business.

78.     Sabre's conduct described above constitutes a deceptive trade practice within the meaning of Minn. Stat. § 325D.44 in that, without limitation, Sabre disparaged the services and business of Northwest by false or misleading representations of fact.

25

79.     Sabre's conduct described above has caused damage to Northwest in an amount in excess of $75,000, including without limitation costs of investigation and reasonable attorney's fees.

## FIFTH CAUSE OF ACTION

80.     Northwest incorporates paragraphs 1 through 63 of this complaint by reference.

81.     Sabre's conduct described above constituted the use of fraud, false pretense, misrepresentation, misleading statements and/or deceptive practices within the meaning of Minn. Stat. § 325F.69.

82.     Sabre's conduct described above was undertaken with the intent that Sabre's subscribers and air travel customers rely upon such conduct and information in connection with the sale of merchandise – to wit, airline travel.  Upon information and belief, Sabre's conduct had the intended effect, in that Sabre's subscribers and air travel customers relied upon the false information provided by Sabre to their and Northwest's detriment.

83.     Sabre's conduct described above constitutes a violation of Minn. Stat. § 325F.69.

84.     Sabre's conduct described above has caused damage to Northwest in an amount in excess of $75,000, including without limitation costs of investigation and reasonable attorney's fees.

## SIXTH CAUSE OF ACTION

85.    Northwest incorporates paragraphs 1 through 63 of this complaint by reference.

86.    Sabre's conduct described above constituted false advertising and/or promotion within the meaning of 15 U.S.C. § 1125(a).

87.    Sabre's conduct described above was undertaken in the course of Sabre's business in a manner affecting interstate commerce.  By using its Global Distribution System to reach all Sabre GDS subscribing travel agents, Sabre undertook an organized campaign to make misrepresentations and false representations and descriptions of fact regarding Northwest and its products and services.  Through its GDS, Sabre misrepresented the availability of international First and Business class seats on Northwest flights, misrepresented the fare for Northwest's flights by adding a $3.75 or $7.50 surcharge to its GDS display, and misrepresented the nature and availability of Northwest flights that would best suit a consumer's travel needs by biasing Northwest flights as described herein.

88.    Sabre's false and misleading representations were made willfully and intentionally.

89.    Sabre's conduct described above constitutes a violation of 15 U.S.C. § 1125(a).

90.    Sabre's conduct described above has caused damage and is likely to cause damage to Northwest in an amount in excess of $75,000, which Northwest is entitled to recover, together with enhanced damages and attorneys fees under the Lanham Act.

27

## SEVENTH CAUSE OF ACTION

91.    Northwest incorporates paragraphs 1 through 63 of this complaint by reference.

92.    In its August 24, 2004 press release, Sabre accused Northwest of breaching the Agreement with Sabre by imposing new and hidden fares on all domestic tickets issued through travel agencies using a GDS.  Sabre's claim of breach is false.

93.    Northwest is entitled to a declaratory judgment that by the acts and omissions alleged herein, Sabre breached the Agreement and that Northwest has not breached the Agreement.

## JURY DEMAND

94.    Northwest demands a trial by jury of all issues triable of right by a jury.

## RELIEF REQUESTED

95.    Northwest requests that the Court declare that the conduct of Sabre specified in this complaint violates Section 2 of the Sherman Act, the Lanham Act, and the Minnesota statutes pursuant to which Northwest has brought its claims.

96.    Northwest further requests that the Court issue a permanent injunction forbidding Sabre from threatening or implementing the biasing of any airline's flight or fare information, and from engaging in any other punitive or retaliatory conduct against Northwest.

97.    Northwest further requests that the Court issue such other permanent injunctive relief, as the Court deems appropriate, designed to create market conditions

capable of dissipating Sabre's unlawfully maintained monopoly power.

98.    Northwest requests that, pursuant to its antitrust causes of action, the Court award it damages against Sabre in an amount to be proven at trial, trebled as permitted under the antitrust laws, as well as interest on the award at the highest lawful rate, together with Northwest's attorneys fees and costs.

99.    Northwest further requests that the Court award it damages against Sabre pursuant to its additional causes of action, in an amount not less than $75,000.00, together with enhanced damages where permitted by law and amounts for Northwest's costs of investigation, reasonable attorneys fees, and costs of suit, and all other such amounts and relief as the Court finds equitable and just.

100.    Northwest further requests that the Court declare that Sabre has breached the Agreement and that Northwest has not breached it.

101.    Northwest also requests such other relief as the Court may deem just and proper.

September 27, 2004

DORSEY & WHITNEY LLP

By    s/Thomas Tinkham
     Thomas Tinkham #0110176
     Theresa M. Bevilacqua #031500X
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600

  Parker C. Folse, III
SUSMAN GODFREY LLP
Suite 3100
1201 Third Avenue
Seattle, WA 98101
Telephone:  (206) 516-3860

  James P. Denvir
BOIES, SCHILLER & FLEXNER LLP
Suite 800
5301 Wisconsin Ave.  NW
Washington, D.C. 20015
Telephone: (202) 895-7560

Attorneys for Plaintiff Northwest Airlines
Incorporated, a Minnesota Corporation

# EXHIBIT   2

# BOIES, SCHILLER & FLEXNER LLP

ISCONSIN AVENUE, N.W. • WASHINGTON, D.C. 20015-2015 • PH. 202.237.2727 • FAX 202.237.6131

February 23, 2005

**Via FedEx**
Galileo International, Inc.
c/o Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808

Re:  Document Subpoena in *Sabre Inc., et al. v. Northwest Airlines, Inc.*, Civil Action No. 4:04-CV-612-Y, Consolidated with 4:04-CV-907-Y (N.D. Tex)

Dear Corporation Service Company:

I was informed that you would accept service of this subpoena on behalf of Galileo International, Inc., and appreciate your willingness to do so.

As you may know, Northwest Airlines and Sabre are engaged in litigation against each other. (Copies of Northwest's complaint against Sabre and Sabre's complaint against Northwest are enclosed.) In order to pursue its lawsuit, and defend against Sabre's suit, Northwest is requesting from your company the documents described in the attached subpoena. The subpoena only provides for the production of documents; it does not require you to give any testimony.

We apologize in advance for any inconvenience the subpoena may cause. Of course, we are willing to work with you to minimize any burden on your company. For example, if it is not possible for you to meet that deadline set forth in the subpoena, Northwest is willing to work with you to set an alternate schedule for the provision of information. You should note that it is necessary to produce only copies of the requested documents; you may retain all original documents. In addition, Northwest will reimburse you for any copying and shipping costs.

The parties to the case have agreed upon, and the Court has entered, a protective order, a copy of which is enclosed, that will ensure the confidentiality of all documents produced in this case, including those produced by non-parties. As explained in the protective order, in order to receive its protections, you must mark as "Confidential" any documents containing trade secrets or other confidential information before you produce them. To the extent you require additional protections, beyond those set forth in the protective order, we are willing to discuss such additional protections with you.

BOIES, SCHILLER & FLEXNER LLP

     If you would like to discuss any aspect of the subpoena, including ways to reduce the burden of compliance by your company or to safeguard the confidentiality of your documents, please do not hesitate to contact me.  My direct telephone line is (202) 274-1130.


                    Sincerely,

                    Daniel L. Low


Enclosures

A088 (Rev. 1/94) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

## For the District of Delaware

| | |
|---|---|
| Sabre, Inc and Sabre Travel International Limited<br><br>     v.<br><br>Northwest Airlines, Inc. | **SUBPOENA IN A CIVIL CASE**<br><br>C.A. No. 4:04-CV-612-Y<br>(ECF)<br><br>Consolidated w/ 4:04-CV-907-Y<br>(ECF) |

TO:

    Galileo International, Inc.
    c/o Corporation Service Company
    2711 Centerville Road, Suite 400
    Wilmington, DE 19808

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
    See Exhibit A

| PLACE : | DATE AND TIME |
|---|---|
| Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808 | March 15, 2005<br>12:00 pm |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that on its is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Parker Folse III* /s/    Attorney for Defendant Northwest Airlines, Inc. | February 23, 2005 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
 Parker C. Folse III, Esq., Susman Godfrey, 1201 Third Avenue, Suite 3100, Seattle, WA, 98101-3000
(206) 516-3880

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
    DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

(c)    PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)    A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fees.

(2)    (A)    A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)    Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)    (A)    On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)    fails to allow reasonable time for compliance,

(ii)    requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)    requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)    subjects to a person to undue burden.

(B)    If a subpoena

(i)    requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)    requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)    requires a person who is not a party or an officer of a party to incur substantial expenses to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)    DUTIES IN RESPONDING TO SUBPOENA.

(1)    A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)    When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**Exhibit A**

## DEINITIONS AND INSTRUCTIONS

A.   "Document" shall have the meaning set forth in Federal Rule of Civil Procedure 34(a) and refers to the original and all non-identical copies or reproductions of any written, printed, typed or recorded matter of any kind known to you or in your possession, custody, or control.

B.   The term "you" or "your" means Galileo and/or any of its assigns, agents, current or former employees and representatives and/or other persons or entities acting, or authorized to act, on its behalf.

C.   The term "Northwest" means Northwest Airlines, Inc. and any of its assigns, agents, current or former employees, and representatives.

D.   "Refer" or "relate to" means pertinent, relevant, material to, evidencing, affecting, discussing, dealing with, considering or otherwise concerning in any manner whatsoever the subject matter of this inquiry.

E.   "GDS" means Global Distribution System, sometimes referred to as a "Computer Reservation System."

F.   "Shared GDS Fee Initiative" means Northwest's policy announced on August 24, 2004, implemented on September 1, 2004 and rescinded on September 2, 2004, pursuant to which Northwest planned to charge travel agents who booked air travel on Northwest through a GDS $3.75 per one-way ticket and $7.50 per roundtrip ticket.

G.   "Distribution Channels" include (a) internal reservations (by phone and ticket office); (b) web sites of airlines; (c) any direct connect technology offered by an airline that permits travel agents to book flights directly with the airline rather than through a GDS; (d) brick and mortar travel agencies; (e) direct connect technologies offered by other persons (*e.g.*, Orbitz) that allow travel agents to by-pass GDSs for booking travel on airlines; and (f) on-line travel agencies (*e.g.*, Travelocity, Expedia).

H.   "Person" refers to and includes natural persons and any and all other legal entities, including, without limitation, corporations, companies, firms, partnerships, joint ventures, proprietorships and associations.

I.   These requests seek documents created, dated or received from January 1, 2000, through the present, unless otherwise specified.

J.   If any privilege is claimed with respect to any document requested, please state:

1.    the nature of the document (*e.g.,* letter, memorandum, report, etc.);

2.    the date it bears or, if undated, the date it was written or created;

3.    its author(s);

4.    the identity of each of its recipients;

5.    its general subject matter;

6.    its present or last known location and/or custodian; and

7.    the privilege claimed and the basis therefore.

## DOCUMENTS REQUESTED

1.    All agreements in effect as of August 24, 2004 between You and any domestic airline ("airline") that govern the terms of that airline's participation in your GDS, including any amendments to such agreements, side letters or other documents that memorialize or refer or relate to agreements on pricing or other terms governing that airline's participation in Your GDS, including, without limitation, all agreements or understandings relating to access by Your GDS to web fares of any airline (collectively "participation agreements").

2.    All documents that refer or relate to the negotiation of such participation agreements between You and any airline.

3.    All documents that that refer or relate to any provisions of Your participation agreements that purport to affect, or could be interpreted as affecting, any airline's ability to pass on to travel agents all or part of booking fees charged by You to the airline or of any airline's ability to match or otherwise respond to any other airline's implementation of such an initiative.

4.    All documents that refer or relate to Northwest's "Shared GDS Fee" initiative, including, but not limited to, documents that refer or relate to actions You considered undertaking, or undertook, in response to such initiative, as well as documents that refer or relate to actual or potential actions of any other person in response to that initiative.

5.    All documents constituting or referring or relating to communications between You and any other person concerning Northwest's Shared GDS Fee initiative.

6. Documents sufficient to show: (a) each variation in the form or content of subscriber agreements You have with travel agents; (b) each variation in the payments provided for in such agreements to travel agents in the form of bonuses, productivity payments, or other types of consideration ("travel agent payments"); (c) total travel agent payments for the year 2003 and from January 2004 to date; (d) average travel agent payments per travel agent locations; and (e) the total number of subscriber agreements You have with travel agents, broken down by the duration (in years) of such agreements.

7. All documents that refer or relate to travel agent payments (apart from the subscriber agreements themselves), including, without limitation, all documents that discuss or analyze the reasons for such payments and their utility in achieving the purposes of such payments.

8. All documents that refer or relate to subscriber agreement provisions (apart from the subscriber agreements themselves) that relate to any liabilities or penalties that would be imposed on travel agents for an early termination of their subscriber agreements with You, including without limitation, all documents that discuss or analyze the effectiveness of such liabilities or penalties in deterring early contract terminations.

9. Documents sufficient to show, since January 2002, the total number of travel agency subscriber agreements with You that have been terminated by the travel agency before the end of the contract term and the identity of each such travel agent that engaged in such early termination.

10. All documents that refer or relate to WorldAgent Direct Web, other similar electronic services offered by other airlines that allow travel agents to book tickets directly with airlines, or other services that are, or may be offered, by other persons that would permit travel agents to bypass GDSs to obtain flight and fare information and to book airline travel.

11. All documents that refer or relate to Your pricing (booking fee) strategies or practices.

12. All documents that refer or relate to the costs incurred in providing GDS services relative to the revenues received from providing such services.

13. All documents that refer or relate to competition in the provision of airline flight and fare information and booking capability to travel agents, including, but not limited to, documents that refer or relate to the market(s) in which such services are provided or to actual or potential competitors in such market(s).

14. All documents that refer or relate to the effects of the position of flights on GDS screens or of screen bias on airline bookings.

15.    All documents that discuss or refer to the actual or potential effects of DOT's Final Rule in the CRS Rulemaking (published at 69 Fed. Reg. 976 (Jan. 7, 2004)) on Your business plans, including, but not limited to any, plans or consideration given to selling or offering display bias to airlines.

16.    All documents dated after January 1, 2000, that discus the possibility that an airline might initiate an effort to pass GDS fees (in whole or in part) on to travel agents or on to passengers or any other means of reducing the fees paid by airlines to GDSs.

17.    All documents discussing the extent to which airlines rely on travel agents for the sale and distribution of tickets.

18.    All documents discussing the extent to which travel agents rely on GDSs, or particular GDSs, for access to flight and fare information and booking capability.

19.    All documents discussing the extent to which airlines or particular airlines sell passenger travel through distribution channels other than travel agents.

# EXHIBIT   3

| | |
|---|---|
| **From:** | Daniel Low |
| **Sent:** | Thursday, March 10, 2005 11:12 AM |
| **To:** | 'maltschul@mwe.com' |
| **Subject:** | Subpoena cover letter |

Mark,

When we spoke yesterday, you indicated that you had not received a copy of the cover letter I had sent with the document subpoena.  I'm attaching a copy for your reference.

During our conversation yesterday, we agreed to an extension of the deadline for your objections to March 16.  I look forward to receiving your objections then.

Thanks,

Daniel L. Low
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, NW
Suite 800
Washington, DC  20015

202.274.1130 (Phone)
202.237.6131 (Fax)
dlow@bsfllp.com
www.bsfllp.com

*This message and any attached documents contain confidential and/or privileged information from the law firm of Boies, Schiller & Flexner LLP. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by telephone or reply e-mail and delete this message.*



Galileo 2-23.PDF

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Milan
Munich New York Orange County Rome San Diego Silicon Valley Washington, D.C.

March 9, 2005

VIA FACSIMILE AND MAIL

Daniel Low
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Suite 800
Washington, D.C. 20015

Re:    Sabre Inc. and Sabre Travel International Limited v. Northwest Airlines, Inc.

Dear Daniel:

I am writing to confirm our telephone conversation and agreement that Galileo International, Inc. shall have until March 16, 2005 to serve its objections to the subpoena for production of documents, dated February 23, 2005.

Thank you for your courtesy and cooperation in this matter.

Sincerely,

*Mark J. Altschul*

Mark J. Altschul

cc:    Ryan L. Nelson
       David F. Wentzel

# EXHIBIT   4

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Milan
Munich New York Orange County Rome San Diego Silicon Valley Washington, D.C.

David F. Wentzel
Attorney at Law
dwentzel@mwe.com
312.984.7789

March 16, 2005

VIA FACSIMILE AND MAIL

Daniel L. Low
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue N.W., Ste. 800
Washington D.C. 20015

Re:    February 23, 2005 Document Subpoena in Sabre, Inc. et al. v. Northwest Airlines, Inc.,
       Case No. 4:04-CV-612-Y (N.D. Tex.)

Dear Daniel:

Pursuant to Fed. R. Civ. P. 45(c)(2)(B), Galileo International, Inc. ("Galileo") hereby serves its objection to the February 23, 2005 document subpoena issued by counsel for defendant Northwest Airlines, Inc. ("Northwest").

## A.    General Objections

Galileo incorporates by reference each and every general objection set forth below into each and every specific response. From time to time a specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response shall not be interpreted as a waiver of any general objection to that response.

1.    Galileo objects to this subpoena to the extent the subpoena is inconsistent with the provisions set forth in Rule 45 of the Federal Rules of Civil Procedure.

2.    Galileo objects to this subpoena as attempting to impose undue burden and expense, thus violating the duty set forth in Rule 45(c)(1).

3.    Galileo objects to this subpoena as seeking the production of documents within an unreasonably short amount of time.

4.    Galileo objects to this subpoena to the extent that it purports, through definitions or otherwise, to impose burdens and duties that exceed the scope of reasonable and permissible discovery under the Federal Rules of Civil Procedure.

03/16/05  WED 13:40 FAX                    MWE CHICAGO                              ☒003

Daniel L. Low
March 16, 2005
Page 2

5.      Galileo objects to this subpoena to the extent that it seeks documents protected by the attorney-client privilege, work product doctrine, or any other applicable law, privilege, protection or doctrine.

6.      Galileo objects to this subpoena to the extent that it seeks information that is neither relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of admissible evidence.

7.      Galileo objects to this subpoena to the extent that it seeks documents already in the possession of Northwest or in the public domain, which are, thus, as readily available to Northwest as they are to Galileo.

8.      Galileo objects to this subpoena on the grounds that it is overly broad and unduly burdensome, in particular to the extent that it would require Galileo to produce documents related to, but not limited to, its negotiations, correspondence, agreements with hundreds of airlines.

9.      Galileo objects to this subpoena to the extent that it seeks information or documents that Galileo is not permitted to disclose pursuant to confidentiality obligations or agreements with third parties.

10.     Galileo objects to this subpoena to the extent that it seeks information or documents that are confidential and proprietary to Galileo.

11.     Galileo objects to this subpoena to the extent that it seeks the production of documents which would reveal trade secrets and other confidential research, development, or commercial information the disclosure of which would severely compromise Galileo. Production of such information to Sabre, a competitor, or Northwest, a customer, would cause irreparable harm to Galileo.

12.     Galileo objects to this subpoena to the extent it seeks information relevant to Northwest's antitrust claims against Sabre. Sabre has a pending motion to dismiss the antitrust claims for failure to state a claim.

**B.**      **SPECIFIC OBJECTIONS TO DOCUMENTS REQUESTED**

**1.**      **All agreements in effect as of August 24, 2004 between You and any domestic airline ("airline") that govern the terms of that airline's participation in your GDS, including any amendments to such agreements, side letters or other documents that memorialize or refer or relate to agreements on pricing or other terms governing that airline's participation in Your GDS, including, without limitation, all agreements or understandings relating to access by Your GDS to web fares of any airline (collectively "participation agreements").**

Daniel L. Low
March 16, 2005
Page 3

   Galileo objects to this request on the ground that it seeks confidential and proprietary

information, the disclosure of which to the litigants would materially and irreparably harm

Galileo. Galileo further objects that disclosure of the agreements between Galileo and any

domestic airlines would violate non-disclosure agreements provided for in the relevant contracts

between Galileo and such airlines. Galileo further objects to this request to the extent that it is

overly broad and unduly burdensome and that it seeks information that is neither relevant to

issues raised by the pleadings nor reasonably calculated to lead to the discovery of admissible

evidence.

2.  **All documents that refer or relate to the negotiation of such participation agreements between You and any airline.**

   Galileo objects to this request to the extent that it seeks documents protected from

disclosure by the attorney-client privilege, work product doctrine, or any other applicable law,

privilege, protection or doctrine. Galileo also objects to this request on the ground that it seeks

confidential and proprietary information, the disclosure of which to the litigants would materially

and irreparably harm Galileo. Galileo further objects that disclosure of the agreements between

Galileo and any domestic airlines would violate non-disclosure agreements provided for in the

contracts between Galileo and such airlines. Galileo further objects to this request on the ground

that it is overly broad and unduly burdensome.

3.  **All documents that refer or relate to any provisions of Your participation agreements that purport to affect, or could be interpreted as affecting, any airline's ability to pass on to travel agents all or part of booking fees charged by You to the airline or of any airline's ability to match or otherwise respond to any other airline's implementation of such an initiative.**

Daniel L. Low
March 16, 2005
Page 4

Galileo objects to this request on the ground that it seeks confidential and proprietary

information, the disclosure of which to the litigants would materially and irreparably harm

Galileo.  Galileo further objects that disclosure of the relevant contracts between Galileo and any

airlines would violate non-disclosure agreements provided for in the agreements between Galileo

and such airlines.  Galileo further objects to this request on the ground that it is overly broad and

unduly burdensome and that it seeks information that is neither relevant to issues raised by the

pleadings nor reasonably calculated to lead to the discovery of admissible evidence.

4.    **All documents that refer or relate to Northwest's "Shared GDS Fee" initiative,
including, but not limited to, documents that refer or relate to actions You
considered undertaking, or undertook, in response to such initiative, as well as
documents that refer or relate to actual or potential actions of any other person in
response to that initiative.**

Galileo objects to this request to the extent that it seeks documents protected from

disclosure by the attorney-client privilege, work product doctrine, or any other applicable law,

privilege, protection or doctrine.  Galileo also objects to this request on the ground that it seeks

confidential and proprietary information, the disclosure of which to the litigants would materially

and irreparably harm Galileo by causing Galileo to reveal its decision making processes.  Galileo

further objects to this request on the ground that it is overly broad and unduly burdensome.

5.    **All documents constituting or referring or relating to communications between You
and any other person concerning Northwest's Shared GDS Fee initiative.**

Galileo objects to this request to the extent that it seeks documents protected from

disclosure by the attorney-client privilege, work product doctrine, or any other applicable law,

privilege, protection or doctrine.  Galileo also objects to this request on the ground that it seeks

confidential and proprietary information, the disclosure of which to the litigants would materially

Daniel L. Low
March 16, 2005
Page 5

and irreparably harm Galileo. Galileo further objects to this request as overly broad and unduly

burdensome and that it seeks information that is neither relevant to issues raised by the pleadings

nor reasonably calculated to lead to the discovery of admissible evidence.

6.  **Documents sufficient to show: (a) each variation in the form or content of
    subscriber agreements You have with travel agents; (b) each variation in the
    payments provided for in such agreements to travel agents in the form of bonuses,
    productivity payments, or other types of consideration ("travel agent payments");
    (c) total travel agent payments for the year 2003 and from January 2004 to date; (d)
    average travel agent payments per travel agent locations; and (e) the total number
    of subscriber agreements You have with travel agents, broken down by the duration
    (in years) of such agreements.**

    Galileo objects to this request on the ground that it is overly broad and unduly

burdensome vague with respect to the use of the terms "travel agent payments" and "average

travel agent payments per travel agent locations (sic)." Galileo also objects to this request on the

ground that it seeks confidential and proprietary information, the disclosure of which to the

litigants would materially and irreparably harm Galileo. Galileo further objects to this request on

the ground it improperly requests information which is not proper under Fed. R. Civ. P. 45,

namely "the total number of subscriber agreements you have with travel agents, broken down by

the duration (in years of such agreements." Galileo further objects that disclosure of the

information sought by this request would violate non-disclosure agreements provided for in the

agreements between Galileo and such parties to those agreements.

7.  **All documents that refer or relate to travel agent payments (apart from the
    subscriber agreements themselves), including, without limitation, all documents that
    discuss or analyze the reasons for such payments and their utility in achieving the
    purposes of such payments.**

    Galileo objects to this request on the ground that it seeks confidential and proprietary

information, the disclosure of which to the litigants would materially and irreparably harm

Daniel L. Low
March 16, 2005
Page 6

Galileo.  Galileo also objects to this request on the ground that it seeks documents protected from

disclosure by the attorney-client privilege, work product doctrine, or any other applicable law,

privilege, protection or doctrine.  Galileo further objects to this request on the ground that it

seeks confidential and proprietary information, the disclosure of which to the litigants would

materially and irreparably harm Galileo.  Galileo objects to this request on the ground that it

seeks information that is neither relevant to issues raised by the pleadings nor reasonably

calculated to lead to the discovery of admissible evidence.

8.    **All documents that refer or relate to subscriber agreement provisions (apart from the subscriber agreements themselves) that relate to any liabilities or penalties that would be imposed on travel agents for an early termination of their subscriber agreements with You, including without limitation, all documents that discuss or analyze the effectiveness of such liabilities or penalties in deterring early contract terminations.**

Galileo objects to this request on the ground that it seeks confidential and proprietary

information, the disclosure of which to the litigants would materially and irreparably harm

Galileo.  Galileo further objects that disclosure of the relevant contracts between Galileo and

travel agents would violate non-disclosure agreements provided for in the relevant contracts

between Galileo and such travel agents.  Galileo further objects to this request on the ground that

it is overly broad and unduly burdensome and that it seeks information that is neither relevant to

issues raised by the pleadings nor reasonably calculated to lead to the discovery of admissible

evidence.

9.    **Documents sufficient to show, since January 2002, the total number of travel agency subscriber agreements with You that have been terminated by the travel agency before the end of the contract term and the identity of each such travel agent that engaged in such early termination.**

Daniel L. Low
March 16, 2005
Page 7

Galileo objects to this request because the disclosure of the information sought by this request would violate non-disclosure agreements provided for in the agreements between Galileo and such parties to those agreements. Galileo also objects to this request on the ground that it seeks confidential and proprietary information, the disclosure of which to the litigants would materially and irreparably harm Galileo. Galileo further objects to this request on the ground that it seeks information that is neither relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of admissible evidence. Galileo further objects to this request on the ground that it is overly broad and unduly burdensome.

10.   **All documents that refer or relate to WorldAgent Direct Web, other similar electronic services offered by other airlines that allow travel agents to book tickets directly with airlines, or other services that are, or may be offered, by other persons that would permit travel agents to bypass GDSs to obtain flight and fare information and to book airline travel.**

Galileo objects to this request on the ground that it seeks confidential and proprietary information, the disclosure of which to the litigants would materially and irreparably harm Galileo. Galileo also objects to this request on the ground that it seeks information that is neither relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of admissible evidence. Galileo further objects to this request on the ground that it is overly broad and unduly burdensome.

11.   **All documents that refer or relate to Your pricing (booking fee) strategies or practices.**

Galileo objects to this request on the ground that it seeks confidential and proprietary information, the disclosure of which to the litigants would materially and irreparably harm Galileo. Galileo also objects to this request on the ground that it seeks information that is neither

Daniel L. Low
March 16, 2005
Page 8

relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of

admissible evidence. Galileo further objects to this request on the ground that it is overly broad,

unduly burdensome, and vague with respect to the phrases "strategies or practices." Galileo

further objects to this request to the extent that it seeks information Galileo is not permitted to

disclose pursuant to confidentiality obligations or agreements with third parties

**12.    All documents that refer or relate to the costs incurred in providing GDS services
relative to the revenues received from providing such services.**

Galileo objects to this request on the ground that it seeks confidential and proprietary

information, the disclosure of which to the litigants would materially and irreparably harm

Galileo. Galileo also objects to this request on the ground that it seeks information that is neither

relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of

admissible evidence. Galileo further objects to this request on the ground that it is overly broad

and unduly burdensome.

**13.    All documents that refer or relate to competition in the provision of airline flight
and fare information and booking capability to travel agents, including, but not
limited to, documents that refer or relate to the market(s) in which such services are
provided or to actual or potential competitors in such market(s).**

Galileo objects to this request on the ground that it seeks confidential and proprietary

information, the disclosure of which to the litigants would materially and irreparably harm

Galileo. Galileo also objects to this request on the ground that it seeks information that is neither

relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of

admissible evidence. Galileo further objects to this request on the ground that it is overly broad

and unduly burdensome. Galileo further objects to this request on the ground that it seeks

information related to Northwest's antitrust claims against Sabre.

Daniel L. Low
March 16, 2005
Page 9

14.    All documents that refer or relate to the effects of the position of flights on GDS
        screens or of screen bias on airline bookings.

Galileo objects to this request on the ground that it seeks confidential and proprietary

information, the disclosure of which to the litigants would materially and irreparably harm

Galileo.  Galileo also objects to this request on the ground that it seeks information that is neither

relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of

admissible evidence.  Galileo further objects to this request on the ground that it is overly broad,

unduly burdensome, and vague as to the phrases "position of flights on GDS screens" or "of

screen bias on airline bookings."

15.    All documents that discuss or refer to the actual or potential effects of DOT's Final
        Rule in the CRS Rulemaking (published at 69 Fed. Reg. 976. (Jan. 7, 2004)) on Your
        business plans, including, but not limited to any, plans or consideration given to
        selling or offering display bias to airlines.

Galileo objects to this request on the ground that it seeks confidential and proprietary

information, the disclosure of which to the litigants would materially and irreparably harm

Galileo.  Galileo also objects to this request on the ground that it seeks information that is neither

relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of

admissible evidence.  Galileo further objects to this request to the extent that it seeks documents

protected from disclosure by the attorney-client privilege, work product doctrine, or any other

applicable law, privilege, protection or doctrine.  Galileo further objects to this request on the

ground that it is overly broad, unduly burdensome, and vague as to the phrase "display bias."

16.    All documents dated after January 1, 2000, that discuss the possibility that an airline
        might initiate an effort to pass GDS fees (in whole or in part) on to travel agents or
        on to passengers or any other means of reducing the fees paid by airlines to GDSs.

Daniel L. Low
March 16, 2005
Page 10

Galileo objects to this request on the ground that it seeks confidential and proprietary information, the disclosure of which to the litigants would materially and irreparably harm Galileo. Galileo also objects to this request on the ground that it seeks information that is neither relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of admissible evidence. Galileo further objects to this request on the ground that it is overly broad and unduly burdensome.

**17.    All documents discussing the extent to which airlines rely on travel agents for the sale and distribution of tickets.**

Galileo objects to this request on the ground that it seeks confidential and proprietary information, the disclosure of which to the litigants would materially and irreparably harm Galileo. Galileo also objects to this request on the ground that it seeks information that is neither relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of admissible evidence. Galileo further objects to this request on the ground that it is overly broad and unduly burdensome.

**18.    All documents discussing the extent to which travel agents rely on GDSs, or particular GDSs, for access to flight and fare information and booking capability.**

Galileo objects to this request on the ground that it seeks confidential and proprietary information, the disclosure of which to the litigants would materially and irreparably harm Galileo. Galileo also objects to this request on the ground that it seeks information that is neither relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of admissible evidence. Galileo further objects to this request on the ground that it is overly broad and unduly burdensome.

Daniel L. Low
March 16, 2005
Page 11

19.    **All documents discussing the extent to which airlines or particular airlines sell passenger travel through distribution channels other than travel agents.**

Galileo objects to this request on the ground that it seeks confidential and proprietary information, the disclosure of which to the litigants would materially and irreparably harm Galileo. Galileo also objects to this request on the ground that it seeks information that is neither relevant to issues raised by the pleadings nor reasonably calculated to lead to the discovery of admissible evidence. Galileo further objects to this request on the ground that it is overly broad and unduly burdensome.

Please feel free contact me should you wish to discuss these objections or other matters relevant to the subpoena.

Sincerely,

David F. Wentzel

cc:      Thomas DeMay

CHI99 4443507-1.069834.0012