# Exhibit A

ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

2004 AUG 27  PH 4:00

CLERK OF COURT

| | | |
|---|---|---|
| SABRE INC. AND SABRE TRAVEL INTERNATIONAL LIMITED, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. |
| NORTHWEST AIRLINES, INC., | § § | 4:04-CV-612-Y |
| Defendant. | § § | |

**FIRST AMENDED ORIGINAL COMPLAINT
AND REQUEST FOR INJUNCTIVE RELIEF
(Including Jury Demand)**

Plaintiffs Sabre Inc. ("Sabre–US") and Sabre Travel International Limited ("STIL") file this Original Complaint against Defendant Northwest Airlines, Inc. ("**Northwest**"), and would show the Court as follows:

**I.    PARTIES**

1.    Sabre-US is a corporation organized under the laws of Delaware.  Sabre-US's headquarters and principal place of business are at 3150 Sabre Drive, Southlake, Texas 76092-2129.

2.    STIL is a corporation organized under the laws of Ireland.  STIL's headquarters and principal place of business are at Ormonde House, 12 Lower Leeson St., Dublin 2, Ireland.

3.    Northwest is a corporation organized under the laws of Minnesota.  Northwest's principal place of business is located at 2700 Lone Oak Parkway, Eagan, Minnesota 55121.  Northwest may be served with citation by service on its registered agent CT Corp. System, 350 N. St. Paul Street, Dallas, Texas  75201.

## II.    JURISDICTION AND VENUE

4.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.

5.    The Court has general personal jurisdiction over Northwest because it maintains a certificate of authority to do business in Texas.

6.    Venue is proper in the Northern District of Texas, Fort Worth Division, under 28 U.S.C. § 1391(a) and (c) because Northwest is subject to personal jurisdiction in this District and Division.

## III.    BACKGROUND FACTS

7.    STIL maintains contracts with travel suppliers, including Northwest, whereby STIL agrees to distribute suppliers' travel services.   Sabre–US owns and operates the Sabre global distribution system ("**Sabre GDS**") used by travel agencies worldwide for the sale and distribution of air transportation services and information.   By an Amended and Restated Transition Services Agreement, Sabre-US supplies STIL with operational, support, marketing, and business development services, as the context may require, and such other services required in order to enable STIL to meet its contractual obligations to its customers.

8.    Northwest Airlines is the world's fifth largest airline.   Northwest and its travel partners serve nearly 750 cities in almost 120 countries and six continents.

9.    On July 31, 1990, Sabre–US entered into an agreement with Northwest entitled "The Sabre Participating Carrier Distribution and Services Agreement" ("**Sabre PCA**"), which governed Northwest's utilization of the Sabre GDS.   On July 1, 2003, Sabre-US, STIL and Northwest novated the PCA so that the parties to PCA became only STIL and Northwest.

Simultaneously, STIL and Northwest amended the Sabre PCA through an agreement entitled "Direct Connect Availability-Three Year Option" (the **"DCA Amendment"**).

10.    In general, the DCA Amendment entitled Northwest to discounted fees for use of the Sabre GDS, in exchange for Northwest's commitment to "provide through the Sabre GDS to all Sabre Subscribers located in each of the Regions access to Full Content concerning" Northwest's schedules, fees, and seat availability.  "Full Content" is defined by the DCA Amendment as all schedule information, seat availability and Published Fares.  "Published Fares," in turn, is defined as "all Fares made generally available to the public, including (i) GDS Fares; (ii) Airline Internal Reservation System Fares; (iii) Internet Fares; and (iv) Promotional Fares . . .."  Thus, Northwest covenanted to provide STIL and its affiliates with fares that were equal to or less than the fares that Northwest provided to others, including through its own website.

11.    Despite its obligations and the valuable consideration it has received under the July 1, 2003 agreements, Northwest issued a press release on August 24, 2004 announcing a bold new scheme designed to circumvent its use of the Sabre GDS system and its payment of the GDS fees established under the DCA Amendment.  Beginning September 1, 2004, Northwest will impose a fee of $3.75 to $7.50 on all tickets purchased through a GDS system to help Northwest defray its "distribution costs" and increase its profits.  The effect of this action will be to increase the fares charged for tickets purchased from travel agents which use the Sabre GDS system.  In a further attempt to persuade travel agents not to use the Sabre GDS, Northwest is also instituting a policy that allows travel agents to avoid the $3.50 to $7.50 fee if the ticket is purchased through a dedicated web portal made available to travel agents through Northwest's WorldAgent Direct web site.

FIRST AMENED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE
RELIEF (INCLUDING JURY DEMAND)                                                Page 3
complaint draft1.DOC

12.     Northwest's acknowledged course of action is in direct contravention of its obligation under the DCA Amendment to grant Sabre GDS users access to all "Published Fares." This breach of the primary obligation in the DCA Amendment will cause STIL to lose substantial GDS fees that it would otherwise have received if Northwest had fulfilled its obligations to allow GDS users to buy tickets at the same fares as any other published rate for the same ticket.

13.     In addition, for over a year now STIL has accepted a severely discounted fee from Northwest based on Northwest's promise to abide by its obligations for the term of the DCA Amendment.   Based on Northwest's press release, it now appears that STIL will receive significantly less than it bargained for in exchange for its discounted fees and the substantial amounts it has paid Northwest. As shown below, Northwest's actions plainly amount to a breach of contract.

## IV.    COUNT I — BREACH OF CONTRACT

14.     All prior paragraphs are hereby incorporated by reference.

15.     The parties' agreements represented in the DCA Amendment are fully-enforceable against Northwest.

16.     STIL, with the support of Sabre-US, has fully performed all of STIL's obligations under the DCA Amendment and all other agreements ancillary to the DCA Amendment, including without limitation the obligation to reduce its GDS fees and pay Northwest valuable consideration for its endorsement of the new Sabre GDS upgrades.   All other conditions precedent have also been fulfilled.

17.     Northwest has breached its obligations under the DCA Amendment (and thereby the entire Sabre PCA) by failing to provide to STIL, Sabre-US, and the Sabre GDS with total

prices for the sale of its tickets that are as low as the fares it publishes on its website for use by all Sabre GDS users.

18.    As a result of this breach, STIL and Sabre-US have suffered and will suffer damages.

## V.    COUNT II – CLAIM FOR PRELIMINARY AND PERMANENT INJUNCTION

19.    All prior paragraphs are hereby incorporated by reference.

20.    The direct and natural consequence of Northwest's breach of contract will be to cause irreparable injury to STIL and Sabre-US, in the form of loss of goodwill, loss of business opportunities, and harm to the public by increasing the costs and burdens of consumers and travel agents.

21.    Northwest's actions will irreparably injure STIL and Sabre-US by causing what is known in the industry as "channel shift." Basically, this phenomenon is a shift in traveler buying preferences from one distribution channel (such as Sabre-connected travel agencies) to another (such as Northwest's web site). The effects of channel shift can be long-lasting or permanent. Indeed, the desire to avoid channel shift was an essential incentive for STIL to agree to the DCA Amendment in the first place.

22.    Northwest's fare increase is against the public interest. At least two segments of the public are harmed, travelers and travel agents. Northwest's actions would injure travelers by increasing average travel costs. One consumer advocacy group, for example, has complained that Northwest's fare increase is an attempt to "strong arm" and transfer costs to customers. Northwest's actions also hinder consumers from obtaining accurate pricing information. Northwest's sale of its best fares only on its website places consumers with the dilemma of either spending additional time and possibly money searching to find the best deal or making a

purchasing decision with less information. In contrast, the Sabre GDS provides consumers with more complete information (at least when Northwest is fulfilling its contract by providing all fares). Price transparency helps consumers. Northwest is obscuring pricing information.

23.     Northwest's fare increase also harms another segment of the public, travel agents. The fare increase would result in travel agents having to either absorb the costs or pass them on to their customers, the end travelers. If the agent passes the costs on, the traveler will have an incentive to book directly from Northwest's web site. The harm to travel agents is that they will either incur higher costs or likely lose customers.

24.     Because the harms to SIL and Sabre-US, travel agents and the public are permanent and irreparable, and will begin to take effect prior to any trial of this matter, a preliminary injunction is necessary to preserve the status quo. Remedies at trial will not fully compensate STIL and Sabre-US for the harm that results in the interim.

25.     The threatened injury to STIL and Sabre-US (and to consumers, travel agents and the public) of Northwest's breach of duty outweighs any harm to Northwest if a preliminary or permanent injunction issues.

26.     Granting a preliminary and permanent injunction will not disserve the public interest; it will protect it.

27.     STIL and Sabre-US therefore pray for preliminary and permanent injunctive relief.

## VI. COUNT III – DECLARATORY JUDGMENT

28.     All prior paragraphs are hereby incorporated by reference.

29.     There is an existing controversy among the parties as to the proper interpretation of the contract and whether it prohibits Northwest's change in pricing. STIL and Sabre-US are

---

FIRST AMENED ORIGINAL COMPLAINT AND REQUEST FOR INJUNCTIVE
RELIEF (INCLUDING JURY DEMAND)                                                                Page 6
complaint draft1.DOC

entitled to a declaratory judgment that by commission of the acts and omissions alleged herein, Northwest has or will breach the contract.

## VII.  ATTORNEYS' FEES

30.    All prior paragraphs are hereby incorporated by reference.

31.    The party prevailing in any litigation arising from the Sabre PCA or a breach thereof is entitled to recover it attorneys' fees expended in prosecuting the action. *See* TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq.*

32.    STIL and Sabre-US have employed the undersigned attorneys to prosecute this claim based on its rights under the Agreement.  As a result, it has and will incur attorneys' fees in the prosecution of its claims.

33.    Accordingly, STIL and Sabre-US are entitled to recover and sue for the attorneys' fees and court costs it reasonably expends in prosecuting this action.

## VIII.  JURY DEMAND

34.    STIL and Sabre-US requests a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff STIL and Sabre-US pray that Defendant Northwest Airlines, Inc. be cited to appear and answer herein, and that STIL and Sabre-US be awarded its actual damages, its reasonable and necessary attorneys' fees and court costs, an award of pre- and post-judgment interest, any other damages to which it is justly entitled, whether at law or in equity, and for preliminary and permanent injunctive relief.

Respectfully submitted:

R. H. Wallace, Jr.[1]
State Bar No. 20778700
**SHANNON, GRACEY, RATLIFF & MILLER, L.L.P.**
777 Main Street, Suite 3800
Fort Worth, Texas 76102
(817) 336-9333 – Telephone
(817) 336-3735 – Facsimile

David E. Keltner
State Bar No. 11249500
**JOSE, HENRY, BRANTLEY & KELTNER, L.L.P.**
675 N. Henderson Street
Fort Worth, Texas 76107
(817) 877-3303 – Telephone
(817) 338-9109 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

This certifies that on this motion is being filed before any entry of appearance by counsel for the Defendant. Further, this certifies that on the _27th_ day of August, 2004, the Plaintiffs' First Amended Original Complaint and Request for Injunctive Relief was mailed certified mail, return to receipt requested to Defendant's registered agent, CT Corp. System, 350 N. St. Paul Street, Dallas, Texas 75201.

R. H. Wallace, Jr.

---

[1] Substitution of counsel papers are being filed simultaneously with this pleading.

Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SABRE INC. and SABRE TRAVEL INTERNATIONAL LIMITED, | § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 4:04-CV-612-Y (ECF) |
| vs. | § § | Consolidated with 4:04-CV-907-Y |
| NORTHWEST AIRLINES, INC. | § § | |
| Defendant. | § § | |

**BRIEF OF SABRE INC., SABRE TRAVEL INTERNATIONAL LTD., AND SABRE HOLDINGS CORP. IN SUPPORT OF MOTION TO DISMISS NORTHWEST'S FIRST, THIRD, FOURTH, AND FIFTH CLAIMS**

19166\762574.1

## TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 1

II.    SUMMARY OF ALLEGATIONS OF THE COMPLAINTS........................................... 3

      A.     Sabre's Global Distribution System and Industry Structure................................... 3

      B.     Sabre's Agreement with Northwest ........................................................................ 4

      C.     Northwest Raises Prices For Tickets Issued Through Sabre .................................. 5

      D.     The Litigation:  After Sabre Sues Northwest, Northwest Sues Sabre ................... 5

III.   ARGUMENT ................................................................................................................. 6

      A.     Northwest's First Claim for Sherman Act § 2 Violations Should Be
            Dismissed................................................................................................................ 6

            1.     Northwest Lacks Standing to Assert an Antitrust Claim, Because It
                  Has Not, and Cannot, Allege Antitrust Injury ........................................... 8

                  a.     Northwest Fails To Allege Legally Cognizable Injury
                          Arising From Either Its Present Inability to Raise Ticket
                          Prices or The Long Term Potential of Reduced Prices From
                          Increased Competition ...................................................................... 9

                  b.     Northwest's Alleged Injury of Lost Revenues From Biasing
                            States a Contract Claim, Not Antitrust Injury.............................. 11

                  c.     Northwest Complaint that Sabre Refused to Give It, a
                          Competitor, GDS Services For Nothing is Neither Antitrust
                          Injury Nor a Sherman § 2 Violation ........................................... 13

                  d.     Northwest's Contradictory Market Definition Dooms Any
                          Allegation of Antitrust Injury ...................................................... 15

             2.     Northwest Cannot Meet An Independent Requirement of Antitrust
                    Standing, Causation, Because Competitor Airlines' Individual
                    Decisions Not To Match Northwest's GDS Surcharge Caused
                    Whatever Injury Northwest is Claiming ................................................... 17

             3.     Northwest's Assertions That It Must Pay Monopolistically Inflated
                    Fees Under the Agreement Are Insufficient to Allege Antitrust
                    Injury...................................................................................................... 18

      B.     NORTHWEST'S THIRD, FOURTH AND FIFTH CLAIMS SHOULD
            BE DISMISSED. ................................................................................................. 21

            1.     The Airline Deregulation Act Preempts Northwest's  Minnesota
                    Law Claims ............................................................................................. 21

        a.    The ADA Preempts Claims That "Relate To" Airline "Prices" "Routes" or "Services" Including Claims Against Non-Airlines ............................................................................ 21

        b.    Northwest's State Law Claims Relate to Airline Prices, Routes, or Services, and Are Therefore Preempted .................... 22

    2.    Texas Law Governs and Requires Dismissal of Northwest's Third and Fourth Claims for Statutory Violations ............................................. 24

IV.    CONCLUSION ............................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Anago, Inc. v. Tecnol Medical Prod., Inc.,*
    976 F.2d 248 (5th Cir. 1992) ................................................................10, 11

*Associated General Contractors of California, Inc. v. California State Council of*
    *Carpenters,*
    459 U.S. 519 (1983).................................................................................. passim

*Atlantic Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990).........................................................................................9

*Almeda Mall, Inc. v. Houston Lighting & Power Co.,*
    24 P.U.R.4th 29 (S.D.Tex. 1978)...................................................................12

*Bayou Bottling, Inc. v. Dr. Pepper Co.,*
    725 F.2d 300 (5th Cir. 1984) ........................................................................18

*Bell v. Dow Chemical Co.,*
    847 F.2d 1179 (5th Cir. 1988) ...................................................................6, 11

*Bradley v. Chiron Corp.,*
    136 F.3d 1317 (Fed. Cir. 1998)......................................................................4

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (U.S. 1993).............................................................................9, 12

*Brunswick Corp. v. Pueblo Bowl-O-Mat,*
    429 U.S. 477 (1977) ................................................................................ passim

*Campbell v. Wells Fargo Bank, N.A.,*
    781 F.2d 440 (5th Cir.1986) ...........................................................................8

*Car Carriers, Inc. v. Ford Motor Co.,*
    745 F.2d 1101 (7th Cir. 1984), *cert. denied,* 470 U.S. 1054 (1985)...............7, 19

*Cinel v. Connick,*
    15 F.3d 1338 (5th Cir. 1994) ..........................................................................6

*Collins v. Morgan Stanley Dean Witter,*
    224 F.3d 496 (5th Cir. 2000) ..........................................................................4

*Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,*
    836 F.2d 173 (3d Cir. 1988).............................................................................7

*Cont'l T.V., Inc. v. GTE Sylvania Inc.,*
    433 U.S. 36 (1977)........................................................................................14

*Continental Airlines, Inc. v. American Airlines, Inc.,*
    824 F. Supp. 689 (S.D. Tex. 1993) ...............................................................22

*Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*,
    159 F.3d 129 (3d Cir. 1998)..........................................................................................15

*Davies v. Genesis Medical Ctr.*,
    994 F. Supp. 1078 (S.D. Iowa 1998) ...........................................................................15

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
    732 F.2d 480 (5th Cir. 1984).......................................................................................16

*Ellingson v. Burlington Northern, Inc.*,
    653 F.2d 1327 (9th Cir. 1981).......................................................................................4

*Endsley v. City of Chicago*,
    230 F.3d 276 (7th Cir. 2000) ......................................................................................15

*Evangelical Lutheran Church in America v. Atlantic Mutual Insurance Co.*,
    169 F.3d 947 (5th Cir. 1999).......................................................................................24

*SCFC ILC, Inc. v. Visa USA, Inc.*,
    36 F.3d 958 (10th Cir. 1994).......................................................................................14

*Ferens v. John Deere Co.*,
    494 U.S. 516 (1990)...................................................................................................24

*Fla. State Board of Admin. v. Law Engineering and Environ. Svcs., Inc.*,
    262 F. Supp. 2d 1004 (D. Minn. 2003).........................................................................24

*Frontier Airlines, Inc. v. United Airlines, Inc.*,
    759 F. Supp. 1399 (D. Colo. 1989)..............................................................................23

*Garshman v. Universal Resources Holding, Inc.*,
    641 F. Supp. 1359 (D.N.J. 1986) ................................................................................10

*Guidry v. Bank of LaPlace*,
    954 F.2d 278 (5th Cir.1992) ..................................................................................18, 19

*Hack v. President and Fellows of Yale College*,
    237 F.3d 81 (2d Cir. 2000)..........................................................................................16

*Holden Farms, Inc. v. Hog Slat, Inc.*,
    347 F.3d 1055 (8th Cir. 2003) .....................................................................................24

*Indeck Energy Svces. v. Consumers Energy Co.*,
    250 F.3d 972 (6th Cir. 2000) .......................................................................................20

*Johnson v. University Health Services*,
    161 F.3d 1334 (11th Cir. 1998) ...................................................................................14

*Kane Enterprise v. MacGregor (USA) Inc.*,
    322 F.3d 371 (5th Cir. 2003) .........................................................................................4

*Kiepfer v. Beller*,
    944 F.2d 1213 (5th Cir. 1991) .....................................................................................12

*Larry R. George Sales Co. v. Cool Attic Corp.,*
    587 F.2d 266 (5th Cir. 1979) ...................................................................7, 11

*Lovelace v. Software Spectrum, Inc.,*
    78 F.3d 1015 (5th Cir. 1996) ..............................................................................6

*Lyn-Lea Travel Corp. v. American Airlines, Inc.,*
    283 F.3d 282 (5th Cir. 2002) ...............................................................21, 22, 23

*MCI Communications Corp. v. American Telegraph and Telegraph Co.,*
    708 F.2d 1081 (7th Cir. 1983) .........................................................................15

*McCormack v. National Collegiate Athletic Association,*
    845 F.2d 1338 (5th Cir. 1988) .....................................................................7, 10

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992)............................................................................21, 22, 24

*Morris Communications Corp. v. PGA Tour, Inc.,*
    364 F.3d 1288 ....................................................................................................14

*NBO Industrial v. Brunswick Corp.,*
    523 F.2d 262 (3d Cir. 1975).............................................................................11

*Nelson v. Monroe Reg'l Medical Ctr.,*
    925 F.2d 1555 (7th Cir.1991) .............................................................................9

*Northwest Airlines, Inc. v. Astraea Aviation Services Inc.,*
    111 F.3d 1386 (8th Cir. 1997) .....................................................................24, 25

*Orion Pictures Distribution Corp. v. Syufy Enterprise,*
    829 F.2d 946 (9th Cir. 1987) ............................................................................12

*Phototron Corp. v. Eastman Kodak Co.,*
    842 F.2d 95 (5th Cir. 1988) ..............................................................................11

*Pool Water Products v. Olin Corp.,*
    258 F.3d 1024 (9th Cir. 2001) ............................................................................9

*Queen City Pizza, Inc. v. Domino's Pizza,*
    124 F.3d 430 (3d Cir. 1997)...........................................................12, 15, 16, 17

*Read v. Medical X-Ray Ctr., P.C.,*
    110 F.3d 543 (8th Cir.1997) ..............................................................................14

*Seagood Trading Corp. v. Jerrico, Inc.,*
    924 F.2d 1555 (11th Cir. 1991) ........................................................................14

*TV Communications Network, Inc. v. Turner Network Television, Inc.,*
    964 F.2d 1022 (10th Cir. 1992) ........................................................................16

*Tanaka v. University of S. Cal.,*
    252 F.3d 1059 (9th Cir. 2001) ..........................................................................16

*U.S. v. Citizens & S. National Bank*,
    422 U.S. 86 (1975)..................................................................................14

*United Farmers Agents Association, Inc. v. Farmer's Insurance Exch.*,
    89 F.3d 233 (5th Cir. 1996) ..................................................................16

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001)................................................................15

*Verizon Communications Inc. v. Trinko*,
    540 U.S. 398 (2004).....................................................................2, 14, 19

*Witty v. Delta Air Lines, Inc.*,
    366 F.3d 380 (5th Cir. 2004) ................................................................21

*2660 Woodley Road Joint Venture v. ITT Sheraton*,
    369 F.3d 732 (3rd Cir. 2004) ................................................................12

## UNPUBLISHED FEDERAL CASES

*Brady v. Allied Pilots Association*,
    2003 WL. 23119160 (N.D. Tex. 2003)...................................................4

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
    2004 WL. 2861167 (5th Cir. 2004).........................................................4

*Deep South Pepsi-Cola v. Pepsico, Inc.*,
    1989 WL. 48400 (S.D.N.Y. 1989).........................................................16

*E. & G. Gabriel v. Gabriel Brothers, Inc.*,
    1994 WL. 369147 (S.D.N.Y. 1994)........................................................16

*Universal Computer System, Inc. v. Volvo Cars of North America, Inc.*,
    1997 WL. 1433879 (S.D.Tex. 1997) ......................................................19

## FEDERAL STATUTES

44 U.S.C. § 1507....................................................................................5

DOT Proposed Rules, Computer Reservation Systems November 15, 2002
67 F.R. 69399...................................................................................20, 21

Computer Reservations System (CRS) Regulations (Jan. 7, 2004)
69 F.R. 1011.....................................................................................20, 22

Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b)(1)...............21, 22

## STATE STATUTES

Minn. Stat. § 325.68(2)...........................................................................21

Minn. Stat. § 325D.44.............................................................................21

**MISCELLANEOUS**

ABA, *Antitrust Law Development,* (5th ed. 2002).........................................................................11

.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Northwest's complaint is a straightforward breach of contract claim disguised in antitrust and Minnesota law clothing.  Its original complaint alleged only that Sabre breached its Participating Carrier Agreement with Northwest, as amended by the July 2003 Direct Connect Availability Agreement (the "Agreement").  In its First Amended Complaint, Northwest has dressed up its contract claim in meritless Sherman Act § 2 antitrust and Minnesota state law claims.  But Northwest's alleged antitrust injury – the inability to impose a price increase on tickets issued through Sabre – is not a cognizable antitrust injury.  Northwest thus lacks standing under *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977) ("*antitrust* injury [is] injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful").  Northwest three Minnesota law claims are clearly preempted under the federal Airline Deregulation Act and in any case not permitted by the Agreement's Texas choice-of-law provision.  In this Rule 12(b)(6) motion, Sabre requests that the Court dismiss Northwest's antitrust and Minnesota law claims.

The crux of Northwest's claim was and is that Sabre (in response to what it viewed as Northwest's breach of the Agreement) "biased" its computer display of Northwest's fares and seat availability on Sabre's computerized reservation system (called a "GDS" or "Global Distribution System"), which travel agents use to make travel reservations.  This conduct, Northwest now alleges in the amended complaint, not only breached Sabre's contractual obligations, but violated federal antitrust and Minnesota state laws.  In particular, Northwest complains that Sabre's conduct prevented Northwest from implementing its "initiative": (1) to raise the prices of airline tickets sold by travel agents through Sabre's GDS system; (2) to use that price increase to "incentivize" travel agents, who had obtained comparative airline fare information from Sabre's GDS to purchase tickets on Northwest's web site (where Northwest could avoid paying contractually-agreed booking fees to Sabre); and (3) to signal airline competitors to follow Northwest's price increase.

Northwest's antitrust theory, however, does not satisfy the high antitrust standing threshold. Northwest's two asserted injuries – its inability to raise ticket prices and to use Sabre's GDS services without paying for them (to "free ride" on Sabre's infrastructure) – are not the types of injuries the antitrust laws were intended to prevent. Neither injury harms competition; each only harms Northwest as a competitor (indeed each Northwest objective is anti-competitive). This flaw cannot be cured by further amendment and dooms Northwest's antitrust claim.

Northwest's conclusory allegations that Sabre is a monopoly exacting inflated prices and that Northwest's frustrated "initiative" would eventually have lowered prices does not create a surrogate "antitrust injury" under established Supreme Court antitrust doctrine. To summarize:

(1)    Antitrust injury must be immediate and not speculative. The only immediate injury Northwest alleges is that it was stopped from raising prices.

(2)    One competitor's refusal to permit another to free ride on its infrastructure does not constitute the exclusionary or anticompetitive conduct required for antitrust injury. Sabre's refusal to accept Northwest's plan to breach the Agreement and free ride on Sabre's infrastructure was therefore justified.

(3)    A logically defined market is a requirement for alleging antitrust injury. Yet Northwest pleads squarely contradictory market definitions, which, by itself, requires dismissal.

(4)    There must be a causal connection between the antitrust harm and the offending conduct. Yet Northwest concedes that it had to drop its new program (and thereby forgo additional revenues) because its competitor carriers did not follow Northwest's pre-announced price hike. Northwest's competitors' decision therefore is a superseding cause of any "injury" that Northwest suffered.

(5)    Legally acquired monopolies are entitled to enforce contractually set price terms and are under no obligation to subsidize competitors. Northwest does not allege that Sabre acquired its alleged monopoly power by anything other than superior technology, efficiency, and arms length contract negotiations.[1]

In short, Northwest's antitrust complaint reduces to a case of buyer's remorse, in which Northwest asks the Court to use the antitrust laws to change its bargained-for contract price. Northwest did not proclaim monopolistically inflated prices when it was negotiated discounted

---

[1] *Verizon Communications Inc. v. Trinko*, 540 U.S. 398, ---, 124 S. Ct. 872, 879 (2004); *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977).

fees for use of the Sabre system in the July 2003 Agreement, and it cannot do so now one year into the three year contract it negotiated.

Northwest's Minnesota law claims should also be dismissed because they relate to airline prices, routes or services and are thus preempted by the federal Airline Deregulation Act. In addition, the Minnesota statutory and common law claims fail as a matter of law because under the Agreement, Texas law, not Minnesota law, governs the parties' relationship.

## II.    SUMMARY OF ALLEGATIONS OF THE COMPLAINTS[2]

### A.    Sabre's Global Distribution System and Industry Structure

Sabre's GDS links airlines like Northwest to travel agents, so that travel agents can obtain airline fare and flight information and then purchase tickets for their customers through the GDS. (First Amended Complaint ¶ 9 ("FAC") at Appendix 012 ("App.")). The airlines pay a fee to Sabre (called a "booking fee") for each ticket the agent purchases through Sabre's GDS because Sabre has relationships with travel agents whose ticket sales generate huge revenues for the airlines. (FAC ¶¶ 10-13, 56 at App. 010-014, 028).

Travel agents typically use a single GDS, because searching more than one system for tickets adds time to a travel agent's search for the best airfares available from all airlines, and is thus inefficient. (FAC ¶¶ 15, 33, 56 at App. 014, 020-021, 028). Sabre's GDS provides travel agents with access to all fares and flight information and to the best available prices and routes for the passenger buying tickets, i.e., it enables agents to quickly "search out the best flights for their customers." (FAC ¶ 63 at App. 031). GDSs thus play a key role in enabling travel agents to find the most competitively priced tickets for consumers and businesses. Travel agents receive financial benefits from Sabre based on the amount of their sales through the system.

Northwest wants travel agents to bypass the GDS to book travel on its own web site because Northwest will not incur a GDS booking fee for those bookings. But Northwest admits it has a less attractive package for travel agents. It offers travel agents the ability to search only

---

[2] We assume that Northwest's allegations are true only for purposes of this motion.

Northwest and its partners' flights, instead of the hundreds of airlines that can be searched on the Sabre system. (*Compare* FAC ¶¶ 22-23 at App. 017, *with* FAC ¶ 32-33 at App. 020-021). Travel agents will "continue to make most of their bookings through a GDS system . . . because using alternative booking channels is less efficient for travel agents." (FAC ¶ 33 at App. 020-21 (quoting the DOT)). Northwest therefore apparently describes a desired competitive relationship between it and Sabre in which travel agents rely on Sabre's GDS infrastructure to collect airline flight and fare information, "to search out the best flights for their customers," but then purchase Northwest tickets on Northwest's competing web site in order to avoid the Sabre GDS booking fees. (FAC ¶ 63 at App. 031; *see also* FAC ¶¶ 9, 13, 50, 52, 56, 57 at App. 012-014, 026-029). Northwest also needs other airlines to match its initiative across all GDSs in order for Northwest's price increase "policy" to survive. (FAC at 50, 52 at App. 026-027).

**B.     Sabre's Agreement with Northwest**

Pursuant to their Agreement, Northwest contracted to pay Sabre on average a $12.50 GDS charge for each round trip ticket issued through Sabre. (August 25, 2004 Original Complaint ¶ 10 ("Original Complaint") at App. 003).[3] Northwest also alleges that it passes on its GDS charges in "varying degrees," to its customers in the form of increased ticket prices. (FAC ¶¶ 27, 30, 53 at App. 018-019, 027). The July 1, 2003 amendment to the Agreement[4]

---

[3] The Court may properly consider allegations in Northwest's original complaint on this Motion to Dismiss. *See, e.g.*, Schwarzer, et. al., Fed. Civ. Proc. Bef. Trial at § 9:223.5 (The Rutter Group 2004) ("The district court [on a Motion to Dismiss under Rule 12(b)6] is not required to accept as true allegations in an amended complaint that, without any explanation, contradict an earlier complaint"); *see also Bradley v. Chiron Corp.*, 136 F.3d 1317, 1324-26 (Fed. Cir. 1998) (court in ruling on Motion to Dismiss was not required to accept as true allegations in second amended complaint that were inconsistent with prior pleadings); *Ellingson v. Burlington Northern, Inc.*, 653 F.2d 1327, 1329-30 (9th Cir. 1981).

[4] While Northwest's Complaint did not provide the Court with a copy of the latest and operative amendment to the Agreement, dated July 1, 2003, Northwest expressly cites and relies on it in its Complaint; thus the Court may consider it in this motion. "[T]he court may review the documents attached to the motion to dismiss, e.g., the contracts in issue here, where the complaint refers to the documents and they are central to the claim." *Kane Enter. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003); *see also Causey v. Sewell Cadillac-Chevrolet, Inc.*, 2004 WL 2861167, *2 (5th Cir. 2004); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *Brady v. Allied Pilots Ass'n*, 2003 WL 23119160, *3 (N.D. Tex. 2003).

stated that, in exchange for Northwest providing to Sabre all of its fares at the same prices Northwest offered on its web site, the current booking fee to Northwest, "*shall be reduced* and remain at that amount" for a three year period, or through July 2006. (Agreement ¶ 2 at App. 072 (emphasis added); *see also* Agreement ¶ 3 at App. 072 ("(a) In consideration of the *reduced fees provided* by Sabre . . . [Northwest] shall provide through the Sabre GDS . . . Full Content concerning [its] schedules, fares and seat availability.  * * * (c) . . . [at] no less favorable levels and amounts than . . . [on] its own web site, or web sites operated by third parties")) (emphasis added).  Northwest now complains that these contractually negotiated fees to which it agreed are "monopoly prices."  (FAC ¶ 53 at App. 027).

### C.    Northwest Raises Prices For Tickets Issued Through Sabre

On August 24, 2004, Northwest announced a new policy intended to "provid[e] incentives for travel agents to use non-GDS alternatives in booking Northwest flights," by directly charging travel agents $7.50 for each Northwest ticket purchased through a GDS, (FAC ¶¶ 32, 36 at App. 027), a charge Northwest did not apply to tickets purchased from Northwest's website or the Orbitz system (which was partly owned by Northwest).  (Original Complaint ¶ 10 at App. 002-003).  Sabre immediately sued, claiming that Northwest's conduct breached the Agreement.  Sabre also simultaneously issued a press release accusing Northwest of breaching the Agreement by imposing a new and hidden fare increase on all domestic tickets issued through a GDS.  (Original Complaint ¶¶ 12-13 at App. 003).  Sabre announced a new policy applicable to *every* airline participating in its Direct Connect Availability three-year program ("DCA 3"), according to which *any* airline that charged a fee on tickets issued through Sabre but did not apply that fee to tickets purchased through the airline's own web site – a breach of the Agreement – would receive less prominent display of its flights than carriers providing the full complement of fares as required under the Agreement.  (Original Complaint Exh. 1 at App. 006).

### D.    The Litigation:  After Sabre Sues Northwest, Northwest Sues Sabre

Northwest sued Sabre in Minnesota on August 25, alleging that Sabre breached the Agreement by placing Northwest in an unfavorable position on Sabre's GDS display.  Northwest

alleged that this breach damaged Northwest by causing it to lose ticket sales. (Original Complaint ¶¶ 11, 14 at App. 003; FAC ¶ 54 at App. 027-028). Notwithstanding Northwest's announced $7.50 surcharge, Northwest alleged that "Northwest has not changed its fares, nor does Northwest believe that it has breached the Agreement with Sabre." (Original Complaint ¶ 15 at App. 003).[5] Northwest filed its First Amended Complaint in Minnesota on September 27, 2004, adding its antitrust and state statutory and tort law claims to its existing contract claim. On November 8, 2004, this Court denied Northwest's motion to stay or in the alternative to transfer Sabre's first-filed action to Minnesota. By stipulated order, the Minnesota court transferred Northwest's action to this Court, which by order dated December 21, 2004, consolidated the actions.

## III.    ARGUMENT

### A.    Northwest's First Claim for Sherman Act § 2 Violations Should Be Dismissed

The Supreme Court in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 (1983), has "articulated the high standing threshold that plaintiffs must cross in the antitrust setting. Unlike the case of the more modest Constitutional standing requirement of injury in fact, courts addressing antitrust claims 'must make a…determination whether the plaintiff is a proper party to bring a private antitrust action.'" *See also Bell v. Dow Chemical Co.*, 847 F.2d 1179, 1183 (5th Cir. 1988) (applying standing analysis to Sherman § 2 claim and quoting *Associated*, 459 U.S. at 535). Courts regularly dismiss antitrust claims for failure to state a claim where the plaintiff has failed to adequately

---

[5] The Department of Transportation ("DOT") disagreed with Northwest. It views the surcharges that Northwest and other carriers announced at the same time as the GDS fee as fare increases. *See* DOT November 5, 2004 Notice at App. 077-081. Sabre hereby requests the Court to take judicial notice of all DOT pronouncements cited herein and attached in the accompanying appendix. (*See infra* note 29 and accompanying text and note 32). The Court is required to take judicial notice of the DOT findings published in the Federal Register. 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . ."). Moreover, consideration of these documents is proper in ruling on a motion to dismiss. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996) (stating that courts may consider on motion to dismiss "matters of which they may take judicial notice"); *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994) ("In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record").

allege antitrust standing. *See, e.g., Larry R. Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273

(5th Cir. 1979) (adopting district court's order dismissing antitrust claim on 12(b)(6) motion

where plaintiff offered "conclusory allegations" that failed to provide facts supporting antitrust

standing and showed, at most, that Plaintiff had claims for tort and breach of contract).[6] This

Court must therefore scrutinize the Complaint's allegations to determine if Northwest has alleged

with reasonable particularity the factors necessary to demonstrate antitrust standing.

Conclusions are not enough; the antitrust plaintiff must allege supporting facts. *Associated Gen'l

Contractors*, 459 U.S. at 527 ("it is not … proper to assume that [the plaintiff] can prove facts

that it has not alleged or that the defendants have violated the antitrust laws in ways that have not

been alleged").[7]  At least two of the factors required by *Associated General Contractors* are

missing here: (1) Northwest's alleged injury is not of the type for which the antitrust laws were

intended to provide redress; and (2) there is no causal connection between the alleged antitrust

violation and Sabre's alleged harm to Northwest. *Bell*, 847 F.2d at 1183 (interpreting *Associated

Gen'l Contractors*).

---

[6] *Accord Associated Gen'l Contractors,* 459 U.S. at 519 (affirming dismissal because plaintiff's
speculative allegations of indirect injury were insufficient to establish antitrust injury);
*McCormack v. National Collegiate Athletic Ass'n,* 845 F.2d 1338, 1342 (5th Cir. 1988)
(affirming dismissal of antitrust claim where alleged connection between anti-competitive
conduct by NCAA and injury to alumni was "the sort of 'speculative' and 'abstract' causal chain
that the Supreme Court has held insufficient to support antitrust standing"); *Campbell v. Wells
Fargo Bank, N.A.*, 781 F.2d 440, 443 (5th Cir.1986).

[7] Standing elements must be pled with reasonable particularity.  In a factually complex antitrust
case, "[A] *district court must retain the power to insist upon some specificity in pleading before
allowing a potentially massive factual controversy to proceed.*" *Associated General
Contractors,* 459 U.S. at 528 n.17 (emphasis added). "When the requisite elements are lacking,
the costs of modern federal antitrust litigation and the increasing caseload of the federal courts
counsel against sending the parties into discovery when there is no reasonable likelihood that the
plaintiffs can construct a claim from the events related in the complaint." *Commonwealth of Pa.
ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 182 (3d Cir. 1988) (quoting *Car Carriers,
Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

1.     **Northwest Lacks Standing to Assert an Antitrust Claim, Because It Has Not, and Cannot, Allege Antitrust Injury**

Northwest lacks standing because it has not alleged an antitrust injury.[8]  Northwest alleges that Sabre used its monopoly power to stop Northwest from succeeding with its GDS surcharge initiative.  Even assuming that Sabre's reaction to Northwest's announcement stopped Northwest from implementing the planned price increase, Northwest's injury (i.e., the inability to raise prices) is not the sort of "harm" that Sherman § 2 was designed to prevent.  (*See infra* at 9-10).  The Supreme Court has repeatedly held that private antitrust plaintiffs do not have standing to allege antitrust claims unless they plead with reasonable particularity that their claimed injuries resulted from anticompetitive effects of defendant's conduct.  *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977); *Associated General Contractors*, 459 U.S. at 535.[9]  It is not enough to claim that a monopoly exists or to speculate that there is some causal connection between the monopoly and any injury flowing from defendant's use of its monopoly power.  As the Supreme Court in *Brunswick* explained:

> Plaintiffs must prove *antitrust* injury, which is to say injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

---

[8] Northwest alleges two types of damages because "Sabre's conduct effectively prevented Northwest from successfully implementing the Shared GDS Fee Policy."  (FAC ¶ 54 at App. 027-028).

> 1. Northwest must continue to pay booking fees to Sabre under the Agreement.  The imposition of its surcharge would have enabled Northwest (1) to avoid incurring Sabre booking fees since tickets travel agents would have booked on the Northwest website to avoid the Northwest surcharge, and (2) with respect to tickets purchased through Sabre, to "defray" the costs of Sabre booking fees by obtaining the $7.50 surcharge from travel agents.  In addition, Northwest's inability to impose the surcharge also allowed Sabre to maintain its "per segment booking fee" at the contractually mandated level.  (FAC ¶ 54 at App. 027-028; FAC ¶ 53 at App. 027).

> 2. For a few days before September 1, 2004, Sabre's "manipulation of [displayed] information," (the alleged Sabre breach) caused Northwest to lose "sales that it otherwise would have made" through Sabre travel agents.  (FAC ¶ 54 at App. 027-028).

[9] *Accord Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 443 (5th Cir.1986) (dismissing antitrust claim on 12(b)(6) motion where "the injuries claimed [we]re not a direct consequence of the alleged activities of the defendants").

*Brunswick Corp.*, 429 U.S. at 488 (emphasis added).  This test means that the Court must connect the alleged injury to the purpose of the antitrust law being asserted.  Compensation for that injury must be consistent with the purposes of antitrust law generally and with the rationale for condemning the particular defendant.  The antitrust injury requirement for standing prevents any recovery for losses resulting from competition, even if conduct violating the antitrust laws caused competitive injury to plaintiff: "The antitrust laws . . . were enacted for the 'protection of competition, not competitors.'"  *Id.* at 488.

**a.    Northwest Fails To Allege Legally Cognizable Injury Arising From Either Its Present Inability to Raise Ticket Prices or The Long Term Potential of Reduced Prices From Increased Competition**

Northwest's injury allegedly resulting from Sabre's "killing" of Northwest's plan to encourage other airlines to raises prices is simply Northwest's lost revenue.  This is not the antitrust injury which Sherman § 2 was designed to prevent.  It is fundamental that rendering a plaintiff unable to raise prices is not antitrust injury.  *See, e.g., Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338-339 (1990) (finding no antitrust injury where plaintiff's complaint was "really claiming that it [is] unable to raise prices").  Being unable to raise prices (if not the result of predatory pricing) is not antitrust injury and cannot be said to stem from anticompetitive conduct.  *Id.; accord Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) ("discouraging a price cut and forcing firms to maintain supracompetitive prices, thus depriving consumers of the benefits of lower prices in the interim, does not constitute sound antitrust policy"); *Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) ("the antitrust laws are only concerned with acts that harm 'allocative efficiency and *raise[ ] the price of goods* above their competitive level or diminish[ ] their quality'") (emphasis added); *see also Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1564 (7th Cir. 1991) (antitrust injury "means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws").

Sabre's alleged breach did not exclude Northwest as a competitor, restrict output, or increase prices to Northwest as a consumer of GDS services or to its passengers. It was just the opposite. Sabre's actions ensured that travel agents benefited from the terms of Sabre's contract with Northwest so that prices did not increase, agents using the Sabre GDS had access to *all* of Northwest's fares, and GDS output did not decrease. Tellingly, it is Northwest that sought to achieve "[t]ypical [Sherman § 2] anticompetitive effects [which] include[d] increased prices and decreased output." *Anago, Inc. v. Tecnol Med. Prod., Inc.*, 976 F.2d 248, 249 (5th Cir. 1992); *accord Garshman v. Universal Res. Holding, Inc.*, 641 F.Supp. 1359, 1369-70 (D.N.J. 1986) (granting 12(b)(6) motion to dismiss Sherman § 2 claim where "the actions alleged neither excluded competitors, nor suppressed supply in order to maintain a monopoly and to increase prices charged to consumers").[10] Thus, as in *Brunswick*, using § 2 to provide refuge for Northwest to increase prices and signal its price increase to other airlines is "inimical" to the purpose of the antitrust laws. For this reason alone, Northwest's complaint fails to state a claim for "antitrust injury" and should be dismissed.[11]

*Brunswick's* facts are further instructive because Northwest asserts that Sabre's continued breach will injure it in the future. Northwest alleges that its surcharge initiative would have eventually permitted Northwest to reduce its GDS booking fee expenses, as travel agents moved toward non-GDS alternatives. (FAC ¶¶ 30, 54 at App. 019-020, 027-028). In *Brunswick*, the lower court found the merger violated Clayton § 7 because it would enable the merged firm to

---

[10] *Compare Bell*, 847 F.2d at 1183 ("The court's focus must be upon competition in the allegedly restrained market. Restraint in the market affects consumers and competitors in the market; as such, they are the parties that have standing to sue.").

[11] It is therefore no surprise that, as in *Brunswick*, Northwest does not allege facts in support of any conclusory allegations of injury to competition. Northwest does not connect what it characterizes as "anticompetitive and exclusionary conduct," arising from Sabre's alleged "message" to the carriers, with any of Northwest's list of claimed damage. (*Compare* FAC ¶¶ 62-63 at App. 030-031 *with* ¶54 at App. 027-028). And for good reason, since ¶ 54 simply lists damages peculiar to Northwest as a competitor. Northwest's mismatch between any alleged antitrust injury and its claimed damages is underlined by ¶ 63's focus on injury to just the travel agent subscribers. To the extent that Northwest claims it was excluded from the broader ticket distribution market and suffered injury as a competitor (¶ 63), Northwest's complaint concedes Sabre's justification in refusing to give Northwest its services for nothing. *See infra* at 13-15.

engage in future predatory pricing and thereby undermine legitimate competition in the bowling

alley market.[12]  *See NBO Indus. v. Brunswick Corp.*, 523 F.2d 262, 268 (3rd Cir. 1975).  That

sort of speculation about future pricing, however, does not give rise to antitrust injury.  *Id.*  For

while this future anticompetitive conduct was sufficiently "probable" to make Brunswick's

acquisition unlawful, it had not yet occurred, and therefore could not have injured plaintiff, a

competitor of the acquired bowling alley.  *Id.*  Courts look only to the immediate impact of

challenged conduct on competition.[13]  Northwest's allegations of speculative future injury cannot

create antitrust injury and thus cannot support a private Sherman § 2 claim.

> **b.**  **Northwest's Alleged Injury of Lost Revenues From Biasing States a Contract Claim, Not Antitrust Injury**

Northwest's core antitrust injury assertion is that Sabre breached the Agreement by

biasing its computer display, costing Northwest lost profits from ticket sales and frustrating

Northwest's initiative to strengthen its competing web site by pressuring travel agents to book

tickets on it.  (FAC ¶¶ 36-54 at App. 021-028).  Contract disputes and breaches harming just

competitors, however, are not antitrust injury to competition.  *Brunswick*, 429 U.S. at 487;

---

[12] The *Brunswick* plaintiffs, owners of small bowling alleys, claimed that Brunswick, a bowling equipment manufacturer, had violated § 7 of the Clayton Act (prohibiting mergers that may substantially reduce competition) by acquiring and resurrecting bankrupt bowling alleys that competed with plaintiffs' alleys.  But for Brunswick's acquisition, the bankrupt firms would have exited the market, concentrating competition and thereby increasing plaintiffs' revenues. As *Brunswick* explained, however, plaintiffs' lost profits resulting from increased competition did not give rise to antitrust standing.  Lost profits from increased competition, is not the type of injury that the antitrust laws were designed to prevent.  429 U.S. at 488.  To have awarded damages for plaintiff's injury would have been "inimical to the purposes of those [antitrust] laws."  *Id.*

[13] *Accord Associated Gen'l Contractors*, 459 U.S. at 525 (court of appeals incorrectly relied on rationale that injury to union was "a foreseeable consequence of the antitrust violation"); *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 100 (5th Cir. 1988) (merely "facing the specter of [antitrust injury] is [not] enough to create standing").  Thus, speculative allegations about anticompetitive effects will not satisfy the exacting standard for establishing antitrust injury. *E.g., Anago*, 976 F.2d at 249; *see also McCormack*, 845 F.2d at 1338 (affirming grant of motion to dismiss antitrust claim where alleged connection between anti-competitive conduct by defendant and injury to plaintiffs was "the sort of 'speculative' and 'abstract' causal chain that the Supreme Court has held insufficient to support antitrust standing"); *Bell*, 847 F.2d at 1184 (dismissing antitrust suit where plaintiff's theory of antitrust injury was "speculative, abstract, [and] impractical").

*Kiepfer v. Beller*, 944 F.2d 1213, 1221 (5th Cir. 1991) ("An antitrust plaintiff must show not just that the defendants' actions injured him, but that they unreasonably restrained competition") (citations omitted). Courts repeatedly recognize that antitrust injury is unlikely where the alleged injury would be better addressed as a breach of contract or business tort (no matter how egregious). *Brooke Group Ltd.*, 509 U.S. at 225 ("[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce'") (citations omitted); *Queen City Pizza, Inc. v. Domino's Pizza*, 124 F.3d 430, 441 (3rd Cir. 1997) (unreasonable behavior addressed by contract remedy, not by antitrust laws).[14]

The case of *Orion Pictures Distribution Corp. v. Syufy Enter.*, 829 F.2d 946, 949 (9th Cir. 1987) is illustrative. There the Ninth Circuit affirmed a directed verdict because of the absence of Sherman § 2 antitrust injury arising from defendant movie exhibitor's breach of its contract to pay guarantees to be able to show plaintiff distributor's film in the Las Vegas market. Plaintiff claimed that defendant purchased additional movie theatres and obtained increased monopoly leverage after bidding to distribute plaintiff's film. Plaintiff alleged that defendant's monopolization of the market made possible defendant's repudiation of the contract after it had acquired monopoly power in the market.[15] The *Orion* court rejected the argument:

---

[14] *Accord Larry R. George Sales*, 587 F.2d at 272 ("[i]t is apparent on the face of these allegations that Plaintiff has, at most, stated causes of action for extortion or for tortious interference with contractual relations, and not any claim under the Sherman Antitrust Act. That Act does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce"); 2660 *Woodley Road Joint Venture v. ITT Sheraton*, 369 F.3d 732, 738-39 (3d Cir. 2004) (injury caused by breach of contract and corruption, not by antitrust violation); *Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 24 P.U.R. 4th 29, 30 (S.D.Tex. 1978) ("Because the antitrust laws are designed to protect competition as opposed to competitors, a mere showing of lost profits to plaintiffs as a result of defendant's practice, even if assumed to be technically illegal, is insufficient to establish an injury compensable under the antitrust laws"); *see also* ABA, Section of Antitrust Law, *Antitrust Law Developments*, at 849 (5th ed. 2002) ("Antitrust injury also is not likely to be found where the alleged injury would be better addressed through a breach of contract business tort cause of action").

[15] The Ninth Circuit did not reach the trial court's findings on the Exhibitor's monopoly power. 829 F.2d at 948.

> Orion's damages do not constitute antitrust injury. The purpose of
> the antitrust laws is to protect competition. Syufy's alleged
> monopolization did not affect the competition to license *The
> Cotton Club* at the time of bidding for the movie. After *The Cotton
> Club* was licensed, Syfuy's duties to Orion were fixed by its
> contractual commitment to pay guarantees. Because competition
> was no longer a factor in determining Syufy's obligation to Orion,
> Orion's injury does not "reflect the anticompetitive effect" of
> Syufy's alleged monopolization. Orion has suffered a breach of
> contract, not an antitrust injury.

829 F.2d at 949. Similarly, without pleading any facts that Sabre's alleged monopolization

impacted the parties' negotiation of the Agreement and prices, Northwest cannot begin to allege

that it suffered anything other than a simple contract breach, as Northwest originally claimed.

<blockquote>

c.   **Northwest's Complaint that Sabre Refused to Give It, a
     Competitor, GDS Services For Nothing is Neither Antitrust
     Injury Nor a Sherman § 2 Violation**

</blockquote>

Northwest acknowledges that travel agents must rely on Sabre's GDS system, "to search

out the best flights for their customers" (FAC ¶¶ 63, 56 at App. 031, 028).[16] To attempt to

compete with Sabre, Northwest says that it must be allowed to impose a surcharge (or tax) on the

travel agents who use Sabre to motivate them to book Northwest tickets on the Northwest web

site. (FAC ¶¶ 50, 53, 54, 57 at App. 026-029). Northwest pays nothing when a travel agent

*searches* the Sabre GDS to find the best flights and fares. It pays only when a ticket is *booked*

on the Sabre GDS. For each fare booked on Northwest's site, Northwest thus avoids entirely

Sabre's GDS charges. Northwest's "initiative" to impose a charge on travel agents for booking

on Sabre's GDS is intended in part to relieve Northwest of its obligation to compensate Sabre for

the value Northwest receives from the Sabre GDS. With a surcharge, Northwest would continue

to benefit from having travel agents use Sabre's GDS services to locate and compare Northwest

flights and fares. But so long as the travel agents avoid buying the tickets on Sabre (to avoid the

surcharge), Northwest pays nothing.

This is classic "free riding," generally viewed by the courts as anticompetitive. *Morris*

---

[16] Northwest acknowledges that GDSs are superior and more efficient information search
engines than alternative booking channels such as Northwest's (FAC ¶¶ 33, 63 at App. 020-021,
031).

*Communications Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1298 (11th Cir. 2004 ("[t]he prevention of free-riding, which is an inherently economic motivation, provides a valid business justification" for allegedly anticompetitive conduct in violation of Sherman § 2).[17] Competitive principles contemplate that competitors such as Northwest should expend their own resources to compete.[18] That Sabre did not meekly submit to Northwest's free riding and price discrimination against GDS tickets is neither an antitrust violation nor a basis for finding antitrust injury. In an analogous case, the Supreme Court recently stated that even a monopolist has no duty to assist its rivals:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing – a role for which they are ill-suited. Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion.

*Verizon Communications*, 540 U.S. ---, 124 S. Ct. at 879; *see also Johnson v. Univ. Health Services*, 161 F.3d 1334, 1338 (11th Cir. 1998) (refusal to subsidize doctor's private practice is

---

[17] *See also Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 55 (1977) (overturning *per se* prohibition of vertical nonprice intrabrand restrictions because as a result of "the so-called 'free rider' effect, these services might not be provided by retailers"); *Read v. Medical X-Ray Ctr., P.C.*, 110 F.3d 543, 546-47 (8th Cir.1997) (prevention of free-riding was legitimate business justification for conduct allegedly in violation of Sherman § 2); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991) (rejecting plaintiff's antitrust claim based on defendants' refusal to allow free-riding on its business: "The plaintiffs then are asking us to equip them with [the defendant's] competitive advantage. This is not a function of the antitrust laws. The antitrust laws are not intended to support artificially firms that cannot effectively compete on their own"); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 972 (10th Cir. 1994) (antitrust defendant's efforts to prevent free-riding by refusing to deal with competitor could not constitute Sherman § 1 violation).

[18] "The central message of the Sherman Act is that a business entity must find new customers and higher profits through internal expansion – that is, by competing successfully rather than by arranging treaties with its competitors." *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 116 (1975).

not the type of injury that the antitrust laws were intended to prevent). Northwest, therefore, can allege no antitrust violation or injury on its exclusionary theory.

This is particularly true because the parties' Agreement sets the charge that Northwest now seeks to avoid. It tried unilaterally to change that contract price, both by avoiding paying GDS fees as contemplated by the Agreement, and simultaneously by trying to improve its competitive position against Sabre by free riding. (*See infra* at 20). Northwest's initiative gives free riding new meaning and fully justified Sabre's alleged refusal to deal with Northwest. While Northwest baldly asserts exclusionary conduct, it is unable as a matter of law to support it with any alleged facts.[19] Northwest's free ride theory further demonstrates why this action is no more than a contract dispute.

### d. Northwest's Contradictory Market Definition Dooms Any Allegation of Antitrust Injury

The Court should dismiss Northwest's complaint on the independent ground that Northwest alleges profoundly contradictory and overly restrictive market definitions in an attempt to create the appearance of monopoly market power critical to alleging antitrust injury. *See, e.g., Queen City Pizza Inc. v. Domino's Pizza*, 124 F.3d 430, 436 (3rd Cir. 1997) (affirming 12(b)(6) dismissal where alleged relevant market was unreasonably restricted).[20] On the one

---

[19] *Compare* FAC ¶¶ 62 and 63 at App. 030-031 (alleging that Sabre had no business justification for its computer biasing and engaged in exclusionary conduct), *with United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001) (in order for a practice to be exclusionary, "it must harm the competitive *process* and thereby harm consumers. … [H]arm to one or more *competitors* will not suffice" for a § 2 violation.) (emphasis in original); *MCI Communications Corp. v. American Tel. and Tel. Co.*, 708 F.2d 1081, 1149 (7th Cir. 1983) ("as pure matter of antitrust law . . . we decline to hold AT&T liable for a refusal to make available its full nationwide network to a competitor"). It is counterintuitive and implausible for Northwest to allege that "Sabre would have no legitimate reason to sacrifice short term profits," when Northwest alleges that its objective was to have Sabre subsidize Northwest's web site.

[20] *Accord Davies v. Genesis Med. Ctr.*, 994 F. Supp. 1078 (S.D. Iowa 1998) (12(b)(6) dismissal appropriate where complaint in § 2 case contained contradictory allegations regarding anticompetitive actions affecting relevant product and geographic markets and led to finding of no antitrust injury, but only injury to plaintiff); *Endsley v. City of Chicago*, 230 F.3d 276 (7th Cir. 2000) ("where plaintiff fails to identify any facts from which the court can 'infer that defendants had sufficient market power to have been able to create a monopoly,' their § 2 claim may be properly dismissed"); *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129 (3rd Cir. 1998) (in monopolization case, even allegations of large market share are insufficient as a matter of law where plaintiff failed to allege other factors relevant to monopoly

hand, to attempt to allege Sabre's "monopoly power," monopoly maintenance and exclusionary

conduct, Northwest alleges an exceedingly narrow and circular market – literally limited by

definition to travel agents that use Sabre: "Sabre possesses monopoly power in the market for

provision of GDS services *to Sabre travel agency subscribers*," where Sabre obviously has "a

share . . . that approaches 100%." (FAC ¶¶ 56, 54, 62, 61, 65 at App. 027-028, 030-033)

(emphasis added).  Northwest alleges that this market is a function of the restrictions in the

contracts between each GDS and its travel agents.  (FAC ¶¶ 16, 18 at App. 014-015).  But that

market definition runs afoul of a well established line of decisions dismissing antitrust

complaints based on a one company market defined solely by restrictive contracts and not by the

reasonable interchangeability of products.[21]

---

power); *E.& G. Gabriel v. Gabriel Bros., Inc.*, 1994 WL 369147, *4-5 (S.D.N.Y. 1994) (granting 12(b)(6) motion, "It is axiomatic that, without first delineating a relevant market with minimal specificity, one cannot allege monopolization of this market... Plaintiff's failure to allege a plausible product market is fatal to its claim. . . .  Without an appropriate product market, 'it is impossible for a court to assess the anticompetitive effect of challenged practices'").

[21] *See, e.g., Queen City Pizza Inc.*, 124 F.3d at 436 (affirming 12(b)(6) dismissal where plaintiff's proffered market definition lacked allegations of reasonable product interchangeability, and instead was based on contracts subject to competition at the pre-contract stage: "where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted"); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81 (2nd Cir. 2000) (affirming 12(b) dismissal: "economic power derived from contractual arrangements affecting a distinct class of consumers cannot serve as a basis for a monopolization claim"); *United Farmers Agents Ass'n, Inc. v. Farmer's Ins. Exch.*, 89 F.3d 233, 237 (5th Cir. 1996) ("economic power derived from contractual agreements such as franchises or in this case, the agents' contracts with Farmers 'has nothing to do with market power, ultimate consumer's welfare, or antitrust'" and could not be used to define relevant market) (citation omitted).

Similarly, courts have routinely dismissed cases where, as here, the relevant market is alleged as being limited to only the defendant's product, brand, or distribution. *See, e.g., Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir. 1984) (plaintiff's definition of market as limited to defendant's hotel rooms "is without merit as a matter of law, because absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market"); *Deep South Pepsi-Cola v. Pepsico, Inc.*, 1989 WL 48400 at * 7 (S.D.N.Y. 1989) ("It is well settled that a manufacturer's monopoly over the distribution of its own product cannot form the basis of a valid monopolization claim . . .") at App. 128; *Tanaka v. Univeristy of S. Cal.*, 252 F.3d 1059, 1062-63 (9th Cir. 2001) (affirming dismissal of action where plaintiff attempted to restrict the relevant market to a single athletic program in Los Angeles); *see also TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964

On the other hand, in its effort to find some basis to claim antitrust injury, Northwest strains to allege that it is a *competitor* of Sabre. (FAC ¶ 57 at App. 028-029). To do so, Northwest alleges a far broader product market in which Sabre, all GDSs, Northwest, all other airlines, and alternative booking services all must compete: "Northwest is a competitor . . . because Sabre provides services . . . to travel agency subscribers (who use the system to access that information and to make bookings). From the standpoint of travel agents, Northwest provides an alternative to the Sabre GDS . . . through Northwest's own dedicated web site for travel agents . . . ." (*Id.*). If Northwest's web site, which allows booking only "on Northwest and its code share partners," (FAC ¶ 32 at App. 020), is competing with Sabre, then all airlines with web sites must also compete with Sabre as well as with all GDSs.[22]

Given these and other admissions of a much broader product market,[23] Northwest's allegations preclude its claim. Either it is unable to allege that Sabre has monopoly power in the market in which it competes, or it must retreat to the nonsensical definition that the Sabre GDS is the market (and therefore that Sabre has nearly a 100% market share), meaning it is not a competitor and cannot allege antitrust injury. Either way its antitrust claim is fatally flawed.

  2.  **Northwest Cannot Meet An Independent Requirement of Antitrust Standing, Causation, Because Competitor Airlines' Individual Decisions Not To Match Northwest's GDS Surcharge Caused Whatever Injury Northwest is Claiming**

Independent of Northwest's inability to allege antitrust injury, Northwest's complaint precludes it from alleging another required element of antitrust standing: a causal connection

---

F.2d 1022, 1025 (10th Cir. 1992) (affirming dismissal where plaintiff alleged a relevant product market over which the defendant held a natural monopoly).

[22] *See, e.g., Queen City Pizza Inc.*, 124 F.3d at 437 ("the outer boundaries of a relevant market are determined by reasonable interchangeability of use ... 'Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively'").

[23] Northwest also admits that there is competition "from on-line alternatives to GDS services provided to travel agents." (FAC ¶ 53 at App. 027), and other "alternative forms of distribution" to the GDSs (FAC ¶ 51 at App. 026-027), and that there is competition among GDSs that Sabre attempted to restrain by stopping efforts to "wean" travel agents from one GDS. (FAC ¶ 50 at App. 026).

between Sabre's alleged antitrust violation and Northwest's injury. *Associated General Contractors*, 459 U.S. at 535. Northwest admits that its initiative ultimately failed *because other airlines did not match Northwest's increased GDS ticket prices.* (Ex. B ¶¶ 2, 50, 52). The complaint alleges no facts supporting Northwest's apparent supposition that all other major airlines would have matched Northwest's GDS surcharge had Sabre not reacted to Northwest's breach. The complaint does not allege, for instance, that carriers always match one another's price increases.[24] As pled, Northwest's situation would have been the same with or without Sabre's alleged biasing – that is, Northwest would have had to back off its planned price increase because the other airlines refused to follow. Thus, the complaint fails to allege causation of antitrust injury.[25]

### 3. Northwest's Assertions That It Must Pay Monopolistically Inflated Fees Under the Agreement Are Insufficient to Allege Antitrust Injury

Northwest asserts background allegations of Sabre's and other GDSs' pre-existing monopoly power being wielded to result in "excessive," "supracompetitive," "monopolistically inflated" booking fees and competitive harm to consumers and airlines. These assertions without supporting historical allegations of anticompetitive conduct cannot add up to the missing antitrust injury allegations. This Court should therefore reject Northwest's conclusory equation that alleged high contract prices equals Sherman § 2 antitrust injury. "Monopoly prices" without

---

[24] While Northwest may allege in conclusory fashion the motives for the other airlines' decisions not to match Northwest's lead, (i.e., that every airline was intimidated by Sabre's announcement and actions) there is no basis in the Complaints or in common sense to view Northwest's speculation as plausible. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir.1992) ("conclusory allegations and unwarranted deductions of fact are not admitted as true" on a motion to dismiss).

[25] *See, e.g., Brunswick Corp.*, 429 U.S. at 487-98 (no causal link established between claimed anti-competitive conduct and alleged injury where injury could have occurred even in the absence of any conduct in violation of the antitrust laws); *Bell*, 847 F.2d at 1184 (noting that while "Bell blames the lack of sales on the high price [defendant] charged for the materials; other causal possibilities abound, such as the price of the machine or its limited product uses"); *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir. 1984) (anti-trust case dismissed where injuries were not caused by alleged antitrust violation but instead by other forces including lawful competition).

anticompetitive intent, are not inappropriate, are at most evidence of monopoly power, and are to

be expected. *Verizon Communications*, 540 U.S. ---, 124 S. Ct. at 879:

> The mere possession of monopoly power, and the concomitant charging of
> monopoly prices, is not only not unlawful; it is an important element of the free-
> market system. The opportunity to charge monopoly prices – at least for a short
> period – is what attracts "business acumen" in the first place; it induces risk
> taking that produces innovation and economic growth. To safeguard the incentive
> to innovate, the possession of monopoly power will not be found unlawful unless
> it is accompanied by an element of anticompetitive conduct.

Northwest has wrongly relied on labels and has not pled antitrust injury with "reasonable

particularity."[26]  Indeed, as demonstrated above, Northwest has not even alleged a

coherent product market. (*Supra* at 15-17).

    The contract reveals that the Sabre prices complained of are the result of Northwest's

successful negotiations with Sabre to achieve a *discounted* GDS price in July 2003.  (Agreement

at App. 072).  If Sabre had monopoly power sufficient to extract monopoly prices, as Northwest

alleges, how could Northwest have negotiated price discounts?  Instead, one would have

expected to see allegations of Sabre wielding monopoly power to force Northwest to provide its

lowest fares *without* Sabre entering into price negotiations, let alone concessions.  *See Associated*

*Gen. Contractors*, 459 U.S. at 528, n.17 ("Had the District Court required the Union to describe

the nature of the alleged coercion with particularity before ruling on the motion to dismiss, it

might well have been evident that no violation of law had been alleged").  In addition, Northwest

did not file an antitrust complaint after entering into the Agreement of July 2003.[27]  On August

25, 2004, Northwest filed only a vanilla contract breach claim with no allegation that the prices

---

[26] *See Car Carriers*, 745 F.2d at 1106-07 ("The pleader may not evade these requirements [of
reasonable particularity] by merely alleging a bare legal conclusion; if the facts 'do not at least
putline or adumbrate' a violation of the Sherman Act, the plaintiffs 'will get nowhere merely by
dressing them up in the language of antitrust.'"); *Guidry*, 954 F.2d at 281 ("conclusory
allegations and unwarranted deductions of fact are not admitted as true" on a motion to dismiss);
*Universal Computer Sys., Inc. v. Volvo Cars of North America, Inc.*, 1997 WL 1433879, *6
(S.D.Tex. 1997) (granting 12(b)6 motion to dismiss Sherman § 2 claims where plaintiff had
failed to allege with particularity facts establishing anti-trust injury as required by *Associated
Gen. Contractors*, 459 U.S. at 528, n. 17) at App. 138.

[27] The FAC also lacks allegations that it was Sabre's alleged monopoly power that made possible
Sabre's breach of the Agreement.

in that contract were "monopolisitic" or that is was coerced into entering the Agreement. The Court should give no credence to Northwest's current, unsupported antitrust injury labels of "monopolistic inflated prices." At bottom, Northwest's lonely status as the sole carrier claiming to have been the victim of Sabre's alleged anticompetitive conduct underlines that it is alleging injury only to itself as a competitor unhappy with its earlier Agreement, and not injury to competition.[28]

To paper over its buyer's remorse and inability to allege any anticompetitive conduct, Northwest alleges quotes from, and refers to, DOT comments in support of this so called GDS monopoly power, without providing context or dates. These ersatz monopoly allegations are inconsistent with more recent pronouncements by the DOT. For instance in pronouncing its Rules on January 7, 2004, the DOT noted in rejecting a so called "zero fee rule" [the notion that GDSs not charge booking fees to airlines] that: "[T]he [GDS] systems' exercise of their ability to charge monopoly-level prices to one set of airline users – does not violate antitrust principles or the antitrust laws." 69 Fed Reg. at 1012 at App. 092; *see also*, DOT Proposed Rules, Computer Reservation Systems November 15, 2002, 67 Fed Reg. 69400 ("We have made no finding that each system's booking fees exceed the system's costs of providing services to airlines.") at App. 097-099.[29]

The DOT has also noted that airlines had the ability to negotiate for better terms, *see* 67 Fed. Reg. at 69399 at App. 097, that travel agencies can choose between GDS systems so that the systems compete on price, *see id.*, and that a "zero fee" would mean that airlines, "a major beneficiary of the [GDS] services would not be charged . . . [so that] it would enable airlines to

---

[28] The airline industry is not shy about filing law suits when competitively injured. Northwest has sued Sabre and Sabre's predecessor company, American Airlines, Inc, in the past. Northwest's isolated claimed injury is another reason to dismiss Northwest's action for lack of standing to allege antitrust injury. *See, e.g., Indeck Energy Svces. v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000), *cert denied*, 533 U.S. 964 (2001).

[29] As stated *supra*, Sabre requests the Court to take judicial notice of these DOT comments, which are public records and are published in the Federal Register. These documents may be judicially noticed and considered in ruling on a motion to dismiss. *See supra* note 5.

obtain [GDS] services without payment." *See* 69 Fed. Reg. at 1011. "That would discourage systems from improving the services offered participating airlines." *See id.* at 1012.

## B.   NORTHWEST'S THIRD, FOURTH AND FIFTH CLAIMS SHOULD BE DISMISSED

### 1.    The Airline Deregulation Act Preempts Northwest's Minnesota Law Claims

Northwest's amended complaint includes three state law claims. Northwest alleges that Sabre: (1) violated Minnesota's Deceptive Trade Practices Act,[30] (2) violated Minnesota's Consumer Fraud Act,[31] and (3) interfered with Northwest's prospective contractual relations in violation of Minnesota common law. (FAC ¶¶ 70-84 at App. 032-034). The federal Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b)(1), preempts all three of Northwest's state law claims. Accordingly, those claims should be dismissed. *See Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 383 (5th Cir. 2004) (reversing district court's denial of motion to dismiss pursuant to preemption provision of the ADA).

#### a.    The ADA Preempts Claims That "Relate To" Airline "Prices" "Routes" or "Services" Including Claims Against Non-Airlines

The ADA expressly prohibits a state from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier . . . ." 49 U.S.C. § 41713(b)(1). Thus, the plain text of the ADA preempts any state law claim "related to" airline prices, routes and services. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992); *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282 (5th Cir. 2002). The purpose of the ADA's preemption provision was "[t]o ensure that the States would

---

[30] That act provides in relevant part that "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person: . . . (8) disparages the goods, services, or business of another by false or misleading representation of fact . . . ." Minn. Stat. § 325D.44.

[31] That act prohibits, in relevant part the "employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . . ." Minn. Stat. § 325F.69. Section 325F.69(1) defines "merchandise" as "any objects, wares, goods, commodities, intangibles, real estate, loans or services." Minn. Stat. § 325.68(2).

not undo federal deregulation with regulation of their own." *Morales*, 504 U.S. at 378. In

*Morales*, the Supreme Court held that the ADA's preemption provision expresses a "deliberately

expansive" policy of preemption, one with a "broad scope," and an "expansive sweep." 504 U.S.

at 384. The ADA thus preempts any state enforcement action that has a "connection with or

reference to" airline prices, routes, or services.[32] *Id.; see also Lyn-Lea Travel*, 283 F.3d at 286.

The ADA's preemption provision applies equally to claims brought against airline and

*non-airline* defendants. *See, e.g., Lyn-Lea Travel*, 283 F.2d at 287 n.8 (holding that "ADA

preemption is not limited to claims brought directly against air carriers," and affirming dismissal

of fraud, tortious interference, and deceptive trade practices claims against a GDS (Sabre) and an

airline (American)); *Continental Airlines, Inc. v. American Airlines, Inc.*, 824 F. Supp. 689, 697

(S.D. Tex. 1993) (dismissing Northwest's state law tortious interference and unfair competition

claims against non-airline defendant [parent of American] because "it is preposterous to assume

that Congress intended to block the prosecution against air carriers of certain suits but to allow

those same suits to proceed against all others").

> **b.     Northwest's State Law Claims Relate to Airline Prices,
> Routes, or Services, and Are Therefore Preempted**

The Sabre activities on which Northwest bases its state law claims "relate to" the prices,

routes, and services of an air carrier. They all concern Sabre's distribution of Northwest's

schedules, fares, and services to travel agents and Northwest's ability to sell tickets for its flights.

Claims involving dissemination of airline schedules and fare information through a GDS "relate

to" an airline's prices, routes, and services under the ADA's preemption provision. *Lyn-Lea*

*Travel*, 283 F.2d at 288-289 (a "carrier's relations with travel agents, as intermediaries between

---

[32] In January 2004, the DOT allowed federal regulations over GDSs to expire, thus effectively
deregulating the GDS industry, just as airlines themselves had been deregulated years before. 69
Fed. Reg. at 976. The DOT's recent deregulation of the GDS industry only reaffirms the
preemptive effect of the ADA. The DOT recognized that the deregulation of GDSs "will ensure
that government regulation does not interfere with market forces and innovation in the [GDS]
and airline distribution businesses." Computer Reservations System (CRS) Regulations, 69 Fed.
Reg. at 978 (Jan. 7, 2004). *See supra* note 5 for the Court's authority to judicially notice and
consider the contents of the Federal Register.

carriers and passengers, plainly fall within the ADA's deregulatory concerns," and that claims

arising out of that relationship "are ADA-preempted because they have a 'connection with' [the

airline's] prices and services."). Similarly, claims involving the terms under which an airline

accesses a GDS "relate to" airline prices, routes, and services. *Frontier Airlines, Inc. v. United

Airlines, Inc.*, 758 F. Supp. 1399, 1410 (D.Colo. 1989) (dismissing state law antitrust, consumer

protection, and tortious interference claims brought against a GDS).

    The Sabre activities about which Northwest complains are "related to" airline prices,

routes and services, and are therefore preempted. Northwest's state law claims rest on

allegations that Sabre "lied about Northwest's fares," "falsely and fraudulently represented

Northwest's fares to travel agents and to the public," misrepresented "flight information on

international routes," made "misleading statements" "in connection with the sale of . . . airline

travel," "showed that Northwest's business and first-class cabins were full – despite the fact that

ample seats were available" and "disparaged the services and business of Northwest." *See* FAC

¶¶ 46, 48, 78, 81-82 at App. 024-026, 033-034; *see also* ¶ 41 at App. 022-023 (complaining of

harm to specific Northwest routes). Northwest's allegations plainly "have a connection with" an

airline's prices, routes and services. Indeed, Northwest's allegations even use those statutory

terms to describe its injury: Northwest complains of misleading statements about "fares," or

prices, misrepresentation of information on Northwest's "routes," and disparagement of

Northwest's "services."

    Courts in similar cases have dismissed exactly the claims Northwest asserts here. The

gravamen of Northwest's claim is that Sabre biased its displays, and this cost Northwest ticket

sales. In *Frontier Airlines*, the district court dismissed an airline's deceptive trade practices and

consumer fraud claims where the airline asserted that a GDS's display bias had injured the

airline's ability to sell its tickets. 758 F. Supp. at 1408. In *Lyn-Lea Travel*, the Fifth Circuit

affirmed the dismissal of a tortious interference with prospective advantage claim in which a

travel agent alleged that the inability to access the Sabre GDS, and thus the inability to book

tickets on American Airlines, had cost a travel agency customers. 283 F.3d at 288-89. Finally,

in *Morales*, the Supreme Court held that the ADA preempted consumer protection claims alleging misrepresentations to the traveling public about the availability of certain fares. 504 U.S. at 390-93. Such claims, the Court held, involve the marketing and selling of airline tickets and thus relate to airline prices, routes and services. *Id.* Accordingly, they were preempted. This Court should similarly find that Northwest's state law claims are preempted.

### 2.    Texas Law Governs and Requires Dismissal of Northwest's Third and Fourth Claims for Statutory Violations

Independent of preemption, neither of Northwest's Minnesota state law claims are actionable since the Agreement provides that Texas law controls.[33] Under Minnesota choice of law rules, the parties' contractual choice-of-law provision applies to all of Northwest's state law claims because the non-contract claims involve contract interpretation and are closely related to the issue of performance under the contract. *Northwest Airlines, Inc. v. Astraea Aviation Servs. Inc.*, 111 F.3d 1386, 1392 (8th Cir. 1997).[34]

First, claims of deceptive trade practices, and consumer fraud are closely related to the parties' contractual relationship and to the issue of contractual performance. *See id.* (negligent performance, misrepresentation, deceptive trade practices, and unjust enrichment); *Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1061 (8th Cir. 2003) (negligent design and negligent misrepresentation); *see also Florida State Bd. of Admin. v. Law Eng'g and Environ. Svcs., Inc.*, 262 F. Supp. 2d 1004, 1014-15 (D. Minn. 2003) (breach of fiduciary duty, negligence, negligent misrepresentation, and indemnification). Second, these claims involve Sabre's alleged failure to accurately display Northwest's flights, fares, and availability, conduct which Northwest contends Sabre was contractually required to perform. Thus, Northwest has

---

[33] Sabre and Northwest agreed that Texas law would govern any disputes between them. Section II(J) of the Agreement, the choice-of-law provision, provides: "Governing Law – This Agreement and any disputes arising hereunder shall be governed by the laws of the United States and the State of Texas without regard to its conflict of laws rules." Agreement at App. 059.

[34] The choice-of-law rules of Minnesota, the transferring forum, apply to determine the effect of the parties' governing-law provision. *See Ferens v. John Deere Co.*, 494 U.S. 516, 523-25 (1990); *Evangelical Lutheran Church in America v. Atlantic Mut. Ins. Co.*, 169 F.3d 947, 949 (5th Cir. 1999).

contractually agreed to have Texas law applied to them. *See Northwest Airlines, Inc.*, 111 F.3d at 1392. Therefore, Northwest's Minnesota statutory claims must be dismissed.

## IV.    CONCLUSION

For all the above reasons, Northwest's First, Third, Fourth, and Fifth Causes of Action should be dismissed.

DATED: January 13, 2005

                                   By:    /s/ Frank J. Riebli

                                   R.H. Wallace, Jr.
                                   Texas State Bar No. 20778700
                                   **SHANNON GRACEY RATLIFF &
                                   MILLER LLP**
                                   777 Main Street, Suite 3800
                                   Fort Worth, TX 76102
                                   Telephone: (817) 336-9333

                                   **Attorneys for SABRE INC., SABRE
                                   TRAVEL INTERNATIONAL
                                   LIMITED, and SABRE HOLDINGS
                                   CORPORATION, Defendants in Action
                                   No. 4:04-CV-907-Y**

                                   (Additional Counsel listing on following
                                   page)

Roderick M. Thompson
Cal. Bar No. 096192 (Pro hac vice)
Neil A. Goteiner
Cal. Bar No. 083524 (Pro hac vice)
Thomas B. Mayhew
Cal. Bar No. 183539 (Pro hac vice)
Frank Riebli
Cal. Bar No. 221152 (Pro hac vice)

ARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 30th Flr.
San Francisco, CA 94104
Telephone: (415) 954-4400

Fred H. Bartlit
IL State Bar No. 127280
Chris Lind
IL State Bar No. 6225464 (Pro hac vice)
BARTLIT, BECK, HERMAN, PALENCHAR
& SCOTT LLP
Courthouse Place, 54 West Hubbard Street
Chicago, IL 60610
Telephone: (312) 494-4400

Attorneys for SABRE INC., SABRE TRAVEL
INTERNATIONAL LIMITED, and SABRE
HOLDINGS CORPORATION, Defendants in
Action No. 4:04-CV-907-Y

F