# EXHIBIT 1

## Amy Mauser

**From:**    McClain, Scott [Scott.McClain@delta.com]

**Sent:**    Sunday, September 11, 2005 7:20 AM

**To:**    Amy Mauser

**Cc:**    ddz@rh-law.com; Philip Nicholas (Business Fax); dwentzel@mwe.com

**Subject:** Northwest v Sabre - Subpoena to Delta Air Lines

Amy,
    Counsel for Worldspan, Galileo, and Amadeus have all informed me in writing that they do object to the production by Delta of their confidential documents and that the issues with respect to the scope of the production of those documents are being or will be litigated in the matters pertaining to Northwest's efforts to subpoena the same documents directly from those GDSs. In view of this, and to protect the rights of all affected parties, I would suggest that the most efficient way to proceed is for me to hold off on this production until the issues are resolved in those proceedings, after which I will be guided by whatever the courts order in those matters.

    Please let me know if that is acceptable. I have copied counsel for the GDSs as well. Their respective contact information is:

Dan Zegura (404) 420-4607 (Worldspan)
Philip Nicholas (305) 499-6445 (Amadeus)
David F. Wentzel (312) 984-7789  (Galileo)


*********************
J. Scott McClain
Delta Air Lines, Inc.
(404) 773-6514

CONFIDENTIALITY NOTICE: This email message is a communication from the Delta Air Lines Law Department that may be confidential and privileged. If you are not an intended recipient, please delete this message and its attachments from your computer system immediately. Transmission of this message is not a waiver of any applicable privilege.

9/13/2005

# EXHIBIT 2

# CORR CRONIN MICHELSON BAUMGARDNER & PREECE LLP

1001 FOURTH AVENUE, SUITE 3900
SEATTLE, WASHINGTON 98154-1051
TEL: (206) 625-8600
FAX: (206) 625-0900
WWW.CORRCRONIN.COM

Kevin C. Baumgardner
Direct: (206) 621-1480
E-mail: kbaumgardner@corrcronin.com

101.00027

August 19, 2005

**VIA FEDERAL EXPRESS**

Daniel L. Low
Boies, Schiller & Flexner LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, DC 20015

> Re:    *Sabre, Inc. and Sabre Travel Intl. Ltd. v. Northwest Airlines, Inc.*
> Alaska Air Group, Inc.'s Responses and Specific Objections
> to February 16, 2005 Subpoena.

Dear Mr. Low:

Alaska Air Group, Inc. ("Alaska") hereby provides written responses to Northwest Airlines' February 16, 2005 Subpoena (the "Subpoena") in the above matter. Specific responses to each of the requests for production in the Subpoena are set forth in the numbered paragraphs below. These responses are in addition to, and are intended to supplement, Alaska Air Group's Objections to Subpoena filed in the United States District Court for the Western District of Washington on March 7, 2005.

Enclosed are copies of the documents identified for production below, BATES nos. ASA 000001 – ASA 000113. Please note that certain documents produced herewith have been stamped "RESTRICTED ACCESS" pursuant to the Stipulation and Protective Order No. 2 Addressing Non-Party Discovery entered on July 19, 2000 in Civil Action No. 4:04-CV-612-Y, Consolidated With 4:04-CV-907-Y in the United States District Court for the Northern District of Texas. Please note also that certain documents produced herewith have been redacted to remove information in accordance with Alaska's continuing objections. Such documents are stamped "REDACTED".

Daniel L. Low
August 19, 2005
Page 2

## SPECIFIC RESPONSES/OBJECTIONS TO DISCOVERY REQUESTS

The following numbered paragraphs correspond to the numbered discovery requests set forth in the Subpoena. In response to each such discovery request, Alaska expressly incorporates the objections set forth in Alaska Air Group's Objections to Subpoena filed in the United States District Court for the Western District of Washington on March 7, 2005.

**1.    Alaska responds to Request No. 1 as follows:**

At this time, Alaska objects to the production of documents evidencing agreements between it and any non-party GDS, including without limitation all contracts as well as all amendments, addenda and side letters to such contracts, on the ground that such production, without the express written consent of the GDS in question, would violate written confidentiality agreements to which Alaska is contractually bound. This objection applies to agreements between Alaska and the following entities: Worldspan, L.P., Galileo International Partnership, Amadeus Marketing S.A.R.L., and Infini Travel Information Inc.

Pursuant to its contractual obligations, Alaska has informed each of the aforementioned non-party GDSs for which it has responsive documents, in writing, of the existence of the Subpoena. To date, none of those non-party GDSs has consented to the production of those documents. Accordingly, Alaska must continue to assert a confidentiality objection on behalf of those GDSs.

Alaska understands that Northwest has directly subpoenaed most or all of the non-party GDSs as to which responsive documents are in the possession or control of Alaska. Alaska accordingly suggests that Northwest negotiate directly with each non-party GDS regarding the resolution of objections and the scope of production of documents pertaining to each such GDS.

Alaska hereby produces the Marketing Agreement between Alaska Airlines, Inc. and Sabre, Inc., BATES nos. ASA 000001 – ASA 000004. This document has been redacted to remove irrelevant, highly confidential and proprietary participation and fee information.

Additionally, Alaska will produce the PCA between Alaska Airlines, Inc. and Sabre, Inc, and amendments thereto.[1]

**2.    Alaska responds to Request No. 2 as follows:**

Alaska hereby produces D. Hehyawi's email to S. Jarvis dated August 26, 2004 re "GDS Shared Fee Model," BATES nos. ASA 000005 – ASA 000008. This document has been redacted to remove irrelevant, highly confidential and proprietary information.

---

[1] These documents will be produced within the next few business days.

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SABRE INC., ET AL. | § | |
| | § | NO. 4:04-CV-612-Y |
| vs. | § | Consolidated with 4:04-CV-907-Y |
| | § | |
| NORTHWEST AIRLINES, INC. | § | |

NORTHWEST'S BRIEF IN OPPOSITION TO SABRE'S MOTION
TO DISMISS NORTHWEST'S FIRST, THIRD, FOURTH, AND FIFTH CLAIMS

Parker C. Folse, III
SUSMAN GODFREY, L.L.P.
1201 Third Avenue, Suite 3100
Seattle, WA 98101
Telephone: (206) 516-3860


Thomas Tinkham
Theresa M. Bevilacqua
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600

Jonathan T. Suder
FRIEDMAN, SUDER & COOKE
604 East Fourth Street, Suite 200
Fort Worth, TX 76102
(817) 334-0400


James P. Denvir
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, D.C. 20015
Telephone: (202) 895-7500

**Attorneys for
Northwest Airlines, Inc.**

February 25, 2005

## TABLE OF CONTENTS

I. INTRODUCTION............................................................................................ 1

II. SUMMARY OF THE ALLEGATIONS ..................................................... 1

III. ARGUMENT .................................................................................................. 5

    A. The Legal Standard Governing Sabre's Motion................................... 5

    B. Northwest has Antitrust Standing.......................................................... 6

        *1. Northwest's allegations establish antitrust injury. ....................... 6*

            *a. Northwest's injury is not, as Sabre asserts, based on "an inability to raise ticket prices"; rather, it results from Sabre's anticompetitive acts to maintain its monopoly. ...................................................................... 6*

            *b. Sabre's private agreement not to bias its display does not insulate it from liability under the federal antitrust laws for doing so. ................................. 11*

            *c. Sabre's "free-rider" argument is a factual claim not to be decided on a 12(b)(6) motion. ......................................................... 12*

            *d. Northwest has properly alleged a relevant product market. ......................... 13*

        *2. Northwest has properly alleged a causal connection between Sabre's violation and Northwest's injury........................................................ 17*

        *3. Northwest has properly alleged that Sabre unlawfully maintained monopoly power through anticompetitive conduct and caused Northwest to suffer antitrust injury . ............................................................ 17*

    C. Northwest's Minnesota State Law Claims Are Neither Preempted By The Airline Deregulation Act ("ADA") Nor Barred By The Agreements' Choice-Of-Law Provision................................................................. 21

        *1. The ADA does not preempt an airline's state law claims against a non-airline ...................................................................... 21*

            *a. The ADA applies to air carriers, not to non-airline GDS providers.............. 21*

            *b. Cases applying the ADA to preempt state law claims against airline-owned GDS providers or an airline's agents are inapplicable......... 21*

            *c. Recent federal deregulation of GDS providers underscores the ADA's inapplicability. .......................................................... 23*

*2.  Texas law does not apply to Northwest's claims for statutory violations.* ........ 24

**IV. CONCLUSION** ............................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*In re Air Passenger Computer Reservations Systems Antitrust Litig.*
694 F. Supp. 1443 (C.D. Cal. 1988) ................................................................... 16

*American Key Corp. v. Cole Nat'l Corp.*
762 F.2d 1569 (11th Cir. 1985) ......................................................................... 20

*Anago, Inc. v. Tecnol Medical Products, Inc.*
976 F.2d 248 (5th Cir. 1992) .............................................................................. 9

*Ancar v. Sara Plasma, Inc.*
964 F.2d 465 (5th Cir. 1992) .............................................................................. 6

*Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*
300 F.3d 620 (5th Cir. 2002) ............................................................................ 14

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*
472 U.S. 585 (1985) ................................................................................... 11, 13

*Associated General Contractors, Inc. v. California State Counsel of Carpenters*
459 U.S. 519 (1983) .................................................................................... 6, 10

*Atlantic Richfield Co. v. USA Petroleum Co.*
495 U.S. 328 (1990) ........................................................................................ 9

*Bayou Bottling, Inc. v. Dr. Pepper Co.*
725 F.2d 300 (5th Cir. 1984) ............................................................................ 17

*Bell v. Dow Chemical Co.*
847 F.2d 1179 (5th Cir. 1988) ....................................................................... 6, 17

*Brotech Corp. v. White Eagle Int'l Technologies Group, Inc.*
2004 WL 1427136 (E.D. Pa. June 21, 2004) ....................................................... 15

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*
509 U.S. 209 (1993) ........................................................................................ 9

*Brunswick Corp. v. Pueblo Bowl-O-Mat*
429 U.S. 477 (1977) .................................................................................. 17, 18

*Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*
6090 F.2d 489 (5th Cir. 1982) ........................................................................... 6

iii

*Data Gen. Corp. v. Grumman Sys. Support Corp.*
36 F.3d 1147 (1st Cir. 1994) ................................................................. 20

*Davies v. Genesis Med. Ctr.*
994 F. Supp. 1078 (S.D. Iowa 1998) ........................................................ 17

*Deep South Pepsi-Cola v. Pepsico, Inc.*
1989 WL 48400 (S.D.N.Y. 1989) ............................................................ 15

*Dimmitt Agri. Indust., Inc. v. CPC Int'l, Inc.*
679 F.2d 516 (5th Cir. 1982) ................................................................. 14

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*
732 F.2d 480 (5th Cir. 1984) ............................................................. 14, 15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*
504 U.S. 451 (1992) ........................................................................ 13, 15

*Electronic Data Systems Corp. v. Computer Associates International, Inc.*
802 F. Supp. 1463 (N.D. Tex. 1992) ........................................................ 13

*Envirosource, Inc. v. Horsehead Resource Dev. Corp.*
1996 WL 363091 (S.D.N.Y. July 1, 1996) .................................................. 18

*Ferens v. John Deere Co.*
494 U.S. 516 (1990) ........................................................................... 24

*Florida State Bd of Admin. v. Law Eng. And env. Serv., Inc.*
262 F. Supp. 2d 1004 (D. Minn. 2003) ..................................................... 24

*Frito-Lay v. Bachman Co.*
659 F. Supp. 1129(S.D.N.Y. 1986) ......................................................... 19

*Frontier Airlines, Inc. v. United Airlines*
758 F. Supp. 1399 (D. Col. 1989) .................................................... 21, 22, 23

*Garshman v. Universal Resources Holding, Inc.*
641 F. Supp. 1359 (D.N.J. 1986) ............................................................ 10

*Hack v. President and Fellows of Yale College*
237 F.3d 81 (2d Cir. 2000) ................................................................... 16

*Holden Farms, Inc. v. Hog Slat, Inc.*
347 F.3d 1055 (8th Cir. 2003) ............................................................... 25

*Larry R. Sales Co. v. Cool Attic Corp.*
587 F.2d 266 (5th Cir. 1979) .................................................................. 6

*Lone Star Milk Producers, Inc. v. Dairy Farmers of Am., Inc.*
2001 U.S. Dist. LEXIS 18716 (E.D. Tex. Jan 22, 2001) ................................ 6, 14

*Lyn-Lea Travel Corp. v. American Airlines*
283 F.3d 282 95th Cir. 2002) ................................................... 21, 22, 23

*Lowery v. Texas A&M Univ. Sys.*
117 F.3d 242 (5th Cir. 1997) ............................................................ 5

*McCormack v. NCAA*
845 F.2d 1338 (5th Cir. 1988) ......................................................... 10

*Mitel Corp. v. A&A Connections, Inc.*
1998 WL 136529 (E.D. Pa. March 20, 1998) ........................................ 15

*Morales v. Trans World Airlines, Inc.*
504 U.S. 374 (1992) .................................................................... 21

*Morris Communications v. PGA Tour, Inc.*
364 F.3d 1288 (11th Cir. 2004) ................................................ 1, 12, 13

*NBO Indus. v. Brunswick Corp.*
523 F.2d 262 (3rd Cir. 1975) ......................................................... 10

*Northwest Airlines v. Astraea Aviation Serv.*
111 F.3d 1386 (8th Cir. 1997) .................................................... 24, 25

*Orion Pictures Distribution Corp. v. Syufy Enterprises*
829 F.2d 946 (9th Cir. 1987) ......................................................... 12

*Pool Water Products v. Olin Corp.*
258 F.3d 1024 (9th Cir. 2001) ....................................................... 8, 9

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*
124 F.3d 430 (3rd Cir. 1997) ......................................................... 16

*Reed v. Med. X-Ray Center, P.C.*
110 F.3d 543 (8th Cir. 1997) ......................................................... 13

*SCFC ILC, Inc. v. VISA USA, Inc.*
36 F.3d 958 (10th Cir. 1994) ......................................................... 13

*Seagood Trading Corp. v. Jerrico, Inc.*
924 F.2d 1555 (11th Cir. 1991) ...................................................... 13

*Sommer Drug Stores Co. v. Corrigan*
883 F.2d 345 (5th Cir. 1989) ......................................................... 24

*TV Communications Network, Inc. v. Turner Network Television, Inc.*
964 F.2d 1022 (10th Cir. 1992) ............................................................. 15

*Tanaka v. University of Southern California*
252 F.3d 1059 (9th Cir. 2001) .............................................................. 15

*Taylor Pub. Co. v. Jostens, Inc.*
216 F.3d 456 (5th Cir. 2000) ............................................................... 11

*Todd v. Exxon Corp.*
275 F.2d 191 (2d Cir. 2000) ................................................................ 13

*United Farmers Agents Ass'n, Inc. v. Farmers Insurance Exchange*
89 F3d 233 (5th Cir. 1996) ................................................................. 14

*United States v. E.I. du Pont de Nemours & Co.*
351 U.S. 377 (1956) .......................................................................... 14

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*
509 U.S. 398 (2004) .......................................................................... 13

*Virgin Atlantic Airways Ltd. v. British Airways PLC*
872 F. Supp. 52 (S.D.N.Y. 1994) ......................................................... 19

## STATUTES

14 C.F.R. § 255.1-255.8 ..................................................................... 23

49 U.S.C. § 41713(b)(1) ..................................................................... 21

## MISCELLANEOUS

3 Phillip E. Areeda & Herbert Hovenkamp
*Antitrust Law* ¶ 651 (1996) ............................................................... 11

*In re Computer Reservation System (CRS) Regulations; Statements of General Policy*
Dockets Nos. OST-97-2881, OST-97-3014, OST-98-4775 and OST-99-5888 ..................... 22

## I. INTRODUCTION

Sabre pays only lip service to the standards governing a 12(b)(6) motion. Instead of liberally construing the allegations in Northwest's First Amended Complaint ("FAC"), it twists them beyond recognition – arguing for example that Northwest's Shared GDS Fee was an attempt to raise air fares although the FAC expressly alleges that the initiative was an effort to reduce Northwest's costs. Instead of taking pleaded facts as true, Sabre controverts them – for example, by arguing that Northwest's objective was to "free ride" on Sabre's GDS.[1] And when Sabre argues that Northwest has failed to *allege* a legally sufficient case, it relies almost entirely on fact-specific decisions in which plaintiffs failed to *prove* their cases on summary judgment or at trial. *See, e.g., Morris Communications v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004) (granting summary judgment after extensive discovery because defendant offered a valid, *unrebutted* business justification) (cited in Sabre Br. at 13-14). In short, Sabre's motion does not test the sufficiency of the FAC. Instead, it asks the Court to ignore Northwest's allegations and—without discovery or evidence—summarily accept Sabre's view of the facts. That is not a proper Rule 12(b)(6) motion. The Court should deny it.

## II. SUMMARY OF THE ALLEGATIONS

Northwest provides the following counter-summary of the allegations of the FAC in response to Sabre's slanted version.

Sabre is one of four major Global Distribution Systems ("GDS") providers (FAC ¶ 16), and is the largest. GDSs provide travel agents with computerized listings of the flights and fares of participating airlines. GDSs also enable travel agents to book flights and issue tickets to their customers. (*Id.* ¶ 9.)

Travel agents are the dominant channel for distributing air transportation services to

---

[1] Sabre also asks the Court to ignore Northwest's allegations regarding market definition and the existence of monopoly power – issues that are plainly to be resolved on an evidentiary record – and reject them as a matter of law. Worse yet, in suggesting that these allegations are defective on their face, Sabre hides from the Court the fact that the U.S. Department of Transportation and the Antitrust Division of the Justice Department have both agreed with Northwest's position.

1

consumers, accounting for approximately 70% of all airline sales revenue, and they continue to rely almost exclusively on GDSs. (*Id.* ¶¶ 11-13, 21.) Because almost all travel agents subscribe to only one GDS, major airlines must participate in all four to have their flight and fare information displayed to all travel agents. (*Id.* ¶¶ 14, 22.) This gives each GDS monopoly power over airlines. (*Id.* ¶ 23.) Travel agents do not pay GDSs for the use of their services; GDSs typically pay travel agents to use their systems. (*Id.* ¶¶ 9, 28.) Instead of charging travel agents, each GDS charges *the airline* a "booking fee" for each transaction processed through its system. (*Id.*) Northwest pays an average of $12.50 for each ticket booked through a GDS. (*Id.* ¶ 26.) In 2003, Northwest paid GDS fees totaling approximately $180 million. (*Id.*)

Because most travel agents typically pay no fees to use a GDS and instead receive kickbacks from GDSs (funded by booking fees paid by the airlines) in order to induce them to book tickets on the GDS at the airlines' expense, there is a perverse incentive structure that encourages the travel agents – who decide how to book tickets – to increase their GDS usage despite its cost to the airlines and the availability of other technologies. (*Id.* ¶¶ 28-30.)

On August 24, 2004, Northwest announced a new policy intended to cut costs by changing this incentive structure. (*Id.* ¶ 36.) Starting September 1, 2004, Northwest would charge travel agents who used a GDS to issue its tickets a "Shared GDS Fee" of $7.50 per round-trip ticket and $3.75 per one-way ticket. (*Id.*) Travel agents who bypassed GDSs – by booking through services such as Northwest's WorldAgent Direct Internet site or using third-party technologies – would pay no fee. (*Id.*) In short, Northwest's proposal countered the GDS kickbacks with a countervailing incentive – the Shared GDS Fee that travel agents would have to pay Northwest unless they booked tickets through a non-GDS technology. Contrary to Sabre's principal assertion about that initiative, the FAC does not allege that this Fee was a price increase, and the specific allegations in the FAC make clear that it was *not*.

Sabre saw Northwest's initiative as a serious threat to its monopoly power over airlines,

particularly if other airlines followed suit. (*Id.* ¶ 37.) That same day, Sabre announced it would begin biasing its GDS display by giving other airlines' flights more prominence than Northwest's, even where Northwest's flights better served a traveler's needs. (*Id.*)

Through its display bias, Sabre placed Northwest's flights in an inferior position so that travel agents would not select them for their customers. (*Id.* ¶ 41.) Sabre moved information about Northwest flights to the bottom of its lists of available flights, where – as Sabre's research showed – travel agents were unlikely even to see them. (*Id.* ¶ 42.) For example, Northwest offers the only non-stop service between Minneapolis and Rapid City, South Dakota. But on its flight display, Sabre placed the non-stop Northwest flight at the end of the third display screen, behind fourteen less convenient connecting flights on other carriers. (*Id.* ¶ 41.) In this way, Sabre misled travel agents (and through them, travelers) about Northwest's flights.[2]

On August 26, 2004, Sabre upped the ante, announcing that if Northwest went through with its plan, Sabre would add the Shared GDS Fee into the Northwest fares displayed to travel agents, thus making its fares appear higher than they really were. (*Id.* ¶ 45.) In other words, although the Shared GDS Fees were to be assessed against *travel agents* – and only those agents who chose to book Northwest travel through a GDS – Sabre falsely treated them as an across-the-board increase in *fares* to Northwest's *passengers*. (*Id.*)  This change, which Sabre implemented on September 1, biased the display of fare information to hurt Northwest whenever travel agents searched the Sabre GDS for the lowest-priced flights for their customers. (*Id.*)

That travel agents might not have to pay the Shared GDS Fee at all (if they booked without using Sabre), or might not pass the Fee on to their customers, was immaterial to Sabre. (*Id.* ¶ 46.)[3] To punish Northwest by hurting its sales, Sabre falsely depicted the Fee as a fare increase – even though

---

[2] Sabre also publicly warned all airlines that it would similarly disadvantage any of them who might have the temerity to make a similar challenge to Sabre's monopoly. (FAC ¶¶ 40, 50.) However, Sabre only took action against Northwest, because only Northwest was willing to mount such a challenge.

[3] As discussed in more detail later in this brief, it is by no means obvious that travel agents would have passed on all – or even a part – of the Shared GDS Fees to consumers. After all, the airline industry has sustained significant increases in costs in recent years, yet air fares have fallen because of competition.

Sabre knew that its was not a fare increase. (*Id.*) Indeed, Sabre manipulated its GDS so that if a travel agent actually succeeded in booking a Northwest ticket despite the roadblocks Sabre set up, the actual issued ticket would *not* include the fictitious fare increase displayed in the Sabre system. (*Id.* ¶ 47.)

Finally, on August 31, Sabre threatened to begin misrepresenting the availability of high-value seats on Northwest's international flights. (*Id.* ¶ 48.) When Northwest did not immediately knuckle under, Sabre's GDS falsely told travel agents who searched for first or business class seats that none were available, although plenty were. (*Id.*)

By misrepresenting information about Northwest's service and prices to a substantial segment of the travel agents responsible for selling Northwest's tickets, particularly at a time when the airline industry was (and is) in desperate economic straits, Sabre sought to force Northwest to abandon its Shared GDS Fee. (*Id.* ¶ 49.) But Northwest was not Sabre's only· target. Sabre also wanted to warn other airlines that Sabre would not tolerate threats to its monopoly power. (*Id.* ¶ 50.) And Sabre recognized that it was more likely that Northwest would withdraw its initiative if other airlines did not match it. (*Id.*) Therefore, Sabre not only punished Northwest to coerce it to abandon the initiative, it also announced its actions publicly to ensure that other airlines got the message and did not match the Northwest initiative. (*Id.* ¶ 40.) Sabre's threats succeeded; no airline dared match the initiative, and on September 2, 2004, Northwest rescinded it. (*Id.* ¶¶ 50, 52.)

In addition to suppressing competition and misrepresenting information about Northwest's flights, fares, and seat availability, Sabre's naked exercise of market power also breached its contract with Northwest. (*Id.* ¶ 44, 67.) Sabre's GDS displays Northwest's flight and fare information under the Sabre Participating Carrier Distribution and Services Agreement ("Agreement"), which expressly requires Sabre not to bias its display of information based on carrier identity. (*Id.* ¶ 44.)

The FAC clearly alleges that Sabre has monopoly power in the market for providing computerized reservation services and booking capability to the many travel agents who subscribe to

its GDS and explains why other reservations and booking services are not effective substitutes. (*Id.* ¶¶ 23, 56.) Sabre has exploited its monopoly power, charging airlines exorbitant fees every time a travel agent uses its system to book a flight. (*Id.* ¶ 26.) Those fees have harmed consumers by increasing the cost of air travel. (*Id.* ¶ 27.) Northwest's Shared GDS Fee initiative was a procompetitive policy designed to reduce Sabre's power over the industry and bring a measure of relief from the financial burden Sabre's monopoly prices have imposed. (*Id.* ¶¶ 36, 62.) In using its monopoly power to force the abandonment of that initiative (*see id.* at ¶¶ 37-41, 45-49), Sabre acted to preserve its monopoly power, in violation of federal antitrust law. (*Id.* ¶¶ 51, 62, 63.)

## III. ARGUMENT

Contrary to Sabre's self-serving rhetoric, this is not just a private quarrel over a contract breach. The issue is whether Sabre will be allowed to use its power over the display of flight and fare information to punish and prevent airline cost-saving initiatives that threaten its monopoly. How that issue is resolved will profoundly affect the travel industry – and the welfare of consumers who use it. One thing is clear, however: that issue is not appropriate for resolution on the pleadings.

### A. The Legal Standard Governing Sabre's Motion

The motion before the Court is a Rule 12(b)(6) motion to dismiss. The legal standards governing such motions are well-known to the Court, but apparently less familiar to Sabre, because it so frequently distorts Northwest's allegations and raises fact-bound arguments that are inappropriate under the Rule. The applicable standards are as follows:

> A motion to dismiss under rule 12(b)(6) "is viewed with disfavor and is rarely granted." The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. The district court may not dismiss a complaint under rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." This strict standard of review under rule 12(b)(6) has been summarized as follows: "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief."

*Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997) (internal citations omitted).

Citing *Associated General Contractors, Inc. v. California State Council of* Carpenters, 459 U.S. 519, 528 n.17 (1983), and *Larry R. Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir. 1979), Sabre argues that the Court must "scrutinize the Complaint's allegations" to determine if Northwest has pleaded antitrust standing with particularity. Sabre Br. at 6-7 & n.7. But in both cases the plaintiffs' allegations were wholly conclusory – and even then the Supreme Court in *Associated General Contractors* accepted the relevant allegations as true for purposes of its decision. 459 U.S. at 528 & n.17. By contrast, Northwest has pleaded detailed facts supporting its antitrust claims and its standing to sue. Moreover, courts have routinely rejected the argument that antitrust complaints are subject to a heightened pleading standard and instead liberally construe allegations contained in antitrust complaints. *See, e.g., Ancar v. Sara Plasma, Inc.,* 964 F.2d 465, 468 (5th Cir. 1992); *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 530 (5th Cir. 1982); *Lone Star Milk Producers Inc. v. Dairy Farmers of Am., Inc.*, 2001 U.S. Dist. LEXIS 18716, *16 (E.D. Tex. Jan. 22, 2001) ("There are no heightened pleading requirements in an Antitrust case, and this Court is not going to look behind [plaintiff's] allegations in the pleading stage of this case . . ."). Contrary to Sabre's argument, and as set forth in detail below, the FAC more than adequately establishes Northwest's standing to sue under § 2 of the Sherman Act.

**B.  Northwest Has Antitrust Standing.**

Sabre makes a variety of attacks on Northwest's standing, including arguments that have nothing to do with standing. None has merit.

*1.  Northwest's allegations establish antitrust injury.*

    *a.  Northwest's injury is not, as Sabre asserts, based on "an inability to raise ticket prices"; rather, it results from Sabre's anticompetitive acts to maintain its monopoly.*

Northwest's allegations establish that it has standing both as an overcharged consumer of Sabre's services and as a competitor harmed by its anticompetitive conduct. *See, e.g., Bell v. Dow Chemical Co.*, 847 F.2d 1179, 1183 (5th Cir. 1988) ("The court's focus must be upon competition in the allegedly restrained market. Restraint in the market affects *consumers and competitors* in the

market; as such, *they are parties that have standing to sue.*") (emphasis added).

Northwest is a consumer of Sabre's GDS services, paying booking fees in return for Sabre's display of Northwest's flight and fare information to Sabre's travel agency subscribers. (FAC ¶ 56.) Sabre has monopoly power in the relevant market, which enables it to charge Northwest and other airlines supracompetitive booking fees. (*Id.* ¶¶ 23, 26, 56, 61.) Northwest adopted the Shared GDS Fee to change the perverse incentive structure that allowed travel agents to drive up Northwest's costs – by booking tickets on the GDS and eschewing other technologies -- in order to get Sabre's kickbacks. (*Id.* ¶ 30.) The purpose of Northwest's initiative was not to raise its fares, but to reduce its costs. (*Id.* ¶ 36.) By forcing Northwest to rescind its Shared GDS Fee through blatantly exclusionary conduct, Sabre preserved its monopoly power against the threat posed by Northwest's policy, ensured that no other airline attempted to promote competition within the relevant market, and secured its ability to continue charging monopolistic fees for its services by protecting itself from nascent competition from alternative booking facilities. These actions not only breached the Agreement, they also damaged Northwest as a consumer of Sabre's GDS services. (*Id.* ¶ 53.)

Northwest is also a competitor in the relevant market. (*Id.* ¶ 57.) It offers an alternative method of booking Northwest travel that does not subject Northwest to GDS booking fee charges. (*Id.* ¶¶ 32, 57.) The Shared GDS Fee gave travel agents an incentive to use Northwest's competing booking site. Agents who used the site (or other non-GDS sites) would not be assessed a Shared GDS Fee; those who used a GDS would share the costs that their actions imposed on Northwest. (*Id.* ¶ 36.) When Sabre abused its monopoly position to force Northwest to rescind the policy, it injured Northwest as a competitor and damaged competition. (*Id.* ¶ 57, 65.) As both a customer and a competitor in the relevant market, therefore, Northwest plainly has alleged antitrust injury.

Ignoring these allegations, Sabre erects and attacks a straw-man claim that bears little resemblance to Northwest's complaint. Sabre's antitrust injury argument depends entirely on its mischaracterization of Northwest's Shared GDS Fee as a price increase. Because that argument is

premised on a factual assumption directly contrary to the allegations in the FAC, it is improper on a motion to dismiss. Even assuming that the question of whether those travel agents who incurred the Shared GDS Fee would have passed it on to consumers is relevant to this lawsuit, it is a question of fact to be resolved after discovery – not presumed true on a motion to dismiss.[4]

However that issue is ultimately resolved, three things are clear: (1) The actual fares Northwest charged consumers never changed, and Northwest would have collected no additional money from consumers;[5] (2) travel agents who were induced by the Shared GDS Fee to book using alternatives to GDSs would not have incurred the fee, and therefore would not have passed it on; and (3) if a travel agent did incur the Shared GDS Fee by booking through a GDS and chose to try to recoup some or all of the fee from its customers by charging them an additional service charge (as opposed to treating the fee as an offset to the kickbacks it received from the GDS), that would have been the travel agent's commercial decision, not Northwest's, and presumably would have been disciplined by competition from other travel agents who chose not to pass it along.[6]

In short, the Shared GDS Fee was a charge to travel agents, not consumers, and it was up to

---

[4] Sabre's motivation for calling the Shared GDS Fee a "fare increase" is transparent: By characterizing the fee as a fare increase to Sabre subscribers, which it says is forbidden by its contract with Northwest, Sabre hopes to excuse its own breach of that agreement by falsifying information about Northwest's fares, flights, and availability. Yet as previously explained, despite its rhetoric in this case, Sabre knew the Shared GDS Fee was not a fare increase, Even when it falsely added the fee into the GDS display of Northwest's fares, it programmed its system so that tickets issued through Sabre would *not* include the phony fare increase shown in the display. (FAC ¶ 47.)

[5] Sabre implies that the Department of Transportation viewed the Shared GDS Fee as a fare increase. (Sabre Br. at 6 n.5.) However, the DOT Notice to which Sabre cites (Sabre App. at 077-081) neither states nor implies any such thing. At the same time as Northwest announced the Shared GDS Fee, it also initiated a separate but unrelated charge to *consumers* who purchased tickets via its telephone reservations offices or airport ticket counters (as compared to Internet purchases), and other carriers adopted similar policies. The DOT Notice cited by Sabre addressed only those policies. In particular, the Notice specified the manner in which such fees were to be treated in airline advertisements of their fares. The Notice says nothing about Northwest's Shared GDS Fee, which was a charge to be assessed against *travel agents*, depending on whether they used GDSs to book Northwest tickets.

[6] Even if all travel agents who used a GDS to process their bookings had passed on the Shared GDS Fee to customers, market efficiency would have improved. Consumers would have had a choice: buy through travel agents who use GDSs and bear part of the booking fee cost triggered by the travel agent's GDS usage, or buy instead through travel agents who book through non-GDS alternatives and pay less. Northwest's pro-competitive, efficiency-enhancing policy is precisely the type of conduct deserving of antitrust protection. *E.g., Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) ("Consumer welfare is maximized when economic resources are allocated to their best use . . . . [The antitrust laws are] concerned with acts that harm 'allocative efficiency and raise[] the price of goods above their competitive level or diminish[] their quality.'").

the travel agent to decide whether and, if so, how to recover it. Northwest's complaint thus is not that it was unable to raise prices to consumers; its complaint is that Sabre thwarted a procompetitive initiative designed to reduce or offset Northwest's costs by enhancing competitive alternatives to Sabre's monopoly. These allegations, which Northwest will prove at trial, establish antitrust injury.

Sabre's use of case law is just as misleading as the "spin" it puts on Northwest's allegations. Sabre cites cases purporting to stand for the proposition that "rendering a plaintiff unable to raise prices is not antitrust injury." Sabre Br. at 9. But that is not Northwest's claim, merely Sabre's misstatement of it. Because the cases Sabre cites are directed at its straw man rather than Northwest's actual claim, it is not surprising that they miss the mark.

In *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) – decided on summary judgment following discovery – plaintiff complained that defendant had conspired with plaintiff's competitors to lower their prices. The Court held that because plaintiff had failed to prove that defendant's prices were predatory, it was really complaining about price competition. *Id.* at 338-38. That case bears no resemblance to this one. Similarly, *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) – decided on a post-trial motion for judgment as a matter of law – held only that one competitor may not complain of another's price competition unless the prices are predatory, *i.e.*, below cost. *Id.* at 224. This case, by contrast, is not about predatory pricing. It is about the use of market power to stifle competition and maintain supracompetitive prices.

*Anago, Inc. v. Tecnol Medical Products, Inc.*, 976 F.2d 248 (5th Cir. 1992) (a Clayton Act §7 challenge to a merger), is likewise inapposite. Sabre asserts that Northwest sought to produce typically anticompetitive effects such as increased prices and reduced output. But this is just self-serving rhetoric that ignores the Northwest's allegations about the purpose behind the Shared GDS Fee – lowering costs – and the purpose and effect of Sabre's retaliatory response – maintaining its monopoly power over pricing. *Pool Water Products v. Olin Corp.*, 258 F.3d 1024 (9th Cir. 2001) (reviewing a summary judgment) is also off point. There, the plaintiff complained that defendant's

lowered prices reduced plaintiff's market share. Here, Northwest expressly alleges that Sabre's exclusionary conduct was aimed at preserving monopoly power and *its own* ability to continue charging supracompetitive prices. (*See, e.g.,* FAC ¶¶ 50-51, 53.) [7]

Sabre also dismisses Northwest's allegation of antitrust injury as too speculative, citing *NBO Indus. v. Brunswick Corp.*, 523 F.2d 262, 268 (3rd Cir. 1975). But that case considered whether plaintiffs had sufficiently proven damages at trial, not whether damages were adequately alleged. Here, Northwest has alleged actual and immediate injury as a consequence of the anticompetitive nature of Sabre's illegal conduct. (FAC ¶¶ 52-54.)[8]

Obviously, such injury is recoverable, as is the future loss caused by a continuing injury. Sabre's argument might have merit where the only injury alleged or proven is speculative future injury. That is clearly not this case. Northwest has alleged not only that Sabre's exclusionary conduct preserved its ability to continue collecting supracompetitive booking fees, but also that its misconduct inflicted on Northwest other direct and immediate injuries, including the following:

- Sabre cost Northwest sales by biasing the display of Northwest flight and fare information and closing down the availability of premium seats on Northwest's international flights. (FAC ¶ 54.)

---

[7] Sabre also relies on *Garshman v. Universal Resources Holding, Inc.*, 641 F. Supp. 1359 (D.N.J. 1986). *Garshman* did not deal with the issue of antitrust standing at all. Moreover, the case was dismissed because plaintiff failed to plead that defendant (a supplier of natural gas) had engaged in any anticompetitive conduct other than its alleged attempts to reduce the price that it paid for gas. *Id.* at 1369.

[8] In footnote 13, Sabre lists cases that it contends stand for the proposition that courts may not consider the probable future effect of defendant's anticompetitive conduct on market conditions. Sabre Br. at 11. That proposition is neither true nor supported by the cases Sabre cites. Sabre tacitly acknowledges that none of the cases it cites actually supports its position by its dubious practice of picking out snippets from cases that sound good, but actually have nothing to do with the rather broad proposition that Sabre contends they support. Thus, for example, Sabre's parenthetical summary of *Associated General Contractors* wrests a phrase out of the Court's background discussion and offers it as a holding. It was not. Similarly, *McCormack v. NCAA*, 845 F.2d 1338 (5th Cir. 1988), bears no resemblance to this case. It involved a challenge by an SMU alumnus to NCAA sanctions imposed on SMU's football program. The only injuries alleged by plaintiff were "devaluation of his degree, the loss of the opportunity to see football games, and [loss of opportunity to rub elbows with student-athletes]." *Id.* at 1342. The Fifth Circuit found that these alleged injuries were not fairly characterized as "injuries to business or property" and thus not within the ambit of the antitrust laws. *Id.* The court then commented that the alleged connection between suspending SMU's football program for a season and devaluing plaintiffs' degree was "abstract" and "speculative." *Id.* That, of course, is a far cry from Northwest's reasonable belief – obviously shared by Sabre – that changing the incentive structure so that travel agents would bear part of the cost of booking on a GDS would induce some agents to use other means of booking tickets.

- By forcing Northwest to rescind the Shared GDS Fee policy, Sabre prevented it from reducing its own costs by charging travel agents a portion of the booking fees triggered by their GDS usage. (*Id.*) That was an immediate, foreseeable, and continuing loss.

- The Shared GDS Fee would have induced some travel agents to use non-GDS vehicles for booking travel on Northwest, saving Northwest booking fee charges that otherwise would have been assessed against it (not only by Sabre but by other GDS's). (*Id.*) This also was an immediate, foreseeable, and continuing loss.

> b. *Sabre's private agreement not to bias its display does not insulate it from liability under the federal antitrust laws for doing so.*

Sabre argues that because its retaliatory acts breached the Agreement they cannot also be the basis for claims of antitrust injury. The argument is nonsense – and unsupported by the cases Sabre cites. An illegal action is not immune from antitrust liability simply because that illegal action *also* breaches the parties' contract. Northwest alleges that Sabre used display bias as an anticompetitive and exclusionary tactic to preserve its monopoly power. (FAC ¶ 62-63.)[9] In other words, Sabre's behavior would have been actionable under the antitrust laws even if it had not foresworn such behavior by contract.[10] By also privately agreeing not to bias its display, Sabre did not insulate itself from federal antitrust liability.

No case cited by Sabre or known to Northwest holds that a breach of contract which is also a violation of the antitrust laws cannot be the subject of an antitrust suit. The cases cited at page 12 and footnote 14 of Sabre's brief held only that when a plaintiff has failed to allege or come forward with proof that a defendant's conduct has unreasonably restrained competition, its antitrust claim fails and it must instead proceed, if at all, under applicable state tort or contract law. Here, Northwest has pleaded facts supporting each element of a federal antitrust violation – including that Sabre's conduct

---

[9] "Exclusionary conduct is conduct, other than competition on the merits or restraints reasonably necessary to competition on the merits, that reasonably appear[s] capable of making a significant contribution to creating or maintaining monopoly power." *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 456, 475 (5th Cir. 2000) (quoting 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651, at 82 (1996)) (internal quotation marks omitted). Exclusionary conduct is conduct that hinders competition or furthers it in an unnecessarily restrictive way. *See id.* (citation omitted); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985).

[10] By the same token, although Northwest intends to prove that Sabre breached its contract with Northwest, Northwest need not prevail on that claim to establish Sabre's antitrust liability.

has harmed competition.

Sabre's reliance on *Orion Pictures Distribution Corp. v. Syufy Enterprises*, 829 F.2d 946 (9th Cir. 1987) (decided on directed verdict during trial) is also misplaced. Sabre asserts that, under *Orion*, it is necessary for Northwest to plead that Sabre's monopolization of the market "impacted the parties' negotiation of the Agreement and prices." Sabre Br. at 13. No such rule of law appears in *Orion*. In that case, defendant's alleged monopolization of the market occurred after execution of an agreement. Even more important, the court rejected plaintiff's antitrust claim because it offered no proof that defendant's subsequent breach adversely affected competition at all. 829 F.2d at 949. Here, Northwest has alleged detailed facts showing that Sabre's conduct not only breached its contract, but also was exclusionary behavior with the purpose and effect of maintaining its monopoly power. (*See* FAC ¶¶ 62-63.)

  c.  *Sabre's "free-rider" argument is a factual claim not to be decided on a 12(b)(6) motion.*

Sabre states as fact that Northwest's Shared GDS Fee was an attempt to "free ride" on Sabre's service. Sabre's hypothesis is that travel agents would search Sabre for flights and fares, but not book tickets on Sabre, thereby giving Northwest the benefits of the GDS without charge. Thus, Sabre argues, it was justified in forcing Northwest to abandon the initiative. None of these "facts" appears in the FAC.

Sabre's argument is not properly considered on a motion to dismiss. It has nothing to do with Northwest's standing to assert antitrust claims. It is a fact-based business justification for challenged conduct that may be argued at trial, but cannot be decided as a matter of law on the pleadings. Sabre's cases only underscore this point. For example, in *Morris Communications v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004), the court granted summary judgment only after "extensive pre-trial discovery," *id.* at 1292, on the ground that defendant had offered a valid, *unrebutted* business

justification for refusing to grant plaintiff free access to defendant's product. *See id.* at 1295-97.[11]

Defendants typically proffer business justifications for exclusionary behavior. The issue – and it is for the jury on an evidentiary record – is whether the defendant was genuinely "motivated by efficiency concerns" or was instead "willing to sacrifice short-run benefits and consumer goodwill" in an effort to impair competition on the merits. *See, e.g., Aspen Skiing,* 472 U.S. at 605 n.32, 610. Northwest has adequately alleged that Sabre's conduct was anticompetitive and has explained why, in detail. *See, e.g.,FAC* ¶ 63. That ends the inquiry on a motion to dismiss.

### d. Northwest has properly alleged a relevant product market.

In characterizing market definition as a question of antitrust injury (Sabre Br. at 15), Sabre hopes to obscure the fact that disputes over market definition are especially unsuited for disposition on the pleadings because "market definition is a deeply fact-intensive inquiry" (*Todd v. Exxon Corp.,* 275 F.2d 191, 199-200 (2d Cir. 2000) (reversing grant of Rule 12(b)(6) motion)), requiring "a factual inquiry into the 'commercial realities' faced by consumers." *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 482 (1992). *See also Electronic Data Systems Corp. v. Computer Associates International, Inc.,* 802 F. Supp. 1463 (N.D. Tex. 1992) ("[p]roduct market definition

---

[11] The cases Sabre cites in footnote 17 are likewise inapposite on a motion to dismiss, because each was decided on the basis of a full record. In *SCFC ILC, Inc. v. VISA USA, Inc.,* 36 F.3d 958 (10th Cir. 1994), the Tenth Circuit reversed the district court's order denying defendant's post-trial motion for judgment as a matter of law based on a finding that defendant had offered sufficient unrebutted evidence to demonstrate that it had excluded plaintiff from the Visa USA/Mastercard association to prevent plaintiff's anticompetitive free-riding. *See id.* at 972. Likewise, in *Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555 (11th Cir. 1991), the Eleventh Circuit affirmed the district court's order granting defendant's motion for summary judgment, filed after "extensive discovery," because plaintiffs failed to offer evidence that defendants' refusal to store and deliver plaintiffs' food products had "anticompetitive impact in the market for the sale of food to franchisees." *See id.* at 1572-73. *Reed v. Med. X-Ray Center, P.C.,* 110 F.3d 543 (8th Cir. 1997), did not even deal with the issue of free-riding. Instead, the Eighth Circuit affirmed the district court's post-trial judgment as a matter of law in favor of defendant on the ground that "no reasonable jury could find [that] [defendant]'s allegedly anticompetitive conduct was 'a material cause of [plaintiff's] injury." *Id.* at 545.

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,* 509 U.S. 398 (2004), also fails to support Sabre's position. That case was a consumer class action challenging an incumbent local telephone exchange carrier's alleged refusal to provide rivals with certain interconnection services that it was required to provide under the Telecommunications Act of 1996. The Court held that the defendant's alleged conduct provided an insufficient basis from which to infer anticompetitive intent, and therefore fell outside the Court's existing precedents concerning a monopolist's refusal to deal with rivals. *Id.* at 879-80. Unlike *Trinko,* this is not a refusal-to-deal case, and in any event, as explained in detail in this brief, Northwest has more than adequately pleaded facts demonstrating that Sabre's conduct was anticompetitive and exclusionary within the meaning of Supreme Court precedent.

generally presents a question of fact for the jury") (denying motion to dismiss and citing *Dimmitt Agri. Indust., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 525 (5th Cir. 1982)); *Lone Star Milk Producers Inc. v. Dairy Farmers of Am., Inc.*, 2001 U.S. Dist. LEXIS 18716, *16 (E.D. Tex. Jan. 22, 2001) ("[T]his Court is not going to look behind [plaintiff's] allegations in the pleading stage of this case to explore facts concerning the Complaint's market definition.").[12]

However Sabre seeks to characterize the issue, dismissal based on failure to allege a proper relevant market is appropriate only if "the plaintiff fails to define its proposed market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 628 (5th Cir. 2002); *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) (relevant product market consists of "commodities reasonably interchangeable by consumers for the same purposes").

Northwest's definition of the product market as "the provision of computerized air passenger transportation flight and fare information and booking capability...to travel agent subscribers of the Sabre GDS" (FAC ¶ 56) meets this test. Northwest has alleged that for airline consumers of GDS services there is no substitute for the provision of flight and fare information and booking capability to travel agent subscribers of Sabre and no other product is reasonably interchangeable for computerized access to those subscribers:

- "[T]ravel agencies continue to be a critical distribution outlet for major airlines sales of air passenger service. Travel agents, in turn, continue to rely almost exclusively on GDSs, resulting in steadily increasing booking fee expenses for major airlines, despite the fact that almost all travel agencies now have Internet access." (*Id.* ¶¶ 11, 13).

- "[I]n order to reach essential groups of travel agents, major airlines are compelled to deal with the GDS that serves those agents. They must have their flights and fares displayed in all

---

[12] Indeed, once again, some of the cases cited by Sabre resolved questions relating to market definition on motions for summary judgment, after the development of a full discovery record. *See, e.g., United Farmers Agents Ass'n, Inc. v. Farmers Insurance Exchange*, 89 F.3d 233 (5th Cir. 1996); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir. 1984).

of the four major GDSs; to ignore any one of them would be to sacrifice sales by the group of travel agents who exclusively use that GDS .... Because of the importance of marginal revenues in the airline business, that is a sacrifice that neither Northwest, nor any other airline, can afford to make. (*Id.* ¶ 22).

- "[M]ost travel agents rely primarily on only one GDS, rather than subscribing to multiple systems." (*Id.*¶ 14).

- "In this market, the services provided by other GDSs *are not substitutes*. Sabre provides the only practical access to Sabre-automated travel agents, since the vast majority of such travel agents only use the Sabre GDS. *Because they are not effective substitutes*, other GDSs do not constrain the pricing power of Sabre in setting the booking fees that airlines such as Northwest must pay." (*Id.* ¶ 56) (emphasis added).

Sabre contends that Northwest's proposed market "is an exceedingly narrow and circular market – limited by definition to travel agents that use Sabre." (Sabre Br. at 16.) But the Supreme Court squarely rejected similar arguments that such "single brand" markets cannot meet the legal standards for product market definition in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992):

> Kodak also contends that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act. We disagree....This Court's prior cases support the proposition that in some instances one brand of a product can constitute a separate market....The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners....Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines. *Id.* at 481-82.[13]

As in *Kodak*, because airline access to Sabre travel agent subscribers is "not interchangeable with" access to subscribers of another GDS, "the relevant market from [the airlines'] perspective is

---

[13] Where a single brand product market is consistent with the rule of reasonable interchangeability and cross-elasticity of demand, courts have denied motions to dismiss. *See, e.g., Brotech Corp. v. White Eagle Int'l Technologies Group, Inc.*, 2004 WL 1427136 (E.D. Pa. June 21, 2004) ("RenalTech....This Court's polymeric resin"); *Mitel Corp. v A&A Connections, Inc.*, 1998 WL 136529, *4 (E.D. Pa. March 20, 1998) ("replacement parts, upgrades, repair service and add-ons for Mitel PBX systems in the United States").

Three of the four cases Sabre cites as supporting its assertion that "courts have routinely dismissed cases where ... the relevant market is alleged as being limited to the defendant's product, brand, or distribution" (Sabre Br. at 16 n.21) *pre-date* the Supreme Court's decision in *Kodak*. *See Domed Stadium, Deep South Pepsi-Cola v. Pepsico, Inc.*, 1989 WL 48400 (S.D.N.Y. 1989), and *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022 (10th Cir. 1992). The fourth, *Tanaka v. University of Southern California*, 252 F.3d 1059 (9th Cir. 2001), involved a challenge to an intercollegiate athletic association rule discouraging student athletes from transferring to member institutions during their collegiate athletic careers. The court rejected plaintiff's market definition as consisting only of the "UCLA women's soccer program" because it was based on her *personal preference* to remain in Los Angeles. *Id.* at 1064. Here, Northwest must deal with Sabre as a matter of necessity, not as a matter of personal preference.

composed of only those" GDS systems that offer access to Sabre's travel agent subscribers.

Sabre derides the alleged product market as "nonsensical" (Sabre Br. at 17), but fails to mention that a U.S. district court, the Department of Transportation (DOT), and the Antitrust Division of the Department of Justice (DOJ) have each endorsed it. The court in *In re Air Passenger Computer Reservations Systems Antitrust Litig.*, 694 F. Supp. 1443 (C.D. Cal. 1988), denied summary judgment because a reasonable jury could find the Sabre GDS to be a separate market:

> *The evidence, interpreted in a light most favorable to plaintiff, could permit a reasonable jury to conclude that SABRE is a separate service market* because there is evidence that airlines view each CRS as offering a unique service:  access to a particular set of travel agents.

*Id.* at 1460 (emphasis added). In 2004, after a multi-year, on-the-record, rulemaking proceeding, DOT came to the same conclusion:

> Sabre has failed to show that the relevant market is not each system, but the broader market of providing travel agent information to consumers, or airline ticket distribution, a market in which each system's share would be relatively small. [citation omitted] *As a practical matter, airlines wishing to electronically provide information and booking capabilities to travel agencies currently have no effective substitute for participation in each system.* Similarly, because travel agencies do not use multiple systems, Sabre's observation that no system has even a 50 percent share of the CRS business, [citation omitted], is irrelevant. *Each system is a separate market insofar as airlines are concerned.* (Final Rule, Computer Reservation Systems (CRS) Regulations, 69 Fed. Reg. 976, 988 (Jan. 7, 2004)) (hereafter "CRS Rulemaking") (emphasis added) (included in NW App. at 014).

And so has DOJ:

> "Each CRS provides access to a large, discrete group of travel agents, and unless a carrier is willing to forego access to those travel agents, it must participate in every CRS. Thus, *from an airline's perspective, each CRS constitutes a separate market* and each system possesses market power over any carrier that wants travel agents subscribing to that CRS to sell its airline tickets." (*Id.* at 987, NW App. at 013) (quoting 67 Fed. Reg. 69376) (emphasis added).[14]

---

[14] Sabre's primary cases involved market definitions that did not include all reasonably interchangeable products. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), for example, involved a product market defined as the aftermarket for sales of supplies to Domino's franchisees. The court rejected the market definition as too narrow because it was "the availability of interchangeable ingredients of comparable quality from other suppliers, at lower cost, [that] motivates this lawsuit. Thus, the relevant market . . . cannot be restricted solely to those products currently approved by Domino's pizza." *Id.* at 438. *Hack v. President and Fellows of Yale College*, 237 F.3d 81 (2d Cir. 2000), involved allegations by Yale students that Yale monopolized a market confined to "student housing in New Haven" based on a policy requiring unmarried freshmen and sophomores to live in on-campus housing. *Id.* at 85. Plaintiffs failed to allege a relevant market because the policy was fully disclosed before

16

Finally, Sabre contends that Northwest's allegation that its own dedicated web site provides an alternative to Sabre amounts to an admission of a "much broader product market." (Sabre Br. at 17). However, currently available technologies that would permit travel agency subscribers of Sabre to by-pass its GDS are no more than fringe competitors (*id.* ¶¶ 32-35) and, as Northwest has alleged, Sabre's exclusionary conduct was designed to ensure that they remain no more than that.

### 2. *Northwest has properly alleged a causal connection between Sabre's violation and Northwest's injury.*

Once again ignoring 12(b)(6) standards, Sabre argues that Northwest's Shared GDS Fee failed not because of anything Sabre did, but because other airlines didn't match the initiative.[15] Sabre ignores Northwest's allegations that no other airline dared follow suit because Sabre cowed them into continued submission. (*See* FAC ¶¶ 40, 50, 54.)

Sabre may argue at trial that Northwest's policy would have failed even if Sabre had not retaliated against Northwest and publicly threatened to retaliate against any other airlines that had the temerity to adopt a similar policy. But that is an argument to be resolved on an evidentiary record by the finder of fact – not by the Court on a 12(b)(6) motion.

### 3. *Northwest has properly alleged that Sabre unlawfully maintained monopoly power through anticompetitive conduct and caused Northwest to suffer antitrust injury.*

Sabre's argument that allegations of supracompetitive prices "without supporting allegations of anticompetitive conduct cannot add up to the missing antitrust allegations" (Sabre's Br. at 18) is a red herring. Northwest has not alleged that Sabre's monopoly power or its monopolistic pricing, standing alone, violates the antitrust laws. Rather, Northwest alleges that Sabre has unlawfully *maintained* its monopoly power (and the concomitant ability to charge monopoly prices) through the

---

enrollment and, if dissatisfied with the policy, students had the option of going to another school. *Davies v. Genesis Med. Ctr.*, 994 F. Supp. 1078 (S.D. Iowa 1998), alleged a market consisting of cardiac anesthesiology services, but there was no allegation that cardiac anesthesiologists were not interchangeable with other anesthesiologists.

[15] In footnote 25 of its brief, Sabre cites three cases in which a plaintiff failed because it did not establish causation. Those cases were not decided on motions to dismiss. *Brunswick* was decided after completion of trial, and *Bell* and *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir. 1984), were decided on Rule 56 motions.

exclusionary conduct (none of which is mentioned by Sabre) that is painstakingly detailed in the Complaint.[16] (FAC ¶¶ 37-40, 45, 48.) As summarized previously, Sabre altered and manipulated its display of information about Northwest's flights, fares, and seat availability in order to put Northwest at a competitive disadvantage to other airlines, and threatened other carriers with similar treatment if they dared to match Northwest's initiative.

Sabre's anticompetitive conduct worked: Northwest was forced to withdraw its Shared GDS Fee initiative, and Sabre preserved its monopoly power against the threat of competition from potential alternatives to the Sabre GDS that Northwest's initiative would have unleashed. (*Id.* ¶¶ 52, 53). As a direct consequence of Sabre's anticompetitive conduct, potentially viable competitive alternatives to Sabre were squelched, and Northwest was forced to continue to pay not only the monopolistic booking fees charged by Sabre, but the equally inflated fees charged by other GDSs. (*Id.* ¶¶ 53, 54). These allegations add up to antitrust injury. *See Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977) ("antitrust injury" is injury "reflect[ing] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation").

Sabre also denies it has monopoly power because (1) Northwest's "ersatz monopoly allegations are inconsistent with more recent pronouncements by DOT" and (2) "the Sabre prices complained of are the result of Northwest's successful negotiations with Sabre to achieve a *discounted* GDS price in July 2003." (Sabre Br. at 19, 20) (emphasis in original). As an initial matter, whether Sabre possesses monopoly power that is reflected in its prices is ultimately a factual question that cannot be resolved at this stage in the litigation.[17] For now it is enough that Northwest has

---

[16] Bizarrely, Sabre faults Northwest for not filing "an antitrust complaint after entering into the Agreement of July 2003" with Sabre and for not including antitrust claims in its initial complaint filed on August 25, 2004. (Sabre Br. at 19-20). As already discussed, however, Northwest's antitrust claims are based on Sabre's anticompetitive *conduct*, which was not implemented until September 1, 2004. And even if Northwest could have filed antitrust claims based only on Sabre's threats (made the day before), there is no requirement that a plaintiff state all of its claims in the initial complaint. Indeed, the Federal Rules expressly contemplate just such amendments as Northwest filed.

[17] *See, e.g., Envirosource, Inc. v. Horsehead Resource Dev. Cop.*, 1996 WL 363091, *12 (S.D.N.Y. July 1, 1996) ("Whether monopoly power actually exists is a question of fact to be determined at trial or on a motion for

properly alleged that Sabre has monopoly power in a properly defined relevant market.

Sabre's selective reliance on "more recent pronouncements by DOT" for the absence of monopoly power is puzzling. None of the quotations Sabre has lifted from DOT's CRS rulemaking comes close to suggesting that Sabre lacks monopoly power;[18] nor do they contradict Northwest's allegations that Sabre's monopoly power allows it to charge supracompetitive prices. More importantly, DOT's "more recent pronouncements" in fact could hardly be *more supportive* of the allegations in the Complaint. As to Sabre's ability to charge monopoly prices, while DOT acknowledged that two of the four GDSs "made modest concessions in exchange for access to airline webfares," (the *"discounted* GDS price in July 2003" to which Sabre refers), DOT concluded that "[w]e have not seen evidence that the systems' fees generally respond to market forces." (CRS Rulemaking, 69 Fed. Reg. at 990, NW App. at 016). DOT concluded that GDSs (including Sabre) have monopoly power and found no reason to question its earlier finding that GDSs charged supracompetitive booking fees:

- *"We find that the systems continue to have market power over airlines*, as argued by the Justice Department . . . and that systems could engage in practices that could unreasonably preserve their market power." (*Id.* at 986, NW App. at 012) (emphasis added). *See also id.* at 989-90, NW App. at 014-15.

- *"When we last compared the systems' prices with their costs, we concluded that the larger systems at least were charging supracompetitive prices.* [citation omitted] We have not done such an analysis since then, as we noted in our notice, but stated *our belief that the systems'*

---

summary judgment by assessing whether [defendant] can control prices or exclude competition.") (citing *Frito-Lay v. Bachman Co.*, 659 F. Supp. 1129, 1139 (S.D.N.Y. 1986)); *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 872 F. Supp. 52 (S.D.N.Y. 1994) (denying motion to dismiss based on argument defendant lacked monopoly power because "such a ruling is only possible after all of the facts have been developed, either on a motion for summary judgment or after trial").

[18] Ironically, one of the DOT quotations in Sabre's brief indicates to the contrary: "'[T]he [GDS] systems' exercise of *their ability to charge monopoly level prices* to one set of airline users—does not violate antitrust principles or the antitrust laws.'" (Sabre Br. at 20) (emphasis added). Northwest agrees with this statement—merely charging monopoly prices does not violate the antitrust laws unless, as here, such charges are accompanied by anticompetitive conduct.

Sabre also lifts out of context DOT's statement that it had made no "finding" that "each system's" booking fees exceed the system's cost of providing service. DOT made that statement in response to a suggestion by America West that DOT regulate GDS prices, and was merely explaining that it had an insufficient record on which to support such a remedy. Nonetheless, consistent with the quotes in the text above, DOT stated in the course of that same discussion: "We have seen no indication that market forces discipline the price or terms for CRS services provided airlines." (Sabre App. at 096.)

*booking fees were probably above competitive levels, because they were not disciplined by market force.*" (*Id.*) (emphasis added).

- "The airline commenters generally support *our finding that booking fees are not disciplined by competition* and contend that the fees substantially exceed competitive levels." (*Id.*) (emphasis added)

- "*We continue to believe that the systems' fees exceed competitive levels* for the reasons set forth in the notice of proposed rulemaking." (*Id.*) (emphasis added).

Sabre's argument that it cannot have monopoly power because it negotiated a discounted price with Northwest in exchange for access to Northwest's web fares is equally wide of the mark. First, Sabre mistakes monopoly power for the *absolute* power to demand whatever it wishes from its customers without any compensation. Monopoly power is simply the sustained ability to charge prices above competitive levels. *See, e.g., Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1182 n.60 (1st Cir. 1994) (evidence of monopoly power existed where defendant charged "supra-competitive" prices); *American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569 (11th Cir. 1985) ("'Monopoly' power exists in a geographic market if one competitor has the power to raise prices to supra-competitive levels . . . ."). In return for the discounted per-transaction price offered to Northwest, Sabre received access to all of Northwest's web fares, obtaining the ability to charge booking fees to Northwest for bookings that were previously exclusively available through Northwest's web site.[19] The result was that Northwest paid a lower per-transaction fee in return for obtaining services (GDS display of web fares) that Northwest did not want or need. This may or may not have been an improvement of the previous situation from Northwest's point of view, but whether it was or not says nothing about whether the revised deal also reflects Sabre's monopoly power.

Thus, although Sabre's monopoly power may not be absolute, it is monopoly power nonetheless. The DOT acknowledged the "discounted" prices that Sabre made available in exchange for access to airline web fares and characterized them as "modest concessions." But it still concluded

---

[19] Because Sabre was now able to charge Northwest booking fees for bookings that previously escaped such fees, Sabre's monopoly profits may have actually increased as a result of the "discount" even though the per transaction fee was somewhat lower.

"that the systems' fees exceed competitive levels for the reasons set forth in the notice of proposed rulemaking." (69 Fed. Reg. at 990, NW App. at 016).

C. **Northwest's Minnesota State Law Claims Are Neither Preempted By The Airline Deregulation Act ("ADA") Nor Barred By The Agreement's Choice-Of-Law Provision.**

1. *The ADA does not preempt an airline's state law claims against a non-airline.*

    a. *The ADA applies to air carriers, not to non-airline GDS providers.*

Sabre argues that the ADA, 49 U.S.C. § 41713(b)(1) (formerly 49 U.S.C. § 1305(a)(1)) preempts Northwest's Minnesota state law statutory and tort claims. Congress enacted the ADA to preempt state efforts to regulate air carriers in areas – "prices, routes, and services" – where Congress had determined that only deregulation or federal regulation was appropriate to enhance competition and efficiency among *airlines. See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 378 (1992). Thus, the ADA applies only if Northwest's state law claims "relate[] to a price, route, or service of an *air carrier.*" 49 U.S.C. § 41713(b)(1) (emphasis added). They don't.

Sabre is a GDS provider, not an air carrier. Moreover, Northwest does not allege that Sabre's anticompetitive actions were intended to reduce competition among *airlines,* but to preserve Sabre's monopoly power against competition from potential competitive alternatives to the Sabre GDS. On its face, the ADA cannot be read to preempt state laws barring a *non-airline* from misrepresenting an air carrier's flight availability and ticket prices to consumers in order to preserve its monopoly power in a *non-airline* market.[20]

    b. *Cases applying the ADA to preempt state law claims against airline-owned GDS providers or an airline's agents are inapplicable.*

Sabre relies primarily on two cases where courts applied the ADA to preempt state law claims involving GDS providers. *See* Sabre Br. at 22-23 (citing *Lyn-Lea Travel Corp. v. American Airlines,* 283 F.3d 282 (5th Cir. 2002) and *Frontier Airlines, Inc. v. United Airlines,* 758 F. Supp. 1399 (D. Colo. 1989)). Neither supports Sabre's preemption argument. In both cases the plaintiffs

---

[20] Under Sabre's reasoning, a conspiracy among oil companies to increase the price of jet fuel to airlines would also be immune from state antitrust claims by virtue of the ADA – a plainly absurd result.

21

sued *airline* owners of GDSs and challenged conduct engaged in by *the airlines*.

In *Lyn-Lea Travel*, the plaintiff travel agency sued *American Airlines*, then owner of the Sabre GDS, as a result of changes in American's "domestic commission schedule that dramatically reduced the commissions paid to travel agencies." 283 F.3d at 284. Prior to this change, *American* had renegotiated *its* contract with Lyn-Lea Travel for GDS services provided through Sabre. Lyn-Lea Travel contended that *American's* failure to disclose its forthcoming changes in commissions constituted tortious interference, fraud, and a violation of the Texas Deceptive Trade Practices Act *by American*. *Id.* at 285. After American spun-off its ownership interest in Sabre, Sabre was "assigned all rights to the Sabre CRS Agreement and succeeded American as defendant and counter-plaintiff." *Id.* at n. 2. In *Frontier Airlines*, a low fare airline competitor of United Airlines sued *United Airlines*, then owner of the Apollo GDS, alleging "that through a variety of practices [using the Apollo system] articulated in the complaint, *United* undertook an ongoing scheme to divert passengers from Frontier to *United* in relation to transportation through Denver, a 'hub' for flights of both airlines." 758 F. Supp. at 1403 (emphasis added).

This case could hardly be more different. Northwest has brought its claims only against Sabre – a non-airline GDS – and does not challenge any airline's conduct. Further, the airline ownership of GDSs that existed when *Lyn-Lea Travel* and *Frontier Airlines* were decided no longer exists today. In the absence of such ownership or any agency relationship[21] between Sabre and any airline, Sabre's conduct is no longer covered by the preemption language of the ADA and is fully subject to state law remedies for deceptive conduct to the same extent as anyone else.

---

[21] Sabre does not claim to be an agent of Northwest's or of any other airline and, indeed, has disclaimed any such relationship in DOT's CRS rulemaking: Citing to its Participating Carrier Agreement, Sabre averred that "there is nothing in [the PCA] creating an agency relationship between Sabre and its participating air carriers. . . The [PCA] specifically describes this relationship between the parties as that of an independent contractor." *In re Computer Reservation System (CRS) Regulations; Statements of General Policy,* Dockets Nos. OST-97-2881, OST-97-3014, OST-98-4775, and OST-99-5888, Comments of Sabre Inc. at 24 (Mar. 17, 2003) (NW App. at 024) ("Sabre's DOT Comments"). In short, Sabre describes itself as "a non-agent independent contractor providing an information service to airlines for the benefit of travel agents." *Id.* at 25, NW App. at 025.

    *c.   Recent federal deregulation of GDS providers underscores the ADA's inapplicability.*

The ADA is intended to ensure that only the federal government can regulate airlines. But as the DOT has recently ruled, and as Sabre itself argued to the DOT, GDSs no longer fall within the exclusive purview of the federal government because airlines no longer control GDSs. Indeed, both *Lyn-Lea Travel* and *Frontier Airlines* based their preemption holdings on DOT's regulation of GDSs as well as air carriers. *See Lyn-Lea Travel Corp.,* 283 F.3d at 288-89 (quoting *Frontier Airlines,* 758 F. Supp. at 1409, and holding that legislative history and the existence of federal regulations regarding airline GDS services supported preemption).

Originally, the DOT regulated GDSs pursuant to its authority to regulate air carriers. *See* 14 C.F.R. § 255.1-255.8, yet just last year the DOT completed a major rulemaking proceeding deregulating GDSs. (*See* CRS Rulemaking, *supra*.) The primary development on which DOT relied was the divestiture by airlines of their ownership interests in GDSs − undermining not only the rationale for the regulations, but a key underpinning of the holdings in *Frontier Airlines* and *Lyn-Lea Travel*: "The major predicate of the rules has always been the systems' control by airlines. The U.S. airlines' divestiture of their ownership interests has eliminated that basis for the rules." (*Id.,* 69 Fed. Reg. at 977, NW App. at 003.)[22]

In advocating deregulation before DOT, Sabre went even further. It argued not only that the airline divestitures destroyed the rationale for regulation, but also that the absence of airline ownership *eliminated DOT's jurisdiction over GDSs*. Thus, Sabre contended that not only did the rules no longer serve the purpose for which they were intended, but that, as a result of the airlines' divestiture of their interests in the GDSs, the DOT *no longer had the power to regulate Sabre or the other GDSs. (See* Sabre's DOT Comments, *supra,* at 21-22, NW App. at 022-23) ("The Department Of Transportation Does Not Have Authority To Regulate Independent Computer Reservation

---

[22] DOT described the principal rationale for the rules as follows: "The airlines that controlled the systems had the incentive and ability to use them to prejudice the competitive position of non-owner airlines and to provide information on airline services through the systems to travel agents that gave an undue preference to the services operated by the owner airlines." (CRS Rulemaking, 69 Fed. Reg. at 977, NW App. at 003.)

Systems Not Owned Or Controlled By U.S. Or Foreign Airlines . . . . When Sabre and Galileo divested themselves of airline ownership in 2000 and 2001, the CRS Regulations did not apply to them."). Although the DOT did not fully adopt Sabre's jurisdictional argument, it did accept Sabre's recommendation to eliminate all of the regulations that previously precluded the type of display bias that Sabre has now used against Northwest. Having persuaded DOT to discontinue the very federal regulations that were previously the substitute for state law remedies, Sabre should not be heard to complain that it is now subject to those state laws. To accept Sabre's position would be to accept that its conduct is not subject to any law. That cannot be.

### 2.  *Texas law does not apply to Northwest's claims for statutory violations.*

Sabre also argues that Northwest's Minnesota statutory causes of action[23] should be dismissed because the Agreement provides that Texas law applies, and therefore claims based on Minnesota statutes cannot lie. Sabre misapplies the case law. The Minnesota statutory claims are not claims arising under the contract, and therefore it does not govern the choice of law applicable to those claims.

A federal court applies the forum state's choice of law to determine the applicability of a contractual choice of law provision. *See Sommer Drug Stores Co. v. Corrigan*, 883 F.2d 345, 353 (5th Cir. 1989); *Florida State Bd. of Admin. v. Law Eng. and Env. Serv., Inc.*, 262 F. Supp. 2d 1004, 1012 (D. Minn. 2003). Because the FAC was filed in Minnesota, Minnesota law governs the contractual choice of law provision. *See Ferens v. John Deere Co.*, 494 U.S. 516, 523-25 (1990).

Such provisions govern non-contract claims only where the claims "are closely related to the interpretation of the contracts and fall within the ambit of the express agreement that the contracts would be governed by [specified state] law." *Northwest Airlines v. Astraea Aviation Serv.*, 111 F.3d 1386, 1392 (8th Cir. 1997). As the Eighth Circuit more recently described Minnesota law, a choice of

---

[23] Although Sabre moves to dismiss Northwest's "Third and Fourth Claims for Statutory Violations" on this ground (Sabre Br. at 24), Northwest's Minnesota statutory claims are actually the Fourth and Fifth Causes of Action in the FAC. Sabre does not address the Third Cause of Action, for tortious interference with prospective contractual relations.

law provision applies to non-contract claims only where "analysis of the claims connected to the contract involves interpretation of the contract." *See Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1061 (8th Cir. 2003).

Although Sabre baldly claims that Northwest's statutory claims involve interpretation of the contract, it neither refers to the contract nor explains how the contract could possibly excuse Sabre's deception. In addition, while Sabre cites *Astraea* and *Holden Farms*, Sabre fails to note that the *Astraea* court *did not* apply the choice of law provision at issue there to the slander, defamation and libel claims. *See Astraea*, 111 F.3d at 1393. Thus, in contrast to claims based upon "negligent performance," "failure to provide functioning parts," or "compensation" – which fell within the contract – claims of libel and defamation fell outside the contract. *See id.* Here, Northwest's statutory claims are based not upon poor performance under the contract, but upon Sabre's misrepresentations concerning Northwest's flights and fares. No contractual interpretation is necessary, and the choice of law provision does not apply. Accordingly, Sabre's motion to dismiss on the basis of the contractual choice of law provision must fail.[24]  In the alternative, should the Court accept Sabre's argument that the contractual choice-of-law provision governs and bars Northwest's Minnesota law claims, Northwest requests leave of Court to amend its complaint to plead the comparable state law claims under the law of Texas.

## IV. CONCLUSION

Northwest respectfully requests that the Court deny Sabre's motion to dismiss in its entirety.

DATED:  February 25, 2005                    SUSMAN GODFREY LLP

By _____
Parker C. Folse, III
1201 Third Avenue, Suite 3100
Seattle, WA 98101
Telephone: (206) 516-3860

---

[24] Sabre's memorandum makes no other arguments as to why Texas law would apply to the statutory claims of Northwest – a Minnesota resident. While Northwest does not undertake to fully analyze Minnesota choice of law principles here, Minnesota's five-factor test supports the application of Minnesota law to these claims. *See, e.g.*, *Astraea*, 111 F.3d at 1393-95.

25

Jonathan T. Suder
FRIEDMAN, SUDER & COOKE
604 East Fourth Street, Suite 200
Fort Worth, TX 76102
(817) 334-0400

Thomas Tinkham
Theresa M. Bevilacqua
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600

James P. Denvir
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, D.C. 20015
Telephone: (202) 895-7500

**Attorneys for
Northwest Airlines, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2005, I electronically filed the foregoing document with the clerk of the court for the U.s. District Court, Northern District of Texas, using the electronic filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

Barry C. Barnett
Theresa M. Bevilacqua
Frank J. Riebli
Neil A. Goteiner
Chris Lind
Ryan Laurence Nelson
Eric R. Olson
Laura Cullen Roche
Roderick M. Thompson
Thomas Tinkham
R.H. Wallace, Jr.

Parker C. Folse, III
1201 Third Avenue, #3100
Seattle, WA 98101
Telephone: (206) 516-3860

Jonathan T. Suder
FRIEDMAN, SUDER & COOKE
604 East Fourth Street, Suite 200
Fort Worth, TX 76102
(817) 334-0400

Thomas Tinkham
Theresa M. Bevilacqua
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

James P. Denvir
BOIES, SCHILLER & FLEXNER LP
5301 Wisconsin Avenue, NW, #800
Washington, D.C. 20015
Telephone: (202) 895-7500

**Attorneys for**
**Northwest Airlines, Inc.**